[IN ACCORDANCE WITH CALIFORNIA INSURANCE CODE (CIC) SECTION 12938,
THIS REPORT WILL BE MADE PUBLIC AND PUBLISHED ON THE
CALIFORNIA DEPARTMENT OF INSURANCE (CDI) WEBSITE]

# WEBSITE PUBLISHED REPORT OF THE MARKET CONDUCT EXAMINATION OF THE CLAIMS PRACTICES OF

# LINCOLN NATIONAL LIFE INSURANCE COMPANY (THE)
# NAIC # 65676 CDI # 0585-0

# FIRST PENN-PACIFIC LIFE INSURANCE COMPANY
# NAIC # 67652 CDI # 1975-2

**AS OF JUNE 30, 2015**

## ADOPTED DECEMBER 5, 2017

## STATE OF CALIFORNIA

## CALIFORNIA DEPARTMENT OF INSURANCE
## MARKET CONDUCT DIVISION
## FIELD CLAIMS BUREAU

790.03 v5 02-16-16

# NOTICE

**<u>The provisions of Section 735.5(a) (b) and (c) of the California Insurance Code (CIC) describe the Commissioner's authority and exercise of discretion in the use and/or publication of any final or preliminary examination report or other associated documents. The following examination report is a report that is made public pursuant to California Insurance Code Section 12938(b)(1) which requires the publication of every adopted report on an examination of unfair or deceptive practices in the business of insurance as defined in Section 790.03 that is adopted as filed, or as modified or corrected, by the Commissioner pursuant to Section 734.1.</u>**

790.03 v5 02-16-16

## TABLE OF CONTENTS

FOREWORD .......... 1
SCOPE OF THE EXAMINATION .......... 2
EXECUTIVE SUMMARY .......... 4
DETAILS OF THE CURRENT EXAMINATION .......... 6
TABLE OF TOTAL ALLEGED VIOLATIONS .......... 8
SUMMARY OF EXAMINATION RESULTS .......... 16

## FOREWORD

This report is written in a "report by exception" format. The report does not present a comprehensive overview of the subject insurer's practices. The report contains a summary of pertinent information about the lines of business examined, details of the non-compliant or problematic activities that were discovered during the course of the examination and the insurer's proposals for correcting the deficiencies. When a violation that reflects an underpayment to the claimant is discovered and the insurer corrects the underpayment, the additional amount paid is identified as a recovery in this report.

While this report contains violations of law that were cited by the examiner, additional violations of CIC § 790.03 or other laws not cited in this report may also apply to any or all of the non-compliant or problematic activities that are described herein.

All unacceptable or non-compliant activities may not have been discovered. Failure to identify, comment upon or criticize non-compliant practices in this state or other jurisdictions does not constitute acceptance of such practices.

Alleged violations identified in this report, any criticisms of practices and the Companies' responses, if any, have not undergone a formal administrative or judicial process.

This report is made available for public inspection and is published on the California Department of Insurance website (www.insurance.ca.gov) pursuant to California Insurance Code section 12938(b)(1).

## SCOPE OF THE EXAMINATION

Under the authority granted in Part 2, Chapter 1, Article 4, Sections 730, 733, and 736, and Article 6.5, Section 790.04 of the California Insurance Code; and Title 10, Chapter 5, Subchapter 7.5, Section 2695.3(a) of the California Code of Regulations, an examination was made of the claim handling practices and procedures in California of:

**Lincoln National Life Insurance Company (The)**
**NAIC # 65676**

**First Penn-Pacific Life Insurance Company**
**NAIC # 67652**

**Group NAIC # 0020**

Hereinafter, the Companies listed above will also be referred to individually as LNLIC, FPPLIC, or the Company, and collectively as the Companies.

This examination covered the claim handling practices of the aforementioned Companies on Life, Annuity, Long Term Care (LTC) as a Life Policy Rider, Disability Income Insurance, Supplemental Disability (Accident Only and Critical Illness), and Dental claims closed during the period from July 1, 2014 through June 30, 2015. The examination was made to discover, in general, if these and other operating procedures of the Companies conform to the contractual obligations in the policy forms, the California Insurance Code (CIC), the California Code of Regulations (CCR) and case law.

To accomplish the foregoing, the examination included:

1. A review of the guidelines, procedures, training plans and forms adopted by the Companies for use in California including any documentation maintained by the Companies in support of positions or interpretations of the California Insurance Code, the Fair Claims Settlement Practices Regulations, and other related statutes,

regulations and case law used by the Companies to ensure fair claims settlement practices.

2. A review of the application of such guidelines, procedures, and forms, by means of an examination of a sample of individual claim files and related records.

3. A review of the California Department of Insurance's (CDI) market analysis results; and if any, a review of consumer complaints and inquiries about these Companies closed by the CDI during the period July 1, 2014 through June 30, 2015, a review of previous CDI market conduct claims examination reports on these Companies; and a review of prior CDI enforcement actions.

The review of the sample of individual claim files was conducted at the offices of the California Department of Insurance in Sacramento, California.

## EXECUTIVE SUMMARY

The Life, Annuity, Long Term Care (LTC), Disability Income, Supplemental Disability, and Dental claims reviewed were closed from July 1, 2014 through June 30, 2015, referred to as the "review period". The examiners randomly selected 301 LNLIC claim files and 45 FPPLIC claim files for examination. The examiners cited 786 alleged claims handling violations of the California Insurance Code and the California Code of Regulations from this sample file review.

This examination included findings in Life, Annuity, Long Term Care (LTC), Disability Income Insurance, Supplemental Disability, and Dental claims.

The Department conducted a market analysis review of consumer complaints, enforcement actions in other states, previous examinations, and prior CDI enforcement actions. There was no specific area of concern identified in the previous claims examination and there have been no previous CDI enforcement actions.

LNLIC was the subject of one justified California consumer complaint closed from July 1, 2014 through June 30, 2015 in regard to the Life line of business. The complaint resolution revealed that LNLIC failed to notify the beneficiary of the specified rate of interest paid on the death benefit. The examiner focused on this issue during the course of file review.

Findings in this examination in the Life line of business included: the failure to provide a clear explanation of the computation of benefits; the failure to provide all required written disclosures prior to the establishment of a retained asset account; and the failure to notify the beneficiary of the specified rate of interest paid on the death benefit.

Findings in this examination in the Annuity line of business included: the failure to provide a clear an explanation of the computation of benefits; the failure to notify the

beneficiary of the specified rate of interest paid on the death benefit; and the failure of the Company to follow its standard procedure.

Findings in this examination in the Long Term Care line of business included: the failure to provide a clear explanation of the computation of benefits; the failure to disclose all benefits, coverage, time limits or other provisions of the insurance policy that may apply to the claim; and, the attempt to settle a claim by making a settlement offer that was unreasonably low.

Findings in this examination in the Disability Income Insurance line of business included: the failure to provide a clear explanation of the computation of benefits; the failure to disclose all benefits, coverage, time limits or other provisions of the insurance policy that may apply to the claim; and, the failure to conduct and diligently pursue a thorough, fair and objective investigation.

Findings of this examination in the Supplemental Disability line of business included: the failure to provide a clear explanation of the computation of benefits; the failure to follow its own procedure; and, the failure to effectuate a fair and equitable settlement of a claim.

Findings of this examination in the Dental line of business included: the misrepresentation of an insurance policy provision in the reason for a denial; and, the failure to respond to communications within 15 calendar days.

## DETAILS OF THE CURRENT EXAMINATION

Further details with respect to the examination and alleged violations are provided in the following tables and summaries:

| LNLIC SAMPLE FILES REVIEW | | | |
|---|---|---|---|
| **LINE OF BUSINESS / CATEGORY** | **CLAIMS IN REVIEW PERIOD** | **SAMPLE FILES REVIEWED** | **NUMBER OF ALLEGED VIOLATIONS** |
| Life / Individual Life / Paid | 1,084 | 40 | 65 |
| Life / Group Life / Paid | 515 | 19 | 40 |
| Life / Individual and Group Life / Denied | 5 | 5 | 7 |
| Annuities / Lump Sum Death Benefit – Individual Annuities | 1,608 | 22 | 48 |
| Annuities / Lump Sum Death Benefit – Group Annuities | 147 | 3 | 0 |
| Long Term Care / Individual Life LTC Rider / Paid and Denied | 137 | 24 | 278 |
| Long Term Care / Individual Life LTC Rider / Rescission | 1 | 1 | 1 |
| Disability Income Insurance / Group Short Term Disability | 4,034 | 15 | 6 |
| Disability Income Insurance / Group Long Term Disability | 656 | 55 | 104 |
| Disability Income Insurance / Individual Disability Income | 23 | 17 | 5 |
| Supplemental Disability / Accident Only Indemnity | 231 | 16 | 18 |
| Supplemental Disability / Critical Illness | 191 | 14 | 0 |
| Dental / Group Paid | 73,673 | 25 | 0 |
| Dental / Group Partially Approved* | 16,670 | 20 | 1 |
| Dental / Group Denied | 11,587 | 15 | 0 |

| LNLIC SAMPLE FILES REVIEW | | | |
|---|---|---|---|
| **LINE OF BUSINESS / CATEGORY** | **CLAIMS IN REVIEW PERIOD** | **SAMPLE FILES REVIEWED** | **NUMBER OF ALLEGED VIOLATIONS** |
| Dental / Group Appeal | 172 | 10 | 1 |
| **TOTALS** | 110,734 | 301 | 574 |

*A portion of the claim was approved and a portion was denied.

| FPPLIC SAMPLE FILES REVIEW | | | |
|---|---|---|---|
| **LINE OF BUSINESS / CATEGORY** | **CLAIMS IN REVIEW PERIOD** | **SAMPLE FILES REVIEWED** | **NUMBER OF ALLEGED VIOLATIONS** |
| Life / Individual Life / Paid | 306 | 11 | 13 |
| Life / Individual Life / Denied | 2 | 2 | 0 |
| Annuities / Lump Sum Death Benefit - Individual Annuities | 12 | 0 | 0 |
| Long Term Care / Individual Life LTC Rider / Paid and Denied | 180 | 32 | 199 |
| **TOTALS** | 500 | 45 | 212 |

## TABLE OF TOTAL ALLEGED VIOLATIONS

| Citation | Description of Allegation | LNLIC Number of Alleged Violations | FPPLIC Number of Alleged Violations |
|---|---|---|---|
| CCR §2695.11(b) *[CIC §790.03(h)(3)] | The Company failed to provide to the claimant and assignee, if any, an explanation of benefits including, where applicable, the name of the provider or services covered and dates of service, and a clear explanation of the computation of benefits with each claim payment. | 332 | 169 |
| CCR §2695.4(a) *[CIC §790.03(h)(1)] | The Company failed to disclose all benefits, coverage, time limits or other provisions of the insurance policy. | 44 | 13 |
| CCR §2695.7(d) *[CIC §790.03(h)(3)] | The Company failed to conduct and diligently pursue a thorough, fair and objective investigation. | 26 | 5 |
| | The Company persisted in seeking information not reasonably required for or material to the resolution of a claims dispute. | 6 | 0 |
| CIC §10172.5(c) *[CIC §790.03(h)(3)] | The Company failed to notify the beneficiary that interest will be paid. | 34 | 0 |
| CIC §10509.937 *[CIC §790.03(h)(1)] | The Company failed to provide all required written disclosures prior to the establishment of a retained asset account (RAA). | 20 | 6 |
| CIC §790.03(h)(3) | The Company failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies. | 18 | 2 |
| CCR §2695.7(c)(1) *[CIC §790.03(h)(3)] | The Company failed to provide written notice of the need for additional time or information every 30 calendar days. | 18 | 2 |
| CCR §2695.7(g) *[CIC §790.03(h)(5)] | The Company attempted to settle a claim by making a settlement offer that was unreasonably low. | 13 | 7 |
| CCR §2695.5(e)(2) *[CIC §790.03(h)(3)] | The Company failed to acknowledge notice of claim within 15 calendar days. | 14 | 2 |

| Citation | Description of Allegation | LNLIC Number of Alleged Violations | FPPLIC Number of Alleged Violations |
| --- | --- | --- | --- |
| CCR §2695.7(b)(3) *[CIC §790.03(h)(3)] | The Company failed to include a statement in its claim denial that, if the claimant believes all or part of the claim has been wrongfully denied or rejected, he or she may have the matter reviewed by the California Department of Insurance, and/or failed to include the address and telephone number of the unit of the Department which reviews claims practices. | 9 | 2 |
| CIC §790.03(h)(5) | The Company failed to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear. | 9 | 0 |
| CIC §790.03(h)(1) | The Company misrepresented to claimants pertinent facts or insurance policy provisions relating to any coverages at issue. | 8 | 0 |
| CIC §1879.2(a) *[CIC §790.03(h)(3)] | The Company failed to include the California fraud warning on insurance forms related to first-party claimants. | 4 | 0 |
| CCR §2695.5(b) *[CIC §790.03(h)(2)] | The Company failed to respond to communications within 15 calendar days. | 2 | 1 |
| CCR §2695.5(e)(1) *[CIC §790.03(h)(2)] | The Company failed to provide necessary forms, instructions, and reasonable assistance within 15 calendar days. | 2 | 1 |
| CCR §2695.3(b)(1) *[CIC §790.03(h)(3)] | The Company failed to maintain claims data that are accessible, legible and retrievable for examination for the current year and the four preceding years. | 2 | 0 |
| CCR §2695.5(e)(3) *[CIC §790.03(h)(3)] | The Company failed to begin any necessary investigation of the claim within 15 calendar days. | 1 | 1 |
| CCR §2695.7(b) *[CIC §790.03(h)(4)] | The Company failed, upon receiving proof of claim, to accept or deny the claim within 40 calendar days. | 1 | 1 |
| CCR §2695.7(b)(1) *[CIC §790.03(h)(13)] | The Company failed to provide in writing the reasons for the denial of the claim in whole or in part including the factual and legal bases for each reason given. | 2 | 0 |

| Citation | Description of Allegation | LNLIC Number of Alleged Violations | FPPLIC Number of Alleged Violations |
|---|---|---|---|
| CIC §790.03(h)(2) | The Company failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies. | 1 | 0 |
| CIC §790.03(h)(4) | The Company failed to affirm or deny coverage of claims within a reasonable time after proof of loss requirements had been completed and submitted by the insured. | 1 | 0 |
| CIC §10111.2(b) *[CIC §790.03(h)(3)] | The Company failed to notify the insured in writing of information needed to determine liability within 30 calendar days after receipt of the claim. | 1 | 0 |
| CIC §10111.2(b) *[CIC §790.03(h)(5)] | The Company failed to accrue interest on the benefit payment beginning the 31st calendar day after receipt of the claim. | 1 | 0 |
| CIC §10111.2(c) *[CIC §790.03(h)(5)] | The Company failed to pay interest on a benefit payment that was not paid within 30 calendar days from receipt of information needed to determine liability. | 1 | 0 |
| CIC §10172.5(a) *[CIC §790.03(h)(5)] | The Company failed to pay interest on a death claim, under a disability policy, that was paid longer than 30 days from the date of death of the insured, pursuant to CIC §10174. | 1 | 0 |
| CIC §10172.5(b) *[CIC §790.03(h)(5)] | The Company delayed payment for a period longer than reasonably necessary. | 1 | 0 |
| CIC §10235.95(b) *[CIC §790.03(h)(5)] | The Company failed to pay interest at a rate of 10% per annum on the amount of any accepted claim beginning on the first calendar day after the day that the payment of the accepted claim was due. | 1 | 0 |
| CCR §2695.7(h) *[CIC §790.03(h)(5)] | The Company failed, upon acceptance of the claim, to tender payment within 30 calendar days. | 1 | 0 |
| **Total Number of Alleged Violations** | | **574** | **212** |

***DESCRIPTIONS OF APPLICABLE
UNFAIR CLAIMS SETTLEMENT PRACTICES**

| | |
|---|---|
| CIC §790.03(h)(1) | The Company misrepresented to claimants pertinent facts or insurance policy provisions relating to any coverages at issue. |
| CIC §790.03(h)(2) | The Company failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies. |
| CIC §790.03(h)(3) | The Company failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies. |
| CIC §790.03(h)(4) | The Company failed to affirm or deny coverage of claims within a reasonable time after proof of loss requirements had been completed and submitted by the insured. |
| CIC §790.03(h)(5) | The Company failed to effectuate prompt, fair, and equitable settlements of claims in which liability had become reasonably clear. |
| CIC §790.03(h)(13) | The Company failed to provide promptly a reasonable explanation of the bases relied upon in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement. |

## TABLE OF ALLEGED VIOLATIONS BY LINE OF BUSINESS

| **LIFE**<br>**LNLIC 2014 Written Premium: $661,146,809**<br>**FPPLIC 2014 Written Premium: $21,505,511**<br>**LNLIC 2015 Written Premium: $689,266,888**<br>**FPPLIC 2015 Written Premium: $21,170,592**<br>**(Includes Written Premium for Long Term Care Life Policy Rider)**<br><br>**AMOUNT OF RECOVERIES $11,549.91** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CCR §2695.11(b) [CIC §790.03(h)(3)] | 42 |
| CIC §10509.937 [CIC §790.03(h)(1)] | 26 |
| CIC §10172.5(c) [CIC §790.03(h)(3)] | 22 |
| CCR §2695.7(c)(1) [CIC §790.03(h)(3)] | 14 |
| CCR §2695.5(e)(2) [CIC §790.03(h)(3)] | 5 |
| CCR §2695.7(d) [CIC §790.03(h)(3)] | 4 |
| CIC §790.03(h)(1) | 2 |
| CIC §790.03(h)(3) | 2 |
| CCR §2695.3(b)(1) [CIC §790.03(h)(3)] | 2 |
| CCR §2695.7(b)(3) [CIC §790.03(h)(3)] | 2 |
| CIC §790.03(h)(2) | 1 |
| CIC §790.03(h)(5) | 1 |
| CIC §10172.5(b) [CIC §790.03(h)(5)] | 1 |
| CCR §2695.7(g) [CIC §790.03(h)(5)] | 1 |
| **SUBTOTAL** | **125** |

| **ANNUITIES**<br>**LNLIC 2014 Written Premium: $1,420,184,217**<br>**FPPLIC 2014 Written Premium: ($106,021)**<br>**LNLIC 2015 Written Premium: $1,383,860,564**<br>**FPPLIC 2015 Written Premium: $-0-**<br><br>**AMOUNT OF RECOVERIES $2,602.30** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CCR §2695.11(b) [CIC §790.03(h)(3)] | 27 |
| CIC §10172.5(c) [CIC §790.03(h)(3)] | 12 |

| **ANNUITIES**<br>**LNLIC 2014 Written Premium: $1,420,184,217**<br>**FPPLIC 2014 Written Premium: ($106,021)**<br>**LNLIC 2015 Written Premium: $1,383,860,564**<br>**FPPLIC 2015 Written Premium: $-0-**<br><br>**AMOUNT OF RECOVERIES $2,602.30** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CIC §790.03(h)(3) | 3 |
| CCR §2695.7(d) [CIC §790.03(h)(3)] | 3 |
| CIC §790.03(h)(5) | 1 |
| CCR §2695.5(b) [CIC §790.03(h)(2)] | 1 |
| CCR §2695.7(b)(3) [CIC §790.03(h)(3)] | 1 |
| **SUBTOTAL** | **48** |

| **LONG TERM CARE LIFE POLICY RIDER**<br>**LNLIC 2014 Written Premium: $661,146,809**<br>**FPPLIC 2014 Written Premium: $21,505,511**<br>**LNLIC 2015 Written Premium: $689,266,888**<br>**FPPLIC 2015 Written Premium: $21,170,592**<br>**(Includes Written Premium for Life)**<br><br>**AMOUNT OF RECOVERIES $123,829.60** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CCR §2695.11(b) [CIC §790.03(h)(3)] | 384 |
| CCR §2695.4(a) [CIC §790.03(h)(1)] | 32 |
| CCR §2695.7(g) [CIC §790.03(h)(5)] | 13 |
| CCR §2695.7(d) [CIC §790.03(h)(3)] | 12 |
| CCR §2695.5(e)(2) [CIC §790.03(h)(3)] | 9 |
| CCR §2695.7(c)(1) [CIC §790.03(h)(3)] | 6 |
| CIC §790.03(h)(3) | 5 |
| CIC §790.03(h)(5) | 3 |
| CCR §2695.7(b)(3) [CIC §790.03(h)(3)] | 3 |
| CIC §790.03(h)(1) | 2 |
| CCR §2695.7(b) [CIC §790.03(h)(4)] | 2 |
| CCR §2695.7(b)(1) [CIC §790.03(h)(13)] | 2 |
| CIC §10235.95(b) [CIC §790.03(h)(5)] | 1 |
| CCR §2695.5(b) [CIC §790.03(h)(2)] | 1 |

| **LONG TERM CARE LIFE POLICY RIDER**<br>**LNLIC 2014 Written Premium: $661,146,809**<br>**FPPLIC 2014 Written Premium: $21,505,511**<br>**LNLIC 2015 Written Premium: $689,266,888**<br>**FPPLIC 2015 Written Premium: $21,170,592**<br>**(Includes Written Premium for Life)**<br><br>**AMOUNT OF RECOVERIES $123,829.60** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CCR §2695.5(e)(1) [CIC §790.03(h)(2)] | 1 |
| CCR §2695.5(e)(3) [CIC §790.03(h)(3)] | 1 |
| CCR §2695.7(h) [CIC §790.03(h)(5)] | 1 |
| **SUBTOTAL** | **478** |

| **DISABILITY INCOME INSURANCE**<br>**LNLIC 2014 Written Premium: $124,878,736**<br>**LNLIC 2015 Written Premium: $110,248,127**<br>**(Includes Written Premium for Dental and Supplemental Disability)**<br><br>**AMOUNT OF RECOVERIES $96,961.13** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CCR §2695.11(b) [CIC §790.03(h)(3)] | 32 |
| CCR §2695.4(a) [CIC §790.03(h)(1)] | 25 |
| CCR §2695.7(d) [CIC §790.03(h)(3)] | 18 |
| CIC §790.03(h)(3) | 9 |
| CCR §2695.7(g) [CIC §790.03(h)(5)] | 6 |
| CCR §2695.7(b)(3) [CIC §790.03(h)(3)] | 5 |
| CIC §1879.2(a) [CIC §790.03(h)(3)] | 4 |
| CIC §790.03(h)(1) | 3 |
| CIC §790.03(h)(5) | 3 |
| CCR §2695.5(e)(1) [CIC §790.03(h)(2)] | 2 |
| CCR §2695.5(e)(2) [CIC §790.03(h)(3)] | 2 |
| CIC §790.03(h)(4) | 1 |
| CIC §10111.2(b) [CIC §790.03(h)(3)] | 1 |
| CIC §10111.2(b) [CIC §790.03(h)(5)] | 1 |
| CIC §10111.2(c) [CIC §790.03(h)(5)] | 1 |
| CIC §10172.5(a) [CIC §790.03(h)(5)] | 1 |

| **DISABILITY INCOME INSURANCE**<br>**LNLIC 2014 Written Premium: $124,878,736**<br>**LNLIC 2015 Written Premium: $110,248,127**<br>**(Includes Written Premium for Dental and Supplemental Disability)**<br><br>**AMOUNT OF RECOVERIES $96,961.13** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CCR §2695.5(e)(3) [CIC §790.03(h)(3)] | 1 |
| **SUBTOTAL** | **115** |

| **SUPPLEMENTAL DISABILITY**<br>**LNLIC 2014 Written Premium: $124,878,736**<br>**LNLIC 2015 Written Premium: $110,248,127**<br>**(Includes Written Premium for Dental and Disability Income)**<br><br>**AMOUNT OF RECOVERIES $-0-** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CCR §2695.11(b) [CIC §790.03(h)(3)] | 16 |
| CIC §790.03(h)(3) | 1 |
| CIC §790.03(h)(5) | 1 |
| **SUBTOTAL** | **18** |

| **DENTAL**<br>**LNLIC 2014 Written Premium: $124,878,736**<br>**LNLIC 2015 Written Premium: $110,248,127**<br>**(Includes Written Premium for Disability Income and Supplemental Disability)**<br><br>**AMOUNT OF RECOVERIES $-0-** | **NUMBER OF ALLEGED VIOLATIONS** |
|---|---|
| CIC §790.03(h)(1) | 1 |
| CCR §2695.5(b) [CIC §790.03(h)(2)] | 1 |
| **SUBTOTAL** | **2** |

| | |
|---|---|
| **TOTAL** | **786** |

## SUMMARY OF EXAMINATION RESULTS

The following is a brief summary of the criticisms that were developed during the course of this examination related to the violations alleged in this report.

In response to each criticism, the Companies are required to identify remedial or corrective action that has been or will be taken to correct the deficiency. The Companies are obligated to ensure that compliance is achieved.

Any noncompliant practices identified in this report may extend to other jurisdictions. The Companies should address corrective action for other jurisdictions when applicable.

Money recovered within the scope of this report was $85,986.55 as described in section numbers 6(a), 12, 14, 19, 24(b), 24(c), 34, 41(a), 42(b), 43(a), 43(b), 43(c), 43(d), 43(e), 43(f), 47(a), 47(b), 47(c), 52, 53, and 54 below. Following the findings of the examination, closed claims surveys as described in sections 24(a), 24(b), 24(c), 43(d), 47(a), and 54 below were conducted by the Companies resulting in additional payments of $148,956.39. As a result of the examination, the total amount of money returned to claimants within the scope of this report was $234,942.94.

**LIFE (LNLIC and FPPLIC) - Group and Individual Life**

**1. In 42 instances, the Companies failed to provide to the claimant and assignee, if any, an explanation of benefits including, where applicable, the name of the provider or services covered and dates of service, and a clear explanation of the computation of benefits with each claim payment.** In the files reviewed, the following practices were observed regarding the Companies' Explanation of Benefits (EOBs):

a) In 21 instances, the EOBs did not provide the beneficiary with information on how interest was calculated including detail regarding the date span for which interest was paid (date of death through date of payment).

b) In 12 instances, the Companies failed to provide the beneficiary an itemized breakdown of the life proceeds in the notice of an Electronic Funds Transfer (EFT).

c) In five instances, the EOB to the beneficiary that accompanied the payment of the death proceeds did not provide a clear computation of the remaining amount of life insurance following the payment of LTC benefits. These policies are issued with a specified amount of life insurance based on a single premium.

d) In two instances, the Companies failed to explain that the amount of life insurance was reduced to compensate for a misstatement of age in the application for insurance.

e) In two instances, the Companies failed to provide an EOB when the beneficiary elected payment via EFT.

The Department alleges these acts are in violation of CCR §2695.11(b) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** The Companies responded to the observations described above as follows:

a) In 21 instances, the Companies acknowledge these findings. Company personnel handled 19 of the 21 instances. To ensure future compliance, the Companies added an EOB computation section to their payment letter that accurately reflects the date span and percentage rate applied to the calculation of interest. The Companies implemented this update effective November 12, 2016.

A Third-Party Administrator (TPA) handled the remaining two instances. The TPA states this was due to an oversight on the part of the examiner. To ensure future compliance, the Companies' Relationship Manager was on-site at the TPA the week of October 19-23, 2015, and verbally discussed the EOB requirement at that time. The Companies also provided a written reminder to the TPA on May 12, 2016.

b) In 12 instances, the Companies acknowledge the letter provided to the beneficiary did not include an explanation of the calculation of interest or any other factors involved in the determination of the settlement amount. To ensure future compliance, the Companies developed a letter that provides a detailed explanation of the settlement amount for all EFT payments and wire transfers. The Companies implemented the letter process, instructions for

their use, and training, as of April 28, 2016. Additionally, the Companies' TPAs received this training on May 4, 2016.

c) In five instances, the Companies disagree with these findings. Nonetheless, the total sum of LTC deductions from the life insurance policy face value will be added to the current death claim payment letter. The Companies anticipate implementation of the revised payment letter during the first quarter of 2018.

d) In two instances referenced in 1(d), the Companies acknowledge these findings. To ensure future compliance, the Companies implemented an Age Adjustment letter effective January 25, 2016. This letter provides a clear explanation for the difference in the face amount paid based on the misstatement of age at time of policy issue.

e) In two instances referenced in 1(e), the Companies acknowledge an explanation of benefits was not provided to the beneficiary. To ensure future compliance, the Companies developed a letter to provide a detailed explanation of the settlement amount for all EFT payments and wire transfers. The Companies implemented the letter process, instructions for their use and training as of April 28, 2016. Additionally, the Companies' TPAs received this training on May 4, 2016.

The Companies do not believe their actions are in violation of CIC §790.03(h)(3).

**2. <u>In 26 instances, the Companies failed to provide all required written disclosures prior to the establishment of a retained asset account (RAA).</u>** Specifically, the Companies' RAA disclosure statement includes disclosures (a) through (k), but is missing item (l) of the disclosures that describes the Companies' procedure in the event an account becomes inactive. The Department alleges these acts are in violation of CIC §10509.937 and are unfair practices under CIC §790.03(h)(1).

**<u>Summary of the Companies' Response:</u>** The Companies acknowledge these findings in all identified instances; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(1). The Companies indicate the missing disclosure item was an inadvertent oversight. Since learning of this oversight, the Companies revised the Life Insurance Claim Form to include the missing disclosure language contained in the insurance code. Given that the Companies do not use a California state-specific claim form, the form needed to be filed for approval in a few states (including California) before it could be used nationwide. The revised claim form was approved by all required states and subsequently implemented for use on February 1, 2016.

**3. <u>In 22 instances, the Companies failed to notify the beneficiary of the specified rate of interest paid on the death benefit.</u>** The Department alleges these

acts are in violation of CIC §10172.5(c) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** The Companies acknowledge these findings in all identified instances; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3).

Company personnel handled these claims in 20 instances. To ensure future compliance, the Companies added an EOB computation section to their payment letters that accurately reflects the interest date-span and interest percentage rate. The Companies implemented this update effective November 12, 2016.

A TPA handled these claims in two instances. The TPA's current procedure requires that when a check is the method of payment, the check stub should contain an explanation as to the interest rate and time period applied to the benefit. Due to examiner oversight, the procedure was not followed in these instances. To ensure future compliance, the Companies' Relationship Manager was on-site at the TPA the week of October 19-23, 2015 and verbally discussed the EOB requirement at that time. The Companies also provided a written reminder to the TPA on May 12, 2016.

**4. In 14 instances, the Companies failed to comply with the requirements of CCR §2695.7(c)(1).**

**4(a). In 13 instances, the Companies failed to provide written notice of the need for additional time or information every 30 calendar days.** The Department alleges these acts are in violation of CCR §2695.7(c)(1) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response to 4(a):** The Companies acknowledge these claim handling activities were not consistent with the Companies' guidelines and procedures due to processing oversights; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3). In researching this matter to ensure future compliance, the Companies discovered a project team was created in July 2014 to develop a Beneficiary Requirements Management team. The team was formed in December 2014. The team's function is to follow up with phone calls and in writing to the beneficiaries when additional claim requirements are needed or when correspondence is received. Claims examiners complete follow-up for additional claim requirements every 28-30 days. Effective January 23, 2015, all work items requiring follow-up are processed in this manner. The written procedure for this process was last updated and approved in August 2015. These claims occurred prior to the most recent update.

**4(b). In one instance, the Company failed to specify, in the written notice, any additional information the insurer requires to make a claim determination and to state any continuing reasons for the Company's inability to make a**

**determination.** The Department alleges this act is in violation of CCR §2695.7(c)(1) and is an unfair practice under CIC §790.03(h)(3).

**Summary of the Company's Response to 4(b):** While the Company believes that the beneficiary was aware of the information needed and the reason for the continuing inability to make a claim determination, the Company agrees the reason was not provided to the beneficiary in a written communication. However, the Company does not believe its action is in violation of CIC §790.03(h)(3). As the Company has a process to keep beneficiaries apprised of information as required by the regulation, this was an oversight on the part of the claims examiner. To ensure future compliance, the Company counseled the claims examiner on proper claim handling and the Company performed additional audit reviews.

**5. In five instances, the Companies failed to provide necessary forms, instructions, and reasonable assistance within 15 calendar days.** The Department alleges these acts are in violation of CCR §2695.5(e)(2) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** In three instances involving claims processed as fast-track, the Companies acknowledge these findings. With the fast-track procedure, the Companies do not require a completed claim form or an original death certificate in order to process the claim. This required information can be obtained via telephone from the funeral home, as applicable. This process allows the claimant an expedited process in which there is typically no written correspondence. Generally, the claim can be handled through telephone contact. In researching this matter to ensure future compliance, the Companies discovered a project team was created in July 2014 to develop a Beneficiary Requirements Management team. The team was formed in December 2014 and full implementation occurred in January 2015. The team's function is to follow up with phone calls and in writing to the beneficiaries when additional claim requirements are needed or when correspondence is received. The fast-track process requires an initial call to be made to the beneficiary at setup. If contact is not made, a message is left and the claim is held for three days to allow for a return call. If the call is not returned within three days, a letter is sent to the beneficiary with claim forms. The written procedure for this process was published on November 15, 2015 and last updated January 2016. These claims occurred prior to implementation of this process. In one instance, the claim was handled by a TPA. To ensure future compliance, the Companies provided the TPA with the written procedure outlining the fast track process noted above on May 12, 2016.

The Companies acknowledge these two findings. In one of these instances, claim forms were initially sent to the insured's agent; however, the Company failed to send the necessary forms to the beneficiary within regulatory guidelines. The Company believes that communication with the agent equates to communication with the claimant since the agent was acting on behalf of the claimant. This assumption is based on the agent having knowledge of the insured's cause of death although the Company did not

receive written documentation requesting the claim be handled by the agent. The Companies' current practice is to send claim forms to all beneficiaries, once identified, unless the beneficiary requests the Companies to work solely with the agent. To ensure future compliance for both instances, the Companies reminded claims management staff of the 15-day requirement at the daily inventory meeting on October 20, 2015 and subsequently passed on to the claims staff during team meetings the week of October 20-23 and October 26-30, 2015. Additionally, the Companies provided a written reminder to the staff on May 10, 2016.

The Companies do not believe their actions are in violation of CIC §790.03(h)(3).

**6. In four instances, the Companies failed to comply with the requirements of CCR §2695.7(d).**

**6(a). In three instances, the Companies failed to conduct and diligently pursue a thorough, fair and objective investigation.** In the first instance, the Company delayed sending necessary claim forms, documents and instructions to an executor to perfect the claim for life proceeds payable to the beneficiary's estate. In the second instance, the Company failed to determine if the insured was totally disabled and eligible for Continued Coverage or Conversion under the existing group policy prior to the initial denial of the claim. In the third instance, the Company failed to follow-up with the executor after receiving an executed Declaration pursuant to California Code Probate Section 13100 or Small Estate Affidavit. The failure to follow-up resulted in funds being placed on hold in Treasury to avoid being escheated to the state. The Department alleges these acts are in violation of CCR §2695.7(d) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response to 6(a):** The Companies acknowledge these findings in all identified instances.

In researching this matter to ensure future compliance in the first instance, the Company discovered a project team was created in July 2014 to develop a Beneficiary Requirements Management team. The team was formed in December 2014. The team's function is to follow up with phone calls and in writing to the beneficiaries when additional claim requirements are needed or when correspondence is received. Claims examiners complete follow-up for additional claim requirements every 28-30 days. Effective January 23, 2015, all work items requiring follow-up are processed in this manner. The written procedure for this process was last updated and approved in August 2015. These claims occurred prior to the most recent update.

To ensure future compliance in the second instance, the Company counseled the claims examiner and the Company performed additional audit reviews to ensure proper claim handling.

To ensure future compliance in the third instance, the Company states that, as a result of human error, the claims examiner failed to follow-up for additional information needed for the Small Estate Affidavit assigned to a trust. The Company states it should have reached out for the claim form, the Distinctive Payee Arrangement forms and the W-9. These items would not have been required if the Small Estate Affidavit was payable to an individual. As a result of this finding, the Company reprocessed the claim and issued payment of $2,215.06 including interest to the named beneficiary.

The Companies do not believe their actions are in violation of CIC §790.03(h)(3).

**6(b). <u>In one instance, the Company persisted in seeking information not reasonably required for or material to the resolution of a claims dispute.</u>** The Company continued to seek proof of loss documents that it had already received to process the life claim. Specifically, the Company continued to request claimant statements from the decedent's parents who were not the beneficiaries of record under the group life policy and failed to fully review its records for the correct named beneficiary under the group life certificate. The Department alleges this act is in violation of CCR §2695.7(d) and is an unfair practice under CIC §790.03(h)(3).

**<u>Summary of the Company's Response to 6(b):</u>** The Company acknowledges this finding and states an oversight occurred in the claims handling; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). The Company's standard process is to verify whether the employee's certificate has a beneficiary designation form on file, or whether a newer one exists in-house at the Company. This verification with the employer and in-house at the Company is to occur concurrently. The claims examiner did not perform the verification at the same time or the claim could have been administered off the appropriate designation form earlier in the process. To ensure future compliance, the Company verbally reminded claims examiners of this process on January 6, 2016, in the life claims team meeting.

**7. <u>In two instances, the Companies misrepresented to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.</u>** In the first instance, the Company misrepresented the provisions of the policy regarding the death claim settlement. The Company provided an inaccurate response to the beneficiary's question regarding the settlement of claims in relation to funds in the accumulation account. In the second instance, the Company misrepresented the decedent's age and the Continuing Coverage-Conversion Privilege in its denial letter. The Department alleges these acts are in violation of CIC §790.03(h)(1).

**<u>Summary of the Companies' Response:</u>** The Companies acknowledge these findings; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(1). In the first instance, the Company representative inadvertently advised the beneficiary regarding the interest payable on the death claim rather than the amount of interest accumulated on the policy since inception. When the representative made the statement that interest was paid by state, the representative was referring to the

state statute requiring interest to be paid on a death claim from the date of death until the date of payment at the current Company rate. Monies were applied in an accumulation account during the lifetime of the policy at the rate of five percent. The response given by the representative was not accurate and did not follow the current Company procedure. To ensure future compliance in the first instance, the Company counseled the claims examiner of the error the week of November 9, 2015. Additionally, the Company amended its written procedures for interest payments and notified all claims staff of these procedures on December 10, 2015. The Company states the second instance was a result of claims examiner oversight. To ensure future compliance, the Company counseled the claims examiner and the Company performed additional audit reviews to ensure proper claim handling.

**8. <u>In two instances, the Companies failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.</u>** In the first instance, the Company failed to send a final letter to the beneficiary following receipt of insufficient proof of claim. In the second instance, the Company failed to record contact information that had been provided by the beneficiary thereby delaying communication with the beneficiary. The Department alleges these acts are in violation of CIC §790.03(h)(3).

**<u>Summary of the Companies' Response:</u>** The Companies acknowledge these findings in both instances handled by a TPA on the same claim; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3). In the first instance, the abandon process requires that the beneficiary be notified that the funds are being abandoned. Due to a claim processing oversight, the beneficiary was not notified that the funds had been abandoned. To ensure future compliance, the Company's Relationship Manager was on-site at the TPA the week of October 19-23, 2015 and verbally discussed with staff the need to review all information prior to abandonment of funds. The Company also provided a written reminder to the TPA on May 24, 2016. In the second instance, also due to a claim processing oversight, the beneficiary's preferred method of communication was not added as a contact method. To ensure future compliance, the Company's Relationship Manager was on-site at the TPA the week of October 19-23, 2015 and verbally discussed with staff the need to update and utilize the beneficiary's preferred method of communication. The Company also provided a written reminder to the TPA on May 12, 2016 and the TPA shared this information with its staff on May 16, 2016.

**9. <u>In two instances, the Companies failed to maintain claims data that are accessible, legible and retrievable for examination for the current year and the four preceding years.</u>** Specifically, the administrator for the Companies' retained asset accounts failed to retain copies of letters to the beneficiary for the time frame in the subject regulation. In both instances, copies of the letters sent to the beneficiary were retained for one year. The Department alleges these acts are in violation of CCR §2695.3(b)(1) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** The Companies acknowledge that the letters to the beneficiaries are no longer available in these two instances; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3). The administrator of the retained asset accounts did not consistently retain copies. To ensure future compliance, effective November 10, 2016, copies of all retained asset account letters to the beneficiary are now sent from the administrator to the Companies and are accessible and retrievable.

**10. In two instances, the Companies failed to include a statement in their claim denial that, if the claimant believes all or part of the claim has been wrongfully denied or rejected, he or she may have the matter reviewed by the California Department of Insurance, and shall include the address and telephone number of the unit of the Department which reviews claims practices.** The Department alleges these acts are in violation of CCR §2695.7(b)(3) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** The Companies acknowledge these findings; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3). In the first instance, the Company did not provide the denial statement as the insured was living in a state other than California at the time of the claim. In the second instance, the Company did not provide a denial statement because the policy was never placed in force. To ensure future compliance in the first instance, effective January 2016, the Company started providing the California Department of Insurance contact information based upon the group policyholder situs state and the insured/beneficiary residence state. To ensure future compliance in the second instance, the Company drafted a letter containing the California Department of Insurance contact information with an implementation date of May 25, 2016.

**11. In one instance, the Company failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.** Specifically, the Company failed to respond timely to communication from the employer's insurance agent regarding the claim. The Department alleges this act is in violation of CIC §790.03(h)(2).

**Summary of the Company's Response:** The Company acknowledges this finding; however, the Company does not believe its action is in violation of CIC §790.03(h)(2). The Company's standard guideline is to respond to inquiries within three business days of receipt. To ensure future compliance, the Company counseled the claims examiner on proper claim handling and the Company performed additional audit reviews.

**12. In one instance, the Company failed to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear.** Specifically, the Company failed to recognize it had received sufficient proof of claim. As a result,

the Company failed to pay the claim. The Department alleges this act is in violation of CIC §790.03(h)(5).

**Summary of the Company's Response:** The Company acknowledges this finding; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). The Company reviewed the file again and determined that the trust document originally provided to the Company contained sufficient information to allow payment of the claim. As a result of this finding, the Company reprocessed the claim and issued payment of $7,227.06, including interest, to the named beneficiary.

**13. In one instance, the Company delayed payment for a period longer than reasonably necessary.** Specifically, the Company paid the claim 61 days after receiving the signed, properly executed claim forms and death certificate. The Department alleges this act is in violation of CIC §10172.5(b) and is an unfair practice under CIC §790.03(h)(5).

**Summary of the Company's Response:** The Company acknowledges this finding; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this finding, the Company's managers are now monitoring work queues daily to ensure that claims are being processed in a timely manner.

**14. In one instance, the Company attempted to settle a claim by making a settlement offer that was unreasonably low.** Specifically, the Company incorrectly calculated the percentage of the accumulation account that is to be added to the death benefit resulting in a low settlement. The Department alleges this act is in violation of CCR §2695.7(g) and is an unfair practice under CIC §790.03(h)(5).

**Summary of the Company's Response:** The Company agrees that the death benefit was incorrectly determined resulting in an underpayment; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this finding, the Company reprocessed the claim and issued payment of $2,107.79, including interest, to the named beneficiary.

**ANNUITIES (LNLIC)**

**15. In 27 instances, the Company failed to provide to the claimant and assignee, if any, an explanation of benefits including, where applicable, the name of the provider or services covered and dates of service, and a clear explanation of the computation of benefits with each claim payment.** In seven instances, the Company failed to provide a clear explanation of the calculation of benefits which includes the dates for which interest was paid. In six instances, the Company issued a check directly to the beneficiary and failed to explain that this check represented the Required Minimum Distribution (RMD). In six instances, the Company failed to provide an EOB when the beneficiary elected to have the benefit transferred or rolled over to a

third-party account. In five instances, the Company failed to provide an EOB when the beneficiary elected payment via electronic funds transfer (EFT). In two instances, the Company failed to notify the beneficiary of the determination of the settlement amount which was delivered via EFT. In one instance, the original check contained the explanation of the computation of benefits; however, the reissued check failed to contain the detail regarding the determination of the settlement amount. The Department alleges these acts are in violation of CCR §2695.11(b) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Company's Response:** The Company acknowledges these findings in all identified instances; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3).

To ensure future compliance regarding the instances in which a clear explanation of the calculation of benefits to include the dates for which interest was paid was not provided; and for settlements involving EFT payments, the Company developed a letter that provides a detailed explanation of the settlement amount for all death benefits. The Company implemented the letter with instructions for its use, and training, as of April 28, 2016.

To ensure future compliance regarding payments involving the RMD and benefits rolled over to a third-party account, the Company developed a letter with a detailed explanation of benefits, which also provides a breakdown for the RMD payment and provides the settlement amount for all claims in which funds are rolled over to a third-party account. The Company implemented the letter process, with instructions for its use, and training, as of July 19, 2016.

To ensure future compliance involving a reissued check, the Company reminded its claims staff on May 31, 2016 to include the detailed computation of benefits on all reissued checks.

**16. In 12 instances, the Company failed to notify the beneficiary of the specified rate of interest paid on the death benefit.** The Department alleges these acts are in violation of CIC §10172.5(c) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Company's Response:** The Company acknowledges the rate of interest was not provided to the beneficiary in all identified instances; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3). To ensure future compliance, the Company developed a letter to provide a detailed explanation of the settlement amount to include the rate of interest, when applicable. The Company implemented the letter process, instructions for its use, and training as of April 28, 2016.

**17. In three instances, the Company failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under**

**insurance policies.** In two instances, the Company failed to provide overnight delivery service when it had been requested by the beneficiary. In one instance, the Company failed to follow Company procedure regarding a complaint. The Department alleges these acts are in violation of CIC §790.03(h)(3).

**Summary of the Company's Response:** The Company acknowledges the findings related to the failure to provide overnight delivery service. An oversight occurred in both instances. The current overnight payment procedure is a two-day process. The first day the payment is to be processed in the administrative system and processes through an overnight cycle for printing. The second day the examiner or approver (if payment is over the examiner's authorization limit) makes the request for overnight delivery the next business day via the Company's check exception handling system. This triggers the Treasury area to pull the check for alternate delivery. To ensure future compliance and in an effort to avoid oversight, the Company sent a reminder to all claims staff on May 31, 2016.

The Company acknowledges the third finding relating to or involving its failure to follow its complaint procedure. Upon receipt of the complaint, the manager did not forward the complaint to the Company's internal compliance department. Complaints are forwarded to this area upon receipt by the Company's mailroom and indexing personnel within each business unit. If the complaint is not identified by the indexer, the claims examiner or processor is responsible for notifying compliance of the complaint. The complaint team responds to complaints within regulatory guidelines. The Company provides complaint training annually to the complaint ream reinforcing the complaint handling process. To ensure future compliance, the Company conducted coaching and a review of the Company's complaint handling procedures with claims management. Additionally, the appropriate Company employees received complaint training through the Company's learning website during the time period of May 26 through June 30, 2016.

The Company does not believe its actions are in violation of CIC §790.03(h)(3).

**18. In three instances, the Company failed to conduct and diligently pursue a thorough, fair and objective investigation.** In one instance, the Company failed to promptly review incoming documents to determine their sufficiency. In the second instance, the Company failed to begin its investigation promptly into the location of a beneficiary. In the third instance, the Company failed to promptly investigate and pay the claim. The Department alleges these acts are in violation of CCR §2695.7(d) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Company's Response:** The Company acknowledges these findings in all identified instances; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3). The Company's turnaround time for a fixed annuity is five business days from receipt of completed claim documents. The time span sometimes varies based on volume. To ensure future compliance, the claims

management staff monitors inventory volumes and turnaround times daily in a morning inventory meeting. Staff is reallocated to assist in any area that may experience a backlog that could result in delays. Additionally, as of January 23, 2015, the Company implemented all follow-up work through its work management system that electronically routes work through the organization.

**19. <u>In one instance, the Company failed to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear.</u>** Specifically, an ex-spouse was still listed as a beneficiary of the annuity contract even though she was divorced from the annuitant. The Company wrongly denied the ex-spouse's claim by basing the denial on New Mexico law rather than on California law where the divorce was finalized. The Department alleges this act is in violation of CIC §790.03(h)(5).

**<u>Summary of the Company's Response:</u>** The Company acknowledges this finding; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this oversight by the claims examiner, the Company issued payment in the amount of $2,602.30 to the beneficiary.

**20. <u>In one instance, the Company failed to respond to communications within 15 calendar days.</u>** Specifically, the Company's response to the beneficiary's inquiry about the determination of the settlement was not within regulatory timeframes. The Department alleges this act is in violation of CCR §2695.5(b) and is an unfair practice under CIC §790.03(h)(2).

**<u>Summary of the Company's Response:</u>** The Company agrees it did not respond to the communication in a timely manner; however, the Company does not believe its action is in violation of CIC §790.03(h)(2). In an effort to avoid this occurring in the future, the Company sent a reminder to all claims staff on June 20, 2016.

**21. <u>In one instance, the Company failed to include a statement in its claim denial that, if the claimant believes all or part of the claim has been wrongfully denied or rejected, he or she may have the matter reviewed by the California Department of Insurance, and/or failed to provide the address and telephone number of the unit of the Department which reviews claims practices.</u>** The Department alleges this act is in violation of CCR §2695.7(b)(3) and is an unfair practice under CIC §790.03(h)(3).

**<u>Summary of the Company's Response:</u>** The Company acknowledges this finding; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). The statement regarding the California Department of Insurance has been available to staff for use and, in this instance, the Company failed to include the referenced language. In an effort to avoid this occurring in the future, the Company sent a reminder to all claims staff on June 27, 2016, regarding the requirement to include the statement in all claim denials.

**LONG TERM CARE (LNLIC and FPPLIC) Life Policy Rider**

**22. In 384 instances, the Companies failed to provide to the claimant and assignee, if any, an explanation of benefits including, where applicable, the name of the provider or services covered and dates of service, and a clear explanation of the computation of benefits with each claim payment.** In these instances, the Companies' Explanation of Benefits (EOBs)/Payment letters were incomplete, failed to provide a clear explanation and calculation of benefits, and/or were not provided. The exceptions are noted below (but not limited to):

- Failure to include disclosure of the monthly benefit amount, if applicable, when the maximum monthly benefit is considered;
- Failure to include disclosure of the daily benefit amount, if applicable, when the maximum daily benefit is considered;
- Failure to include the calculation or computation of the conversion of monthly maximum benefits to daily benefit rates, if applicable;
- Failure to include the calculation or computation of the conversion of a daily benefit amount to another daily rate based on the maximum benefit period and a 30-day month, if applicable;
- Failure to provide an explanation and/or calculation of how the reduction due to a benefit payment is greater than the actual payment, if applicable;
- Failure to explain the determination of the elimination period, if applicable;
- Failure to identify the determination of the benefit amount when a partial month is considered, if applicable;
- Failure to send an EOB/Payment letter to the claimant.

The Department has emphasized to the Companies the need for transparency and compliance to provide (for each claim payment) a complete explanation of benefits and/or communication notice as required under the referenced regulation. These notices can come in any format whether in a narrative letter form or as part of the Companies' system.

The Department alleges these acts are in violation of CCR §2695.11(b) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** Upon review of the EOBs (Claim Status Letters), the Companies agree that the EOBs do not provide an adequate explanation of the calculation of the benefit; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3). While the EOBs do state the amount paid and the period of time covered by the payment, along with the payment's effect upon the policy's Death Benefit and Cash Value, the Companies acknowledge additional information regarding the actual benefit determination would be helpful to the claimant. To ensure future compliance, the Companies created a project team to revise and enhance the LTC EOBs. The revised EOB will include all of the data elements in

the current letter and will be expanded to include the following: monthly/daily maximum benefit, as applicable; billed amount; specific dates of service; explanation of the calculation of the benefit payment, including non-covered expenses; and total cumulative LTC benefits paid. The target date for the completion of the system enhancements, testing, and implementation of the revised EOB is December 31, 2017.

**23. In 32 instances, the Companies failed to disclose all benefits, coverage, time limits or other provisions of the insurance policy.** The Companies failed to disclose benefits, time limits, coverage or other provisions of the policy to the insured including the following: maximum monthly benefit, maximum daily benefit, maximum benefit period, care planning benefit, caregiver training benefit, additional services (home modifications, durable medical equipment, emergency medical alerts systems or devices), and/or other provisions which affect or trigger benefits to qualify payment. In one instance, the Company failed to disclose what is covered and/or approved under an insured's specific Plan of Care (POC). When durable medical equipment is recommended as part of the POC, and, therefore, might reasonably become payable, the Company shall immediately inform and assist the insured in determining the extent of the Company's additional liability. In this instance, the POC listed a life line and grab bars under its suggestions. As the policy provides a lifetime benefit limit for durable medical equipment and emergency alert systems or devices, and the insured was eligible for benefits under the Rider, the Company failed to disclose this benefit or offer reimbursement. The Department alleges these acts are in violation of CCR §2695.4(a) and are unfair practices under CIC §790.03(h)(1).

**Summary of the Companies' Response:** The Companies' LTC Claim Department believes that it does have a process for disclosing benefits and coverages available under their LTC Riders. When the Companies receive an initial notification of a LTC claim via telephone, policy benefits are explained and the call is documented on a Claim Department LTC First Notify form. The Companies' procedure is to describe the daily/monthly maximum benefit at the time the claim is reported as this is an essential element to the claim. If notice of claim occurs with receipt of claim documentation, the insured receives written communication outlining the documentation requirements. Also included in this communication is an explanation of the Deductible Period which must be met under the terms of the Rider before benefits can be paid. When a claim is reported, the Companies request from the claimant the type of care needed or anticipated. The Companies also ask each claimant to complete an Insured's Statement of Loss form at the onset of every claim. The form asks the claimant, in relevant part, what type(s) of services the claimant is currently or will be receiving. The Companies then tailor subsequent correspondence to inform the claimant of the coverages applicable to the care being sought by the claimant. In these subsequent communications, benefits available under the policy would be discussed and described.

However, while described verbally, the Companies acknowledge in 31 instances that, under their current process, it is unable to provide documentation to support

disclosure of the maximum monthly/daily benefit to the claimant or the claimant's representative as this information is not captured on the Claim Department LTC First Notify form. To ensure future compliance, the Companies revised their form to include documentation of disclosure of all benefits and coverages. The Companies published an updated procedure document on October 14, 2016 and communicated this to claims staff on October 20, 2016. Until the revised form is made available in the Companies' workflow system, the Companies established a workaround implemented in December 2016, whereby the examiners are to document the disclosure of benefits and coverages on the current form. Full implementation of the revised form into the Companies' workflow management system was effective February 21, 2017.

In the one instance involving durable medical equipment (DME), the Company agrees there is no evidence in the claim file that the DME included in the POC was addressed. As a result of this examination, the Company contacted the claimant on November 30, December 5, and December 15, 2016 and informed the claimant that the policy offers reimbursement for DME purchased or rented. The claimant informed Lincoln on December 2, 2016, that "everything was taken care of two years ago" and the Company has not received any response to its subsequent emails. Therefore, it does not appear that the claimant is seeking reimbursement for the DME.

The Companies do not believe their actions are in violation of CIC §790.03(h)(1).

**24.** **<u>In 13 instances, the Companies attempted to settle a claim by making a settlement offer that was unreasonably low.</u>** The Department alleges these acts are in violation of CCR §2695.7(g) and are unfair practices under CIC §790.03(h)(5).

**24(a).** In seven instances (FPPLIC policy only), the Company paid one less day resulting in an underpayment. These policies afford a daily benefit versus a maximum monthly benefit.

**<u>Summary of the Company's Response to 24(a):</u>** The Company acknowledges these findings and agrees the claims were underpaid in all identified instances; however, the Company does not believe its actions are in violation of CIC §790.03(h)(5). No additional payments are owed in these observed instances as the LTC benefit was actually paid to the beneficiary as part of the death benefit under the Life policy since the insured passed away.

To ensure future compliance, the Company created a task force to address this issue. The administrative system will be enhanced to accurately calculate these types of claim payments automatically. The target date for completion of the coding, testing, and implementation of these system changes is December 31, 2017. As an interim solution, the Company created manual calculator tools to accurately calculate the claim payment. The Company implemented this manual workaround (manual calculator) in May 2017.

In response to a concern that one less day was paid outside the identified claims in this examination, the Company conducted an internal survey of closed claims from January 1, 2013 through April 30, 2017. The Company completed the survey and reported the results to the Department on September 1, 2017. The Company issued 110 payments totaling $117,081.47 including interest for this section and sections 24(b) and 24(c) below.

**24(b).** In four instances (LNLIC policy only), the Company paid benefits for a partial month based on converting the monthly maximum benefit to a daily benefit resulting in an underpayment. These claims were paid under the Comprehensive Long Term Care Benefits Rider attached to the Life policy. This policy did not have a provision for translating the monthly maximum benefit into a daily benefit.

**Summary of the Company's Response to 24(b):** The Company acknowledges the maximum monthly benefit was owed in all identified instances; however, the Company does not believe its actions are in violation of CIC §790.03(h)(5). In two instances, no additional payment is owed as the LTC benefit was actually paid to the beneficiary as part of the death benefit under the Life policy since the insured passed away. In the remaining two instances, the Company reopened the claims and issued payments of back benefits including interest in the amount of $6,541.69 to the identified claimants.

To ensure future compliance, the Company created a task force to address this issue. The administrative system will be enhanced to accurately calculate these types of claim payments automatically. The target date for completion of the coding, testing, and implementation of these system changes is December 31, 2017. As an interim solution, the Company created manual calculator tools to accurately calculate the claim payment. The Company implemented this manual workaround (manual calculator) in May 2017.

In response to a concern that the Company paid benefits for a partial month based on converting the monthly maximum benefit to a daily benefit resulting in an underpayment outside the identified claims in this examination, the Company conducted an internal survey of closed claims from January 1, 2013 through April 30, 2017. The Company completed the survey and reported the results to the Department on September 1, 2017. The details and results of the survey are included in summary section 24(a) above.

**24(c).** In two instances (LNLIC policy only), the Company's calculation of benefits resulted in a low settlement. In the first instance, the Company paid $1,372.79; however, $1,411.55 was owed. The Company's conversion from a monthly to a daily benefit is based on a 30-day month. When a partial month is calculated for a 31-day month, and this is through the end of the month, the Company considers one day less in the calculation of the benefit. This results in an underpayment even though the daily benefit is more with a 30-day conversion as opposed to a 31-day conversion. In the

second instance, the Company inadvertently paid for one day when two days were claimed resulting in an underpayment.

**Summary of the Company's Response to 24(c):** The Company acknowledges the findings in both instances; however, the Company does not believe its actions are in violation of CIC §790.03(h)(5). In the first instance, the Company stated that when the charges cover less than a full month, the Company converts the monthly maximum to a daily maximum amount and pays that daily amount times the number of days of care. The Company's administration system is based on a 30-day month, so the monthly max benefit is divided by 30 and then multiplied by the number of days of services. Although the claim was underpaid, the amount that would have been paid as an additional LTC benefit was actually paid to the beneficiary as part of the death benefit given that the insured passed away. In the second instance, the Company allowed for one day when two days of service were claimed. As a result of this finding, the Company reopened the claim and issued payment of back benefits including interest in the amount of $157.04 to the identified claimant.

To ensure future compliance, the Company created a task force to address this issue. The administrative system will be enhanced to accurately calculate these types of claim payments automatically. The target date for completion of the coding, testing, and implementation of these system changes is December 31, 2017. As an interim solution, the Company created manual calculator tools to accurately calculate the claim payment. The Company implemented this manual workaround (manual calculator) in May 2017.

In response to a concern regarding the Company's conversion from the monthly to a daily benefit when a partial month is paid, the Company conducted an internal survey of closed claims from January 1, 2013 through April 30, 2017. The Company completed the survey and reported the results to the Department on September 1, 2017. The details and results of the survey are included in summary section 24(a) above.

**25. In 12 instances, the Companies failed to comply with the requirements of CCR §2695.7(d).**

**25(a). In 10 instances, the Companies failed to conduct and diligently pursue a thorough, fair and objective investigation.** In five instances, the Companies' claims handling resulted in the following investigative delays: a three-month delay in requesting trust documents after the claim was filed; a delay in requesting a legible copy of a care provider's license; a six month delay in obtaining a Medical Assessment form from a provider; a two and a half month gap in file activity; and a five month delay in following up with a care provider to obtain a revised form and new discharge date.

In two instances within the same claim, the Company placed the burden of investigation on the insured to provide some missing line items on the Medical Assessment form and to obtain the Care Provider Assessment form rather than pursue this information directly from the providers. In the third instance within the same claim, the Company failed to reach out to the designated person.

In two instances, the Companies failed to investigate the discrepancy in two dates to determine the eligibility date for treatment. Specifically, the Companies utilized a later date for the beginning of the Deductible Period (elimination period) when the insured was admitted to a facility on an earlier date.

The Department alleges these acts are in violation of CCR §2695.7(d) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response to 25(a):** In five instances, the Companies responded as follows:

- In one of the five instances, the Company had information that the policy was owned by a trust, but this was initially overlooked by the examiner. Therefore, the Trustee Powers document was not initially requested. The Company's practice is to include the Trustee Powers document in the initial claim packet letter. To ensure future compliance, the Company provided a reminder to claims staff that the Trustee Powers document must be included in the initial claim packet letter when the owner is a trust. The Company distributed this communication to staff on January 10, 2017.
- In the second of the five instances, the Company agrees that during the email communications between the examiner and the claimant's daughter, during the January 15, 2014 to February 7, 2014 time period, a clear copy of the license should have been requested. In order to prevent this from reoccurring in the future, the Company sent a communication reminder to all claims staff on September 23, 2016 reminding them to review the file and request all needed documentation during each communication.
- In the third, fourth and fifth of the five instances involving investigative delays, the Companies acknowledge the servicing of these claims did not meet the Companies' standard for a diligent and timely investigation. To ensure future compliance, the Companies provided a reminder regarding investigating delays to claims staff on January 10, 2017.

In three instances on the same claim, the Company acknowledges these findings. It is the Company's practice to reach out directly to the physician for missing information on the Medical Assessment form. This process was inadvertently missed in this particular instance. Additionally, the Company had received the disclosure authorization for the daughter and should have contacted the daughter and sent communication to the insured, rather than to the insured. To ensure future compliance, the Company provided a reminder to claims staff on January 10, 2017.

In the two instances involving the failure to investigate the discrepancy in two dates to determine the eligibility date for treatment, the Companies acknowledge these allegations. At the time the claims were processed, it was the Companies' practice to approve a claim not earlier than the date in which the insured was first seen by the physician recommending care. Currently the Companies will approve care based on the date of the physician orders written upon admission, if the services provided are considered eligible for benefits. To ensure future compliance, the Companies updated their "LTC New Claim Approval Guide" which outlines the procedure for determining if the forms and documents are in good order. The Companies conducted training with their claims examiners and updated and published the procedure document on May 16, 2016. Additionally, the Companies provided formal communication to claims staff on May 18, 2016.

The Companies do not believe their actions are in violation of CIC §790.03(h)(3).

**25(b).** **<u>In two instances, the Companies persisted in seeking information not reasonably required for or material to the resolution of a claims dispute.</u>** Specifically, in both instances, the Companies persisted in seeking the Medical Assessment form it had already received prior to the subsequent request. The Department alleges these acts are in violation of CCR §2695.7(d) and are unfair practices under CIC §790.03(h)(3).

**<u>Summary of the Companies' Response to 25(b):</u>** The Companies acknowledge these findings and states oversights occurred in the claims handling; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3). It is not the Companies' practice to request information already received. To prevent this from reoccurring on other claims, the Companies sent a communication reminder to claims staff on September 23, 2016.

**26.** **<u>In nine instances, the Companies failed to provide necessary forms, instructions, and reasonable assistance within 15 calendar days.</u>** In eight instances, while the Companies sent the necessary forms and instructions within 15 calendar days, the Companies failed to provide reasonable assistance (defined as the act of assisting, aiding, helping, supporting) to the insured or to the insured's representative within regulatory guidelines. In these claims, the Companies reached out by way of written correspondence. The Companies mailed the initial claim packet and, if no information was received, the Companies sent follow-up letters every 30 days. Although telephone conversations took place in a few instances, these were the result of the insured or the insured's representative calling the Companies for help in filling out the claim forms or providing supporting documentation. The Companies' claim handling did not reflect it initiated any telephone calls in order to explain the process and to assist the insured in perfecting his or her claim. LTC claims typically involve elderly individuals who may have cognitive issues including, but not limited to dementia and Alzheimer's. Therefore, the burden to assist/aid/help and/or support the insured is much greater. In

one instance, the Company failed to provide any forms, instructions or assistance within 15 calendar days. The Department alleges these acts are in violation of CCR §2695.5(e)(2) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** The Companies disagree with the Department's findings in eight instances and states reasonable assistance was provided. Nonetheless, to ensure future compliance, effective the first quarter of 2018, the Companies will enhance the current LTC claims process to include a proactive telephone call to the insured or their representative, within 15 days of the claim forms being mailed. The purpose of the telephone call will be to confirm receipt of the claim forms on the part of the insured, acknowledge receipt of forms received-to-date by the Companies, and offer assistance with any outstanding requirements. The Companies will also mail a letter following the telephone call.

In one instance, the Company agrees with this finding. The forms were mailed to the wrong insured due to an error made in the policy number entry. To prevent this from reoccurring on other claims, the Company sent a communication reminder to claims staff on September 23, 2016.

The Companies do not believe their actions are in violation of CIC §790.03(h)(3).

**27. In six instances, the Companies failed to provide written notice of the need for additional time or information every 30 calendar days.** Specifically, in four instances involving one claim, and in two instances involving another claim, the Companies were not able to determine liability within 40 days and failed to send a status letter to the claimant stating it needed additional time to accept or deny the claim. The Department alleges these acts are in violation of CCR §2695.7(c)(1) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** The Companies acknowledge these findings; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3). The Companies' procedure is to follow up for any outstanding requirements in writing every 30 days. To ensure future compliance for these oversights, claims management staff monitors inventory volumes and turnaround times daily in the morning inventory meeting. Additionally, the Companies sent a communication reminder to claims staff on September 23, 2016.

**28. In five instances, the Companies failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.** The Department alleges these acts are in violation of CIC §790.03(h)(3).

**28(a).** In three instances, upon receipt of Durable Power of Attorney (DPOA) documents, the Companies sent correspondence and requests directly to the named insured.

**Summary of the Companies' Response to 28(a):** The Companies' practice is to send the initial claim forms and letter to whomever initiated the claim. The Companies' procedure is to send correspondence to the insured if the physician who completed the medical assessment considers the insured competent to direct their own financial affairs or unless the insured specifically requests that the Companies work directly with the DPOA or unless the physician deems it necessary to correspond with the DPOA. Furthermore, the payment status letters are auto-generated from the Companies' system and are sent to the address on record. Nonetheless, the Companies changed their process to copy the DPOA on all manual correspondence mailed to the insured/claimant. The Companies completed staff training and implemented this process in December 2016. For the claim department's system-generated correspondence, the examiners will manually send a copy to the DPOA. Implementation of the manual workaround occurred on April 3, 2017.

The Companies do not believe their actions are in violation of CIC §790.03(h)(3).

**28(b).** In one instance, the Company requested and required a signed statement from the named insured regarding an address change when the Company was in receipt of DPOA documents.

**Summary of the Company's Response to 28(b):** The Company states the attorney-in-fact is an agent for the claimant and acts on behalf of the claimant. The Company adds that the attorney-in-fact is not the claimant and, unless the claimant is not competent, he or she can still act on their own behalf even though he or she has an attorney-in-fact. The Company works with the DPOA, but it does not automatically change the address of record. And, the attorney-in-fact may have authority to change the claimant's address of record, but until there is a change, all correspondence goes to the address of record, which in this case, was that of the insured. The procedure at the time of this claim was to ask the insured to put in writing the request for an address change. Nonetheless, the Company changed its procedure on October 1, 2015 and it no longer requests this of the insured in writing if the DPOA is in place.

The Company does not believe its action is in violation of CIC §790.03(h)(3).

**28(c).** In one instance, upon receipt of returned correspondence as not deliverable, the Company failed to follow its procedure for routing the correspondence.

**Summary of the Company's Response to 28(c):** The Company acknowledges its procedure for returned mail was not followed in this isolated instance; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). The Company's guidelines call for the mail item to be moved to the appropriate team within 25 days of receipt. There was a delay in the returned mail reaching the claims examiner. However, the claim had already been closed prior to the date that the

examiner received the returned correspondence, and thus there was no further action taken by the examiner.

**29. <u>In three instances, the Companies failed to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear.</u>** The Department alleges these acts are in violation of CIC §790.03(h)(5).

**29(a).** In two instances, the Companies failed to apply Medicare offsets concurrently with the deductible period, also known as the elimination period. The LTC Rider states that the "90 day deductible period may be satisfied only by days during which benefits….would otherwise be covered under this rider". Even though the policy does not provide benefits for losses payable by Medicare, the strict reading of the language with respect to "would otherwise be covered under this rider" indicates that if the trigger is met under the policy for LTC benefits, this exclusion does not apply to the deductible period. Therefore, Medicare merely serves as an "offset" on the tax qualified policy. The deductible period commences when the insured becomes eligible for qualified LTC benefits, not when the insured becomes eligible after application of Medicare. This period shall be applied without consideration of the existence or duration of payment of long term care benefits by Medicare. Additionally, if the contract language is otherwise unclear or ambiguous, any ambiguous language goes in favor of the insured. Therefore, a contract of adhesion should be interpreted in favor of the insured in the event of ambiguity. In addition, there are no provisions in the policy which extend the elimination period for the period paid by Medicare (non-duplication period). As such, this period paid by Medicare should run concurrently with the elimination period.

**<u>Summary of the Companies' Response to 29(a):</u>** The Companies disagree with these findings. Nonetheless, in order to resolve this issue, the Companies will begin counting days toward the elimination period as of the date the insured met the benefit eligibility trigger and benefits would otherwise be payable. This period shall be applied without consideration of the existence or duration of payment of long term care benefits by Medicare. The Companies' action plan is targeted for implementation during the first quarter of 2018.

The Companies do not believe their actions are in violation of CIC §790.03(h)(5).

**29(b).** In one instance, the Company had sufficient information to determine the insured met the benefit eligibility triggers under the policy yet the Company failed to approve and process the claim. The Company indicated in order to process the claim, the following documents were necessary: the Durable Power of Attorney for Financial Transactions document, DPOA signature on the authorization, and DPOA signature on the Insured Statement of Loss. As these were the only items the Company deemed necessary, and these items would not preclude approving and paying the claim, the Company failed to effectuate a prompt settlement of the claim in which liability had

become reasonably clear. The Department alleges this act is in violation of CIC §790.03(h)(5).

**Summary of the Company's Response to 29(b):** The Company agrees it had sufficient information to determine that the insured met the benefit eligibility triggers of the LTC Rider and the Company acknowledges that the DPOA document is not necessary in order to make a benefit eligibility determination. Although the Company acknowledges this finding, any benefits due were included in the death benefit given that the insured passed away. In order to prevent this from reoccurring in the future, the Company sent a communication memo to all claims staff on January 10, 2017 reminding them that a determination must be communicated when sufficient information to determine eligibility has been received.

The Company does not believe its action is in violation of CIC §790.03(h)(5).

**30. In three instances, the Companies failed to include a statement in their claim denial that, if the claimant believes all or part of the claim has been wrongfully denied or rejected, he or she may have the matter reviewed by the California Department of Insurance, and/or failed to include the address and telephone number of the unit of the Department which reviews claims practices.** In two instances, no reference to the Department was included in the letter. In the third instance, while the Company provided reference to the Department as well as the telephone number for the California Department of Insurance, the regulation requires the statement to include the address as well. The Department alleges these acts are in violation of CCR §2695.7(b)(3) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Companies' Response:** The Companies acknowledge this finding in all instances; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(3). The statement regarding the California Department of Insurance has always been available to staff for use. However, in an effort to avoid this occurring in the future, the Companies changed the closing of the template on the letter to reflect the required language and the Companies sent a reminder to all claims staff on June 27, 2016 of the requirement to include the statement in all claim denials.

**31. In two instances, the Companies misrepresented to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.** Specifically, while the Companies provided correct policy information to the agent in the notice of claim phone calls in both instances, the Companies misrepresented the Deductible Period in the acknowledgement letters sent directly to the insured. For this LTC Rider, the Deductible Period (elimination period) is waived for Home Health Care (HHC); however, the letters state the policy has a 90-day Deductible Period, which must be met under the terms of the Rider before benefits are paid. The Department alleges these acts are in violation of CIC §790.03(h)(1).

**Summary of the Companies' Response:** While the Companies state it did not misrepresent the insurance policy provision in the phone calls with the agent, the Companies acknowledge that the letters should have mentioned that the 90-day Deductible Period was waived for HHC services. However, the Companies do not believe their actions are in violation of CIC §790.03(h)(1). In order to prevent this from reoccurring in the future, the Companies sent a communication reminder to all claims staff on September 23, 2016.

**32. In two instances, the Companies failed, upon receiving proof of claim, to accept or deny the claim within 40 calendar days.** In the first instance, the Company received invoices from the skilled nursing facility and failed to accept or deny the claim within 40 days of receipt. In the second instance, the Company received invoices on December 6, 2013 and failed to accept the claim until February 28, 2014, over 40 days from proof of claim. The Department alleges these acts are in violation of CCR §2695.7(b) and are unfair practices under CIC §790.03(h)(4).

**Summary of the Companies' Response:** The Companies acknowledge these findings; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(4). In order to prevent this from reoccurring in the future, the Companies sent a communication reminder to all claims staff on September 23, 2016 reminding them of the regulatory requirements.

**33. In two instances, the Companies failed to provide in writing the reasons for the denial of the claim in whole or in part including the factual and legal bases for each reason given.** Notwithstanding the Department's position noted in 29(a) above, in both instances, the Companies failed to reference the policy language supporting the Companies' opinion that days covered by Medicare do not count towards the Deductible (elimination) Period. The Department alleges these acts are in violation of CCR §2695.7(b)(1) and are unfair practices under CIC §790.03(h)(13).

**Summary of the Companies' Response:** The Companies acknowledge that reference to the policy does not comply with the referenced regulation in these instances; however, the Companies do not believe their actions are in violation of CIC §790.03(h)(13). To ensure future compliance, the Companies sent a communication reminder to all claims staff on September 23, 2016 reminding them that the denial reason must be explained according to specific policy on denial letters.

**34. In one instance, the Company failed to pay interest at a rate of 10% per annum on the amount of any accepted claim beginning on the first calendar day after the day that the payment of the accepted claim was due.** The Department alleges this act is in violation of CIC §10235.95(b) and is an unfair practice under CIC §790.03(h)(5).

**Summary of the Company's Response:** The Company acknowledges this finding; however, the Company does not believe its action is in violation of CIC

§790.03(h)(5). As a result of this finding, the Company reopened the claim and issued payment of interest in the amount of $49.40 to the identified claimant.

**35. <u>In one instance, the Company failed, in its response, to furnish the claimant with a complete response.</u>** Specifically, the insured submitted invoices to the Company and requested that the Company confirm the invoices were received. The Company failed to comply with the insured's request. The Department alleges this act is in violation of CCR §2695.5(b) and is an unfair practice under CIC §790.03(h)(2).

**<u>Summary of the Company's Response:</u>** The Company acknowledges that it overlooked the Company's practice to respond to correspondence requesting a response within 15 days; however, the Company does not believe its action is in violation of CIC §790.03(h)(2). To ensure future compliance, the Company sent a communication reminder to all claims staff on June 20, 2016 reminding them of this regulatory requirement.

**36. <u>In one instance, the Company failed to acknowledge notice of claim within 15 calendar days.</u>** The Department alleges this act is in violation of CCR §2695.5(e)(1) and is an unfair practice under CIC §790.03(h)(2).

**<u>Summary of the Company's Response:</u>** The Company acknowledges it failed to acknowledge receipt of the claim within 15 days; however, the Company does not believe its action is in violation of CIC §790.03(h)(2). When the claim was first opened, it was opened under the wrong policy number. Therefore, the initial acknowledgement did not go to the correct claimant. To ensure future compliance, the Company sent a communication reminder to all claims staff on September 23, 2016 reminding them of this regulatory requirement.

**37. <u>In one instance, the Company failed to begin any necessary investigation of the claim within 15 calendar days.</u>** The Department alleges this act is in violation of CCR §2695.5(e)(3) and is an unfair practice under CIC §790.03(h)(3).

**<u>Summary of the Company's Response:</u>** The Company acknowledges it did not comply with the Company's policy to begin the investigation within 15 days of notice of claim; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). In this instance, the forms were mailed to the wrong insured due to human error so the investigation did not occur within 15 days of notification. To ensure future compliance, the Company sent a communication reminder to all claims staff on September 23, 2016 reminding them of this regulatory requirement.

**38. <u>In one instance, the Company failed, upon acceptance of the claim, to tender payment within 30 calendar days.</u>** Specifically, the Company received bills for several months on October 15, 2014 and failed to issue payment for one of these months until December 5, 2014 as a result of a phone call from the Power of Attorney.

The Department alleges this act is in violation of CCR §2695.7(h) and is an unfair practice under CIC §790.03(h)(5).

**Summary of the Company's Response:** The Company agrees that the payment for May 2014 was not made within 30 days and that interest is owed; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). To ensure future compliance, the Company sent a communication reminder to all claims staff on January 20, 2017 reminding them that all claims must be paid within 30 days of being in good order. The Company issued interest payment in section 34 above.

**DISABILITY INCOME (LNLIC) - Group STD and LTD / Individual Disability Income**

**39. In 32 instances, the Company failed to provide to the claimant and assignee, if any, an explanation of benefits including, where applicable, the name of the provider or services covered and dates of service, and a clear explanation of the computation of benefits with each claim payment.** In the files reviewed, the following practices were observed.

a) In 12 instances, the Company failed to provide computation of the California State Disability Income (CASDI) offset on its EOBs including how the Company converted the weekly CASDI benefit to a monthly CASDI offset and any pro-rata calculation of the offsets based on a daily amount.

b) In nine instances, the Company failed to identify the source of "State Plans" shown as an offset on the EOB. "State Plans" refer to payments from California State Disability Income (CASDI).

c) In nine instances, the Company failed to provide a computation of how it calculated the CASDI, Social Security Disability Income (SSDI), Workers' Compensation (WC) and Retirement Employer offsets to reflect payment of the Minimum Monthly Benefit. In these instances, the Company included an amount deducted as the offset so that the net amount equals the Minimum Monthly Benefit.

d) In two instances, the description on the EOB for an offset is identified as "WORKERS COMP (WEEKLY)", yet the amount offset represented a conversion from a weekly to a monthly offset. Therefore, in these two instances, the Company failed to provide an explanation of how it computed the Workers' Compensation offset.

The Department alleges these acts are in violation of CCR §2695.11(b) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Company's Response:** The Company responded to the observations described above as follows:

a) With regard to the 12 instances involving the CASDI offset, the Company believes the EOBs provide a clear explanation of all benefits. In instances in which the claimant knew the California State Disability Income award he or she was receiving, the Company further disagrees that the failure to include the methodology makes the EOBs unclear. Nevertheless, in 11 instances, the Company agrees the EOBs do not clearly disclose how it converted the weekly CASDI into a monthly benefit referenced in the EOBs. In one instance involving a prorated CASDI offset, the Company agrees there is no verbiage to explain the prorated calculation amount on the EOB itself.

b) With regard to the nine instances in which the Company failed to identify the source of "State Plans", the Company believes that the EOBs provide a clear explanation of the gross amount, offset amount/types, and the net benefit. The Company further believes that the source of the offset "State Plans" is clear as it pertains to California State Disability income, and further modifications to the EOB and approval letter would not be warranted. Nevertheless, the Company established changes outlined below to ensure compliance.

c) With regard to the nine instances involving payment of the Minimum Monthly Benefit, the Company believes the EOBs provide a clear explanation of the gross amount, offset amount/types, and the net benefit. However, the Company agrees there is no verbiage to explain the Monthly Minimum Benefit amount on the EOB itself.

d) With regard to the two instances in which the Company failed to provide an explanation of how it computed the Workers' Compensation offset, the Company believes the EOBs provide a clear explanation of the gross amount, offset amount/types, and the net benefit. Nevertheless, the Company agrees that the EOB does not clearly indicate the conversion of the weekly into a monthly amount.

To ensure future compliance for all of the above allegations, the Company provided training and instituted steps necessary to add additional explanation to its letters approving claims for Long Term Disability benefits. These steps include the following:

- Lincoln revised its approval letter sent to claimants and it now incorporates the necessary fields, which include, but is not limited to: Elimination Period, Gross Salary Amount Used for Benefit Calculation, Gross Monthly Benefit Payable, Benefit Percentage (Per the Policy), Net Benefit, Maximum Monthly Benefit (Per the Policy), Minimum Monthly Benefit (Per the Policy), Net

Benefit, All Offset Information (Including WC, CASDI, Partial Disability Employment Information and any other applicable offset information), and information regarding proration of offsets or benefits if applicable to the claim.

- This revised approval letter will be utilized as a manual work around until the system enhancements are completed. The system enhancement to the letter template is anticipated to be placed into Lincoln's production system by December 31, 2017.
- In addition, Lincoln modified its letter template to explain any changes that may occur to the benefit as a result of an offset terminating. The Company will also emphasize to staff that if the benefit amount is changing, that correspondence needs to be sent explaining that change to the insured in detail.
- Formal training took place with the California claims team on November 30, 2016.
- The Company sent a procedure announcement to staff on December 19, 2016 announcing these changes.
- To follow-up and reiterate this information with the Company's claim personnel, the Company provided additional discussion/coaching in its January 2017 team meetings.

The Company does not believe its actions are in violation of CIC §790.03(h)(3).

**40. <u>In 25 instances, the Company failed to disclose all benefits, coverage, time limits or other provisions of the insurance policy.</u>** The Company did not disclose the following benefits, coverages or other provisions: Salary Amount (reported monthly earnings), Benefit Percentage, Elimination Period, Minimum Monthly Benefit, Maximum Monthly Benefit; and/or explanation of applicable offsets under the policy. The Department alleges these acts are in violation of CCR §2695.4(a) and are unfair practices under CIC §790.03(h)(1).

**<u>Summary of the Company's Response:</u>** The Company acknowledges that, per its standard Company procedure, claims examiners are expected to discuss all applicable policy provisions with the claimant during the initial LTD phone call. However, the Company does not believe its actions are in violation of CIC §790.03(h)(1).

To ensure future compliance, the Company provided training regarding this established procedure, including the need to fully document in the file notes all subjects discussed and instituted steps necessary to add additional explanation to its letters approving claims for Long Term Disability benefits. These steps include the following:

- Lincoln revised its approval letter sent to claimants and it now incorporates the necessary fields, which include, but is not limited to: Elimination Period, Gross Salary Amount Used for Benefit Calculation, Gross Monthly Benefit Payable, Benefit Percentage (Per the Policy), Net Benefit, Maximum Monthly

Benefit (Per the Policy), Minimum Monthly Benefit (Per the Policy), Net Benefit, All Offset Information (Including WC, CASDI, Partial Disability Employment Information and any other applicable offset information), and information regarding proration of offsets or benefits if applicable to the claim.

- This revised approval letter will be utilized as a manual work around until the system enhancements are completed. The system enhancement to the letter template is anticipated to be placed into Lincoln's production system by December 31, 2017.
- Formal training took place with the California claims team on November 30, 2016.
- The Company sent a procedure announcement to staff on December 19, 2016 announcing these changes.
- To follow-up and reiterate this information with the Company's claim personnel, the Company provided additional discussion/coaching in its January 2017 team meetings.

**41. <u>In 18 instances, the Company failed to comply with the requirements of CCR §2695.7(d).</u>**

**41(a). <u>In 17 instances, the Company failed to conduct and diligently pursue a thorough, fair and objective investigation.</u>** In the files reviewed, the following situations were observed.

**i.** In five instances, the Company failed to follow up with the treating physician, either by telephone or in writing, prior to the denial of a claim or an appeal; and it did not perform an Independent Medical Examination (IME) or a Functional Capacity Examination (FCE) when the claimant's restrictions and limitations were not clearly identified relative to the claimant's occupation. During the examination review period, the Company requested no FCEs and fourteen IMEs on California policies. One IME was requested during the own occupation stage, two IMEs were requested prior to acceptance of the any occupation stage, five IMEs were requested after acceptance of the any occupation stage, and six IMEs were requested in the appeal stage.

With regard to sections **i.**2, 3, 4 and 5 below, it is the attending physician's purpose to treat the patient and not to document the claimant's functionality. Therefore, it would not be expected that, in all cases, the Company could document functionality by reviewing the medical records of the attending physician(s). The standard of care does not necessarily include documentation of restrictions and limitations to the extent required to make a comprehensive determination of a claimant's ability to perform an occupation with reasonable continuity. As such, it is the Company's investigative responsibility to conduct its own functional assessment of the claimant's capabilities to include contact with the treating provider, an FCE and/or an IME.

1. In one instance, prior to denying the claim, the Company did not resolve contradictory information from the treating provider. Specifically, the attending physician identified disabling conditions and had certified the claimant's inability to work, while the claimant's medical records indicated the condition had resolved. Rather than conduct an investigation into the discrepancy, the Company relied upon the opinion of a Nurse Disability Consultant and on an orthopedic peer reviewer, neither of which had ever seen or treated the claimant, to make a determination of eligibility.

2. In one instance, the Company failed to fully investigate the claim during the appeal phase prior to the decision to uphold the denial on February 20, 2015. As a result of a second level appeal regarding the February 20, 2015 denial, the Company conducted an IME and the denial was overturned.

3. In one instance, the Company relied solely upon a Nurse Disability Consultant to determine the claimant's eligibility for Long Term Disability (LTD) benefits. Although the nurse called the treating physician, the nurse spoke with an office assistant and did not speak with the treating physician. Following the call with the treating physician's assistant, the nurse consultant opined there was no evidence that the claimant lacked the capacity to work. Consequently, the LTD claim was denied after the Short Term Disability (STD) claim was paid for the maximum time frame and without a supporting investigation.

4. In one instance, the Company failed to follow up with the claimant's treating physicians prior to the first denial of the claim to clarify the limitations and restrictions the treating physicians deemed appropriate based on the claimant's injuries/conditions.

5. In one instance, the Company failed to consider an IME or an FCE prior to the denial as a result of the claimant attorney's appeal.

**ii.** In four instances, the Company failed to obtain or consider complete SSDI records relating to an award of benefits. Social Security Administration (SSA) files may contain medical records not obtained in the Company's file and/or may have utilized a board certified physician to perform an IME, an FCE, a medical records review, and/or additional information in the determination of benefits. Although SSA conducts its own review for benefits, this information might reasonably be applicable to the specific claim.

**iii.** In two instances, the Company failed to obtain or consider complete records relating to knowledge of a concurrent Workers' Compensation claim. One of these instances involved an approved Workers' Compensation claim and one involved a denied Workers' Compensation claim. The Workers' Compensation claim files may contain medical records not obtained in the Company's file

and/or include additional information in the determination of benefits. Although the Workers' Compensation carrier conducts its own review for benefits, this information might reasonably be applicable to the specific claim.

**iv.** In one instance, although the Company had sufficient information in the file to approve the claim through the return to work date, the Company opined that additional information was necessary and failed to obtain this additional information. The claimant provided information pertaining to her treating providers on October 7, 2014. There is no information in the file to suggest the claimant treated with any additional providers in between October 7, 2014 and November 5, 2014 when the Nurse Disability Consultant reviewed the file. The Nurse Disability Consultant recommended that the adjuster obtain further documentation from the treating providers and determine if the claimant had seen any providers besides the ones she already provided. During a discussion with the claimant on November 18, 2014, the claimant indicated she was planning to return to work on December 1, 2014. Given the Company's request for more medical documentation, the claimant stated she did not want to "hassle" with pursing LTD benefits. Based on this statement as well as on the Nurse Disability Consultant's recommendation to obtain further documentation from the treating providers, the Company failed to conduct additional investigation by contacting the known treating providers.

**v.** In one instance, the Company failed to diligently follow up for medical records it had requested from a treating provider. Although the Company sent a prepayment fee for copying the records and received verification that the request was being processed, the records were never received. The Company failed to follow up in the way of a phone call or written request.

**vi.** In one instance, the Company requested a signed medical authorization from the claimant. The executed form was provided to the Company as requested and the Company failed to utilize this form to obtain the physical therapy records needed to consider additional benefits.

**vii.** In one instance, the STD claim was rolled into the LTD claim on December 17, 2014 and no investigation was conducted until a phone call was initiated to the claimant on February 24, 2015.

**viii.** In one instance, management reviewed and approved the claim on March 19, 2015 yet the benefits were not approved and paid until April 14, 2015.

**ix.** In one instance, as a result of the STD appeal being overturned on March 12, 2015, the Company delayed opening the LTD claim until May 19, 2015.

The Department alleges these acts are in violation of CCR §2695.7(d) and are unfair practices under CIC §790.03(h)(3).

**Summary of the Company's Response to 41(a):** The Company responded to these findings as follows:

**i.** Of the five instances, the Company acknowledges one and does not agree in four instances.

1. The Company acknowledges that contact with the treating provider would have been beneficial in clarifying the claimant's functional status since the medical records appeared to contradict the opinion of the treating provider; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). As a result of an appeal, the Company overturned the claim and benefits were paid through October 15, 2015 and beyond. The appeal was overturned during the course of the claim, not as a result of this examination. To ensure future compliance, the Company provided a procedure reminder on January 17, 2017 to all disability staff members regarding medical disagreement with the treating provider.

2. The Company believes the appropriate medical review was completed for the claim during the appeal phase. In addition, the Company states it is not conclusive that an IME completed in February 2015 would have yielded the same results as the IME completed in September 2015, as the claimant's medical condition could potentially have changed from February to September 2015. Also, it is not clear if completing an IME in February 2015 would have yielded different results than what was determined by the Nurse Disability Consultant review.

3. The Company does not believe it acted unreasonably in utilizing a registered nurse (RN) to review the medical records of the claimant and to provide input to the claims examiner. The RN reached out to the office of the treating physician on July 1, 2014 to obtain additional information regarding the claimant's medical condition. The RN spoke with an associate of the treating physician and reviewed the medical records. Thereafter, the RN provided an assessment of the claimant's medical condition, which the claims examiner would have considered in reaching a determination of the claim. The medical documentation included in the LTD claim file did not support the claimant's inability to perform her own sedentary occupation as of the original date of disability, February 27, 2014 through her delivery date of June 3, 2014. The first medically supported date of disability would have been June 3, 2014, which was the claimant's delivery date. An elimination period of 90 days from June 3, 2014 would result in a benefit commencement date of September 1, 2014, but benefits were only supported for the usual and customary timeframe of eight weeks post-partum after a C-section. This would have resulted in benefits being supported from June 3, 2014 through July 29, 2014, which failed to meet the elimination period required by the

policy. Due to failure to meet the elimination period, the Company stated no benefits were due the claimant under the LTD claim.

4. The Company did not refer the claim for outside medical review or follow-up with the treating physician prior to the claim denial on January 14, 2014. At the time of this review, the information contained in the claim file was deemed sufficient to make a claim determination without additional documentation from an FCE or an IME.

5. The Company did not find that an FCE or an IME was needed at the time of the November 4, 2014 denial. The Company had three external physician reviews completed by board certified physicians in internal medicine, occupational medicine, and psychiatry. The Company determines when an FCE, IME, or external physician review is appropriate. At the time the file was being reviewed in November 2014, the information contained in the claim file along with the three external physician reviews was deemed sufficient to make a claim determination without additional documentation from an FCE or an IME.

The Company also provided the following response to **i.**2, 3, 4 and 5 above:

> The Company reviews a claimant's office and treatment notes, and the Attending Physician's Statement, along with information from the employer (including job descriptions and/or vocational information) in conjunction with the terms and conditions of the applicable policy to determine if the claimant meets the definition of Disability. In the event that the Company is unable to determine a claimant's functionality given the information contained in the medical documentation, the Company will utilize outside external resources such as an FCE or an IME, if deemed necessary. However, if the medical documentation on file does not support impairment on the basis of a medical condition, an IME or an FCE would not be necessary. These tools are utilized in claim files in which functionality or lack of functionality cannot be determined based on the existing claim file documentation.

Although the Company disagrees with **i**.2, 3, 4 and 5 above, the Company provided remedial measures to ensure future compliance. The Company updated its procedures in August 2017 to indicate that if functionality cannot clearly be determined after review of the claimant's medical records and the attending physician's statement, the claims examiner will need to take additional steps to determine the claimant's capabilities. Such steps shall include, but are not limited to, contacting the treating provider and/or requesting an external review(s).

**ii.** In four instances involving the request for the SSDI records, the Company states its decision to approve or deny benefits is independent of SSA's decision. Although it was not the Company's consistent practice to request copies of the SSDI files at the time of handling of these claims, it is the Company's current practice effective June 2, 2014. Nevertheless, a claim determination is based upon the restrictions and limitations supported by medical evidence contained in the claim file. The Company does not believe its actions are in violation of CIC §790.03(h)(3).

**iii.** In two instances involving the request for the Workers' Compensation records, while the Company states the decision to approve or deny benefits is independent from the Workers' Compensation claim carrier's decision, the Company agrees that consideration and review of a claimant's Worker's Compensation file may be beneficial and could contain information that is helpful in reviewing a claimant's LTD claim. Requesting a copy of a Workers' Compensation file is an option for a claims examiner if it is felt that the information would assist with the adjudication of the claim; however, at the time of this examination, it was not a Company requirement. To ensure future compliance, the Company updated it procedures in August 2017 to indicate that during an initial claim evaluation, it could be of great benefit to partner with the Workers' Compensation carrier. This would involve sharing of medical records and any other testing or evaluations that may have been completed. This information will be documented in the claim file and utilized in making the final claims determinations with regard to benefit eligibility. The Company does not believe its actions are in violation of CIC §790.03(h)(3).

**iv.** In one instance, the Company believes the claim was handled appropriately and disagrees it had sufficient medical documentation to support and approve disability benefits through December 1, 2014. The Clinical Review dated November 5, 2014 opined that the information contained in the claim file was insufficient to determine if the restrictions and limitations provided in the medical documentation would preclude the claimant from full time performance of her own occupation. The Clinical Review notes indicate that the claimant was seeing additional providers for treatment, but that information was not available for review. Clinical notes also indicate that it is unclear what findings prompted the diagnosis and treatment. Additionally, an office visit dated August 5, 2014 (just prior to the benefit commencement date of August 8, 2014) noted subjective complaints, but no functional impairments. Based on the absence of certain medical records, the Clinical Review requested additional medical information in order to make a claim determination. The insured also requested claim closure, even when notified of the potential for payable benefits.

Nonetheless, the Company reopened the claim and approved benefits through December 1, 2014. As a result of this finding, the Company issued payment of $1,508.72, including interest, to the claimant. The Company does not believe its action is in violation of CIC §790.03(h)(3).

**v.** In one instance, the Company states the claims examiner spoke with one provider's office on August 27, 2015 and was informed the request was not received. The Company refaxed the request on August 28, 2015. A prepayment invoice was received on September 8, 2015 and payment was sent on September 10, 2015 although the records were never received. While the Company disagrees that additional action was necessary in terms of resending the original medical records request as Lincoln had confirmation that both requests were received, the Company does agree that additional follow up should have taken place on the prepayment invoice as this indicated the request was being processed. To ensure future compliance, the Company sent a procedure reminder to all staff on January 23, 2017 regarding medical record follow-up. The Company does not believe its action is in violation of CIC §790.03(h)(3).

**vi.** In one instance, the Company does not agree it failed to pursue a diligent investigation of the claim. The Company considered and allowed benefits for the normal recovery time for the diagnosis, age of the claimant, and a light occupation. The Company requested additional information from the claimant in order to extend benefits for the claim beyond the normal recovery time. As the burden to provide continued proof of disability contractually rests with the claimant, the Company does not believe it had a duty to request these records on the claimant's behalf. Nonetheless, after additional clinical review of this claim, Lincoln's original decision on the claim was reversed and an additional benefit payment to the claimant to cover the time period between March 3, 2015 and April 20, 2015, including statutory interest was issued. Payment is noted under section 47(c) below. The Company does not believe its action is in violation of CIC §790.03(h)(3).

**vii.** In one instance, the Company acknowledges this claim handling does not meet the Company's standard for diligent and timely investigation of the claim; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). To ensure future compliance, the Company provided an amended reminder regarding established procedure on January 23, 2017 and the Company addressed this issue as a topic with claim personnel in the Company's January 2017 team meetings.

**viii.** In one instance, the Company acknowledges there was a delay from the date management reviewed the claim file to the date benefits were approved and a payment was issued; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). This does not meet the Company's standard for

diligent and timely investigation of the claim. To ensure future compliance, the Company provided an amended reminder regarding established procedure on January 23, 2017 and the Company addressed this issue as a topic with claim personnel in the Company's January 2017 team meetings.

**ix.** In one instance, the Company acknowledges the claim handling does not meet the Company's standard for diligent and timely investigation into the LTD claim; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). Per Company procedure, the STD claim should have been reviewed within five business days of the overturn decision (and the LTD claim generated at that time). The LTD claim then should also have been reviewed within five business days per Company procedure. To ensure future compliance, the Company provided an amended reminder regarding established procedure on January 23, 2017 and the Company addressed this issue as a topic with claim personnel in the Company's January 2017 team meetings.

**41(b).** **<u>In one instance, the Company persisted in seeking information not reasonably required for or material to the resolution of a claims dispute.</u>** Specifically, the Company received the Workers' Compensation award letter and persisted in seeking this information among other things on two separate occasions. The Department alleges this act is in violation of CCR §2695.7(d) and is an unfair practice under CIC §790.03(h)(3).

**<u>Summary of the Company's Response to 41(b):</u>** The Company agrees it requested copies of the Workers' Compensation award letter when this information was already contained within the claim file. The Company acknowledges an error was made by the claims examiner in failing to review the complete claim file information; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). The claims examiner is no longer with the Company as of August 2016 so Lincoln is unable to provide a specific date that feedback was provided. Although this employee is no longer with the Company, to ensure that all claim examiners have been reminded of the importance of not requesting items multiple times, the Company covered this topic in its team meetings conducted in January 2017.

**42.** **<u>In nine instances, the Company failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.</u>** The Department alleges these acts are in violation of CIC §790.03(h)(3).

**42(a).** In four instances, the Company failed to follow its procedure to provide a delay letter to the claimant every 30 days if the claim is pended for additional information.

**<u>Summary of the Company's Response to 42(a):</u>** The Company acknowledges these findings; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3). If the claim is pended for additional information, the claims examiner must send a delay letter to the claimant. The delay letter must provide a description of the information requested, all reasons for the delay, and any relevant policy provisions. To ensure future compliance, the Company provided formal training with the California claims team on November 30, 2016 and sent a procedural reminder regarding established procedure on December 19, 2016. Additionally, during the Company's January 2017 team meeting, the Company's procedure was reiterated with claims personnel.

**42(b).** In three instances, the Company failed to follow its procedures in whole or in part. Specifically, the Company estimated the CASDI offset without receiving consent from the claimant to apply an estimate or by first confirming the claimant was receiving a CASDI award.

**<u>Summary of the Company's Response to 42(b):</u>** The Company acknowledges these findings; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3). The Company's current procedure is to not apply an estimated offset to a claim until the Company either receives confirmation that the claimant is receiving the award, or the claimant has instructed the Company to apply an estimate in order to prevent an overpayment. To ensure future compliance, the Company provided formal training with the California claims team on November 30, 2016 and sent a procedural reminder to follow its established procedures and policy provisions concerning the verification of CASDI prior to placing this offset on December 19, 2016. Additionally, during the Company's January 2017 team meeting, the Company's procedure was reiterated with claims personnel. In one instance, payment was issued below in section 43(b). In the second instance, the Company referred the claim internally for a payment analysis outlined below in section 43(f).

In the instance where the Company followed its internal procedure in part, the Company acknowledges the claims examiner should only have applied the CASDI estimate for the timeframe it was known that the claimant actually received CASDI benefits. The claimant indicated CASDI benefits were not received beyond the regular eight week postpartum period. Thus, the estimate should not have been applied for the full 52 weeks until written documentation or verbal communication was received from the claimant regarding the remaining 44 weeks of CASDI benefits. While the Company acknowledges the estimate for the CASDI should not have been applied for the remaining 44 weeks of benefits unless verification was received from the claimant, either in writing or verbally; the Company states additional payments will not be considered at this time unless the claimant submits verification that she did not receive the allowed 52 weeks of CASDI.

As a remedial measure, the Company contacted the claimant via letter on June 3, July 13, and September 8, 2016. The claimant responded via e-mail on September

20, 2016. The Company then responded to the claimant via e-mail on September 27, 2016, at which time the Company requested documentation that would support the claimant had not received the full 52 weeks of CASDI. As no additional response was received back, the Company sent one last e-mail to the claimant on December 22, 2016. Although the Company has not received a response to this last e-mail and the Company was not able to confirm whether the claimant had received CASDI beyond the eight weeks that verification was received, the Company determined that payment to the claimant was appropriate for the 44 weeks of estimated CASDI. As a result of this finding, the Company issued payment of $21,053.60, including interest, to the claimant.

**42(c).** In one instance, the Company failed to follow procedure by closing the claim due to its not having received proof of the claimant's California State Disability Insurance benefit.

**<u>Summary of the Company's Response to 42(c):</u>** The Company acknowledges this is not within Company procedures to close the handling of a claim due solely to not having received proof of a CASDI award; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). With the current processes for obtaining offset information (particularly State Disability and Social Security awards), the Company's claim form currently requests this information and the Company does pursue it. However, the language allowing the Company to suspend or deny claims due to non-receipt of the information has been removed from the provision. Additionally, this claim was reopened for consideration of payment. Payment was issued below in section 47(b).

**42(d).** In one instance, the Company failed to follow its procedure to include a copy of the overpayment calculation in a letter to the claimant.

**<u>Summary of the Company's Response to 42(d):</u>** The Company agrees no overpayment calculation was attached to the correspondence regarding the overpayments for the STD and LTD claims; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). It is unclear if this was an error made by the claims examiner or if the overpayment calculation was generated and included in the letter to the claimant but not captured in the Company's system. Since the Company's established procedure dictates that a copy of the overpayment calculation be included with the overpayment letter, a change to the Company's procedure is not needed. To ensure future compliance, the Company provided formal coaching of this oversight with the claim examiner on December 2, 2016.

**43. <u>In six instances, the Company attempted to settle a claim by making a settlement offer that was unreasonably low.</u>** The Department alleges these acts are in violation of CCR §2695.7(g) and are unfair practices under CIC §790.03(h)(5).

**43(a).** In one instance, the Company based the benefit payment on February 8, 2012 as the date of disability rather than on the correct date February 2, 2012, which resulted in a low settlement.

**Summary of the Company's Response to 43(a):** The Company had previously determined the claimant was Actively at Work prior to February 8, 2012 based on a lack of supporting medical documentation prior to that date; however, upon further review, the Company agrees that the date of disability of February 2, 2012 would have been appropriate. Nonetheless, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this finding, the Company issued payment of additional benefits including interest in the amount of $203.65.

**43(b).** In one instance, the Company offset California State Disability Income (CASDI) for a period of time that the claimant did not receive CASDI, resulting in a low settlement.

**Summary of the Company's Response to 43(b):** The Company's review reveals that benefits were not accurately paid under the STD claim; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this finding, the Company issued payment of additional benefits including interest in the amount of $3,359.33.

**43(c).** In one instance, the Company paid the benefit based on the 50% Core benefit when the claimant purchased the 70% Buy-Up benefit. This resulted in a low settlement.

**Summary of the Company's Response to 44(c):** The Company agrees that, due to an oversight, benefits on the claim were underpaid as all file notes indicate the claimant elected the Buy-Up coverage; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this finding, the Company issued additional benefits to the claimant including interest in the amount of $1,229.90.

**43(d).** In one instance, the Company failed to pay the Core benefit when the Buy-Up benefit ended after a one-year period based on the claimant's age. This resulted in a low settlement. All employees under this group plan who do not elect to purchase Buy-Up coverage automatically receive the Core coverage. Optional benefits elected by a claimant should not be more restrictive than Core Benefits. Therefore, the Buy-Up coverage should revert back to the Core benefits since the maximum benefit duration for the Buy-Up coverage is a lesser amount of time.

**Summary of the Company's Response to 43(d):** The Company agrees this claim was not handled in accordance with the policy coverage; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this finding, the Company reopened the claim and issued payment of back benefits including interest in the amount of $23,082.26 to the identified claimant.

In response to a concern that the Company failed to revert back to the Core benefit in other claims in which the Buy-Up benefit ended, the Company discovered one of the group policies was not issued in accordance with the normal Company Core and Buy-Up policies. The Company amended this group policy contract on August 1, 2016 back to the effective date of January 1, 2016 to ensure that the Buy-Up coverage does not include more restrictive maximum benefit duration than the Core coverage.

The Company also reviewed all claims from the effective date of this group policy, January 1, 2013 through August 29, 2016. As a result of this review, the Company identified two additional claims that would have been adversely affected. Following a review of the first claim, it was determined that no additional benefits were due given that the claimant was receiving other sources of income that exceeded her basic monthly earnings. Following a review of the second claim, the Company issued payment of back benefits to the claimant in the amount of $15,222.90 including interest.

**43(e).** In one instance involving an Individual Disability Income claim administered by a third party, the Company underpaid one day of benefits for the month of February 2015.

**Summary of the Company's Response to 43(e):** Due to a system payment issue relating to the month of February in 2015 and an oversight by the claim specialist, the Company agrees that the claimant was underpaid; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). The claim specialist is responsible for verifying payment accuracy and making the necessary adjustments within the claim payment system. To ensure future compliance, the Company reiterated to the claim specialist the importance of special system payment considerations when reviewing payment accuracy prior to disbursement. Additionally, as a result of this finding, the Company issued payment of additional benefits including interest in the amount of $227.12 to the claimant.

Further, in order to determine whether other claimants were affected, the Company internally reviewed its system and confirmed that no other recipients were impacted by this issue.

**43(f).** In one instance, the Company failed to document how it arrived at its offset calculation for California State Disability Insurance. As a result of a payment analysis and re-review of the file, the Company determined the claim was underpaid.

**Summary of the Company's Response to 43(f):** The Company acknowledges there is no documentation within the file to explain how the offset was determined or calculated; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). To ensure future compliance, the Company sent a formal procedure reminder to all claims staff on December 19, 2016. As a result of this finding, the

Company issued payment of additional benefits including interest in the amount of $56.51.

**44. <u>In five instances, the Company failed to include a statement in its claim denial that, if the claimant believes all or part of the claim has been wrongfully denied or rejected, he or she may have the matter reviewed by the California Department of Insurance, and/or failed to include the address and telephone number of the unit of the Department which reviews claims practices.</u>** The Department alleges these acts are in violation of CCR §2695.7(b)(3) and are unfair practices under CIC §790.03(h)(3).

**<u>Summary of the Company's Response:</u>** In four instances, the Company acknowledges it did not provide the denial statement as the claimant was living in a state other than California at the time of the claim. During the handling of these claims, the Company's claims system was programmed to include the California Department of Insurance language only in letters to claimants who reside in California. In the fifth instance, the Company agrees an oversight occurred and it failed to include the information required by the referenced citation.

To ensure future compliance, the Company provided formal training with the California claims team on November 30, 2016 regarding established procedure to include California Department of Insurance contact information for policies issued in California and where insureds/claimants reside outside of the state. Additionally, the Company sent a reminder to claims staff on December 19, 2016 and, during the Company's January 2017 team meeting, the Company reiterated its procedure with claims personnel.

The Company does not believe its actions are in violation of CIC §790.03(h)(3).

**45. <u>In four instances, the Company failed to include the California fraud warning on insurance forms relating to first-party claimants</u>**. All instances involve Individual Disability Income claims administered by a third party. The Department alleges these acts are in violation of CIC §1879.2(a) and are unfair practices under CIC §790.03(h)(3).

**<u>Summary of the Company's Response:</u>** The Company acknowledges that the disability form used by its TPA did not include the proper California fraud warning; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3). To ensure future compliance, the Company revised the disability claim forms to include the proper California fraud warning. The Company's TPA implemented the revised form for use in the first quarter of 2017.

**46. <u>In three instances, the Company misrepresented to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.</u>** In the first instance, the Company misrepresented the Minimum Monthly Benefit available under

the policy. In the second instance, the Company misrepresented the maximum benefit period. In the third instance, the Company misrepresented the type of offset identified on the EOBs. The Department alleges these acts are in violation of CIC §790.03(h)(1).

**Summary of the Company's Response:** The Company acknowledges these findings in all instances; however, the Company does not believe its actions are in violation of CIC §790.03(h)(1). In the first instance, the Company states this was an unintentional oversight. The policy indicates that the minimum benefit would be the greater of $100 or 10%. The minimum of $123.31 should have been quoted in the letter instead of $100.00. In the second instance, the approval letter noted a maximum benefit period of 24 months, when 12 months was the maximum benefit period as defined by the schedule of benefits. This discrepancy was corrected in a phone call to the claimant. In the third instance, the offset was identified as "Workers Compensation" when it should have been identified as "Retirement Employer".

To ensure future compliance, the Company provided formal training with the California claims team on November 30, 2016 and sent a procedural reminder regarding its established procedure on December 19, 2016. Additionally, during the Company's January 2017 team meeting, the Company's procedure was reiterated with claims personnel.

**47. In three instances, the Company failed to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear.** The Department alleges these acts are in violation of CIC §790.03(h)(5).

**47(a).** In one instance, the Company denied the Survivor Income Benefit based on the claimant's not meeting the 180-day elimination period of disability as required by the policy. The claimant's date of disability was January 30, 2014, and the claimant's date of death was September 4, 2014. The time period in between these two dates equates to 217 days.

**Summary of the Company's Response to 47(a):** The Company agrees the spouse is entitled to the Survivor Income Benefit based on the policy provision; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). Once the Company is notified of a claimant's death, the claims examiner enters the date of death into the Company's claims database which then generates alerts for the claims examiner to review the claim for a potential Survivor Income Benefit. As a result of this finding, the Company issued payment to the surviving spouse in the amount of $8,341.36 including interest.

Additionally, the Company ran a report for the review period of July 1, 2014 through June 30, 2015, and found one other claim that was denied for not meeting the 180-day consecutive days of disability as required by the policy. The Company appropriately denied this claim for monthly disability income benefits as the claimant did not survive the 180 days as required by the policy.

In response to the concern that the Company may have overlooked other claims with a Survivor Income Benefit provision, the Company conducted an internal survey from July 1, 2013 through December 5, 2016. As a result of the survey, the Company identified two claims. The Company appropriately denied one claim for not meeting the 180-day consecutive days of disability as required by the policy. Since the claimant did not survive the 180 days, no Survivor Income Benefit was payable. The Company incorrectly denied another claim for not meeting the 180-day period of disability as required by the policy. As a result of this finding, the Company issued payment to the eligible survivor in the amount of $16,098.84 including interest.

To ensure future compliance, the Company implemented a quarterly survey in the first quarter of 2017 of any claims which may be eligible for the Survivor Income Benefit but where one has not been paid. In addition to regularly scheduled quality audits, the additional quarterly survey and review will ensure that all claims are processed in accordance with policy guidelines.

**47(b).** In one instance, the Company closed the claim without payment since the claimant did not provide proof of the California State Disability Income award.

**Summary of the Company's Response to 47(b):** The Company agrees the claimant is due a benefit for the period of July 2, 2014 through the proposed return-to-work date of July 7, 2014; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this finding, the Company conducted a payment analysis and issued an additional benefit check including interest in the amount of $539.58 to the insured.

**47(c).** In one instance, the Company paid benefits through March 3, 2015 and failed to include benefits through April 20, 2015, the date the claimant's treating physician opined the claimant was totally disabled due to a left shoulder surgery to repair a chronic rotator cuff tear. Under the "Physical Impairment" section of the Group Continuance of Disability form, the treating physician stated "no use of L shoulder until 4/20/15". The scope of the claimant's occupation as a banquet server includes setting up tables, retrieving and serving beverages and food orders, and maintaining, cleaning work areas and equipment. As the claimant's essential duties of his occupation requires the use of the left upper extremity, and the Company was in receipt of a Group Continuance of Disability form signed by the treating physician supporting the claimant's total disability, the Company failed to include benefits through April 20, 2015 in which liability had become reasonably clear.

**Summary of the Company's Response to 47(c):** After an additional review of the information contained in the claim file, the Company reversed its original claim determination based on the claimant's age at the time of the procedure and occupational requirements regarding the use of the claimant's upper extremity. The Company issued a benefit payment including interest in the amount of $4,718.68

covering the time period of March 3, 2015 through April 20, 2015. However, the Company does not believe its action is in violation of CIC §790.03(h)(5).

**48. <u>In two instances, the Company failed to acknowledge notice of claim within 15 calendar days.</u>** The Department alleges these acts are in violation of CCR §2695.5(e)(1) and are unfair practices under CIC §790.03(h)(2).

**<u>Summary of the Company's Response:</u>** The Company agrees it failed to acknowledge receipt of these claims within regulatory timeframes; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3). To ensure future compliance, the Company provided formal training with the California claims team on November 30, 2016 and sent a procedural reminder regarding established procedure on December 19, 2016. Additionally, during the Company's January 2017 team meeting, the Company's procedure was reiterated with claims personnel.

**49. <u>In two instances, the Company failed to provide necessary forms, instructions, and reasonable assistance within 15 calendar days.</u>** The Department alleges these acts are in violation of CCR §2695.5(e)(2) and are unfair practices under CIC §790.03(h)(3).

**<u>Summary of the Company's Response:</u>** The Company agrees it failed to provide forms, instructions, and reasonable assistance within regulatory timeframes; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3). To ensure future compliance, the Company provided formal training with the California claims team on November 30, 2016 and sent a procedural reminder regarding its established procedure on December 19, 2016. Additionally, during the Company's January 2017 team meeting, the Company's procedure was reiterated with claims personnel.

**50. <u>In one instance, the Company failed to affirm or deny coverage of claims within a reasonable time after proof of loss requirements had been completed and submitted by the insured.</u>** Specifically, the Company sent a written denial on October 15, 2015 which is more than one year from the date the Company decided to deny the claim on July 28, 2014. The Department alleges this act is in violation of CIC §790.03(h)(4).

**<u>Summary of the Company's Response:</u>** The Company agrees the denial letter was not sent in a timely manner after the denial decision; however, the Company does not believe its action is in violation of CIC §790.03(h)(4). A review of the claim appears to indicate that the claims examiner attempted to send a denial letter on July 30, 2014, but it was not sent out due to an unknown user error. The Company's claim system will notify an employee when a letter is pending completion and submission to be mailed. While this system functionality was originally put in place to ensure letters were issued, this control measure also serves to notify employees of inventory which has not been completed in order to avoid the delay in submission of correspondence as seen in this

claim. Because the employee responsible for the error is no longer with the Company, an opportunity for coaching that employee is not possible. However, to ensure future compliance, the Company provided formal training with the California claims team on November 30, 2016. Additionally, during the Company's January 2017 team meeting, the Company's procedure was reiterated with claims personnel.

**51. In one instance, the Company failed to notify the insured in writing of information needed to determine liability within 30 calendar days after receipt of the claim.** The Department alleges this act is in violation of CIC §10111.2(b) and is an unfair practice under CIC §790.03(h)(3).

**Summary of the Company's Response:** The Company acknowledges that no letter could be located in the claim file; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). The Company's procedure and policy guidelines were not followed in this instance. The Company states this seems to be a training issue with the claims examiner. To ensure future compliance, the Company provided formal training with the California claims team on November 30, 2016 and sent a procedural reminder regarding established procedure on December 19, 2016. Additionally, the Company provided formal coaching to the claims examiner on December 21, 2016. Finally, during the Company's January 2017 team meeting, the Company's procedure was reiterated with claims personnel.

**52. In one instance, the Company failed to accrue interest on the benefit payment beginning the 31st calendar day after receipt of the claim.** Specifically, as no notice was sent by the Company to the insured within 30 calendar days after receiving the claim, interest was not considered when paying the disability claim. The Department alleges this act is in violation of CIC §10111.2(b) and is an unfair practice under CIC §790.03(h)(5).

**Summary of the Company's Response:** The Company agrees with this finding and states interest was overlooked in this isolated instance; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). To ensure future compliance, the Company provided a procedural reminder to all disability claims staff on August 1, 2016. As a result of this finding, the Company issued payment of $555.94 to the insured.

**53. In one instance, the Company failed to pay interest on a benefit payment that was not paid within 30 calendar days from receipt of information needed to determine liability.** Specifically, upon receipt of information needed to consider payment of the claim, the Company delayed payment and failed to include interest. This instance was identified following the Company's response to another allegation. The Department alleges this act is in violation of CIC §10111.2(c) and is an unfair practice under CIC §790.03(h)(5).

**Summary of the Company's Response:** Upon further review of the claim file in this instance, the Company determined that an additional payment was due with interest; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). As a result of this review, the Company issued payment of interest in the amount of $206.83 to the insured.

**54. In one instance, the Company failed to pay interest on a death claim, under a disability policy, that was paid longer than 30 days from the date of death of the insured, pursuant to CIC §10174.** In this instance, the insured died on May 2, 2014, and the Company issued the survivor benefit payment on June 4, 2014 without including interest. The Department alleges this act is in violation of CIC §10172.5(a) and is an unfair practice under CIC §790.03(h)(5).

**Summary of the Company's Response:** The Company acknowledges the payment did not include interest and that it did not have a procedure to include interest on survivor benefit payments; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). To ensure future compliance, the Company's Long Term Disability Survivor Income Benefits (SIB) procedures were updated on July 28, 2016 to clearly indicate that if payment is made more than 30 days after the date of death, interest must be paid. Additionally, the Company sent this procedure announcement to all disability claims staff on August 1, 2016. As a result of this finding, the Company issued payment of $2.73 to the beneficiary.

In response to the concern the Company may have overlooked the payment of interest in the past on an SIB payment made more than 30 days after the date of the insured's death, the Company conducted an internal survey of Disability Income claims in which the SIB became payable between July 1, 2013 and August 30, 2016. As a result of the survey, the Company identified 15 such claims and issued interest payments totaling $553.18 to the beneficiaries.

**55. In one instance, the Company failed to begin any necessary investigation of the claim within 15 calendar days.** The Department alleges this act is in violation of CCR §2695.5(e)(3) and is an unfair practice under CIC §790.03(h)(3).

**Summary of the Company's Response:** The Company acknowledges that a review into eligibility was not completed as none is documented in the claim file; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). To ensure future compliance, the Company updated its California procedure document on December 19, 2016 and sent a formal procedure announcement to all disability staff on this same date.

## SUPPLEMENTAL DISABILITY (LNLIC)

**56. <u>In 16 instances, the Company failed to provide to the claimant and assignee, if any, an explanation of benefits including, where applicable, the name of the provider or services covered and dates of service, and a clear explanation of the computation of benefits with each claim payment.</u>** Specifically, in each instance, the Company failed to provide to the claimant an explanation of benefits that includes the date(s) of service. The Department alleges these acts are in violation of CCR §2695.11(b) and are unfair practices under CIC §790.03(h)(3).

**<u>Summary of the Company's Response:</u>** The Company acknowledges that the EOBs do not clearly identify the date of service for which the payment is being made; however, the Company does not believe its actions are in violation of CIC §790.03(h)(3). The Company uses an outside vendor system for its EOBs. On or about July 1, 2016, the Company manually added the date(s) of service to the EOBs. The Company implemented permanent changes to its EOB effective November 15, 2016 to include the date(s) of service.

**57. <u>In one instance, the Company failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.</u>** Specifically, the Company failed to follow its procedure to reissue a payment that had been cancelled. The initial payment was cancelled on March 24, 2014 and the check was reissued on January 21, 2015. The Department alleges this act is in violation of CIC §790.03(h)(3).

**<u>Summary of the Company's Response:</u>** The Company acknowledges that the original claims examiner failed to follow procedure and missed reissuing the check to the insured; however, the Company does not believe its action is in violation of CIC §790.03(h)(3). The Company later discovered the check had not been reissued and another examiner reissued the check. The Company's procedure states that once notification is received for a replacement check, an email is sent to the claims examiner to investigate. Within 24 hours of the email, the claims examiner will verify if the check has been cleared or if it is still outstanding. If the check is outstanding, the claims examiner will cancel the check in the Company's system, which is an overnight process. The claims examiner will check the claims processing system the next business day to insure that funds have been reversed for the check. The claims examiner can then reissue the check. To ensure future compliance, the Company coached the claims examiner on January 21, 2015, which was the date the check was issued, to prevent this oversight from occurring in the future. Additionally, since February of 2016, a weekly report is produced for any checks that have been reversed to ensure that the Company is reissuing benefits on these claim reversals.

**58. <u>In one instance, the Company failed to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear.</u>** Specifically,

the Company denied the claim even though it had the necessary information to pay the claim. The Department alleges this act is in violation of CIC §790.03(h)(5).

**Summary of the Company's Response:** As a result of an internal claim audit, information was discovered in the medical records and the claim was eventually paid. The Company indicated that no new information was received or requested from the insured resulting in payment of the claim after it was denied; however, the Company does not believe its action is in violation of CIC §790.03(h)(5). To prevent this oversight from occurring in the future, the Company coached the claims examiner on March 5, 2015, the date the portion of this claim was reconsidered and the benefits were issued to the insured.

**DENTAL (LNLIC)**

**59. In one instance, the Company misrepresented to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.** Specifically, the Company misrepresented the reason for the denial of the claim. The Department alleges this act is in violation of CIC §790.03(h)(1).

**Summary of the Company's Response:** The Company acknowledges this finding; however, the Company does not believe its action is in violation of CIC §790.03(h)(1). Due to an inadvertent oversight, the claims examiner applied the procedure code to the incorrect service type. As part of the Company's ongoing quality assurance effort, the staff is regularly coached on procedural items to ensure understanding. Additionally, a monthly quality assurance review process is in place that audits a statistically valid sample set of claims processed by each claims examiner that allows for the identification of trends that may need to be addressed as well as ongoing oversight of potential issues or errors both collectively across the team and individually. The identified issue was brought to the attention of the entire dental claims team in a meeting on October 28, 2015. Further, the Company distributed quick reference cards to the entire claims team and the specific issue subject to this claim was added to these quick reference cards.

**60. In one instance, the Company failed to respond to communications within 15 calendar days.** Specifically, the Company received the insured's appeal on May 18, 2015 and responded on June 9, 2015. The Department alleges this act is in violation of CCR §2695.5(b) and is an unfair practice under CIC §790.03(h)(2).

**Summary of the Company's Response:** While the Company disagrees with the Department's assessment of this situation given that the policy provides for an appeal response within 30 days, the Company modified its practices and implemented the new procedure to respond to all communications regarding a claim within 15 days, including appeals communications. This procedural change was implemented and training was conducted with claims staff on June 2, 2016. An update to written

procedures was completed on October 4, 2016. The Company does not believe its action is in violation of CIC §790.03(h)(2).