DONALD HALL, ) NO. 5:12-cv-01911
) -TJH-DTB
)
PLAINTIFF, ) DEPOSITION OF
) LISA KURTZ
VS. )
)
THE LINCOLN NATIONAL LIFE )
INSURANCE COMPANY, )
A CORPORATION, )
)
DEFENDANT. )

- - - - - - - - - - - - - - -

DEPOSITION OF LISA KURTZ, taken before Dena J. Schweitzer, General Notary Public within and for the State of Nebraska, beginning at 8:03 a.m., on April 12, 2013, at Thomas & Thomas Court Reporters, 1321 Jones Street, Omaha, Nebraska, pursuant to the within stipulations.

A P P E A R A N C E S

FOR THE PLAINTIFF:
MR. ROBERT J. ROSATI
THE ERISA LAW GROUP, LLP
2055 San Joaquin Street
Fresno, California 93721
(559)256-9800 FAX(559)256-9795

robert@erisalg.com

FOR THE DEFENDANT:
MS. ADRIENNE C. PUBLICOVER
WILSON ELSER, LLP
525 Market Street
17th Floor
San Francisco, California 94105
(415)433-0990 FAX(415)434-1370

adrienne.publicover@wilsonelser.com

A L S O P R E S E N T

Charles Cunningham

INDEX

CASE CAPTION ........................... Page 1
APPEARANCES ............................ Page 2
INDEX .................................. Page 3
STIPULATIONS ........................... Page 6
TESTIMONY .............................. Page 6
REPORTER CERTIFICATE ................... Page 190
READ & SIGN LETTER ..................... Page 191
ERRATA SHEET ........................... Page 192

DIRECT EXAMINATION:
By Mr. Rosati ..................... Page 6

| EXHIBIT | PAGE |
|---|---|
| 9. LTD CLAIM FILE | 6 |
| 10. ACTIVITY LIST | 6 |
| 11. REFERRAL | 6 |
| 12. CLAIM DOC SCREEN | 6 |
| 13. TELEPHONE NOTES LTD | 6 |
| 14. POLICY | 6 |
| 15. SCREEN SHOT | 6 |
| 16. LETTER DATED DECEMBER 31, 2009 | 6 |
| 17. LETTER DATED JANUARY 6, 2010 | 6 |
| 18. DOCUMENT DATED SEPTEMBER 24 2010 | 6 |
| 19. LETTER DATED SEPTEMBER 27, 2010 | 6 |
| 20. DOCUMENT DATED OCTOBER 3, 2010 | 6 |
| 21. LETTER DATED MARCH 8, 2011 | 6 |
| 22. LETTER DATED MAY 5, 2011 | 6 |
| 23. LETTER DATED JUNE 12, 2011 | 6 |
| 24. LETTER DATED AUGUST 19, 2011 | 6 |
| 25. LETTER DATED OCTOBER 19, 2011 | 6 |

26. DOCUMENT DATED NOVEMBER 22, 2011 6
27. DOCUMENT DATED NOVEMBER 28, 2011 6
28. LETTER DATED DECEMBER 20, 2011 6
29. LETTER DATED DECEMBER 30, 2011 6
30. LETTER DATED JANUARY 25, 2012 6
31. LETTER DATED APRIL 2, 2012 6
32. LETTER DATED MAY 29, 2012 6
33. HALL'S DECLARATION 6
34. UPDATED MEDICAL RECORDS 6
35. DRUG INFORMATION 6
36. AMERICAN PAIN SOCIETY DOCUMENT 6
37. INSTITUTE OF MEDICINE REPORT 6
38. AMA GUIDS 6
39. LINCOLN'S FINANCIAL DOCUMENT 6
40. BOTTERBUSCH ESSAY 6
41. SIMON ARTICLE 6
42. LETTER DATED JUNE 1, 2012 6
43. LETTER DATED JUNE 5, 3012 6
44. PEER REVIEW DATED JUNE 28, 2012 6
45. DR. AKHAVAN'S REPORT 6
46. LETTER DATED AUGUST 1, 2012 6
47. LETTER DATED AUGUST 22, 2012 6
48. LETTER DATED AUGUST 24, 2012 6
49. LETTER DATED AUGUST 30, 2012 6
50. LETTER DATED SEPTEMBER 4, 2012 6

51. LETTER DATED OCTOBER 12, 2012 6
52. LETTER DATED OCTOBER 17, 2012 6
53. LETTER DATED OCTOBER 19, 2012 6
54. LETTER DATED OCTOBER 22, 2012 6
55. LETTER DATED OCTOBER 24, 2012 6
56. LETTER DATED OCTOBER 30, 2012 6

(Whereupon, the following proceedings were had, to-wit:)

(Exhibit Nos. 9-56 marked for identification.)

COURT REPORTER: Stipulations?

MR. ROSATI: No.

LISA KURTZ

having been first duly sworn,

was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROSATI:

**Q. Morning.**

**A. Morning.**

**Q. My name is Bob Rosati. This is a deposition in a case of Hall versus Lincoln National.**

**Can you state and spell your name for the record, please.**

**A. Lisa Kurtz, L-I-S-A, K-U-R-T-Z.**

**Q. Can you state your business address?**

**A. 8801 Indian Hills Drive, Omaha, Nebraska 68114.**

**Q. Do you understand that you're under oath?**

**A. Yes.**

**Q. And that despite the informal surroundings**

**here in the court reporter's office, your testimony today carries the same weight as if we were in front of a judge and/or jury?**

**A. Yes.**

**Q. During the deposition the lawyers get to ask you questions, you get to answer questions. The court reporter will record the questions and answers in a little booklet, do you understand that?**

**A. Yes.**

**Q. At some point the booklet will be printed and you will have the opportunity to review it and make corrections, do you understand that?**

**A. Yes.**

**Q. However, if you make significant corrections or significant changes, I could comment at the time of the trial that your testimony today was not accurate or that your memory was not good, so it's best that you be as accurate as possible today, do you understand that?**

**A. Yes.**

**Q. You do have the right to correct misstatements in the deposition. A lot of times while reviewing subsequent facts, you remember something earlier. Feel free to make correction to earlier testimony in the course of the deposition,**

do you understand that?

A. Yes.

Q. Please don't answer a question unless you understand it. If you answer it, we will assume that you understood it, therefore, if you don't understand the question, ask me to clarify, do you understand that?

A. Yes.

Q. Do not guess, but I am entitled to your best estimate if you don't know the exact answer. Do you know the difference between a guess and an estimate?

A. Yes.

Q. Please answer audibly. The court reporter can't record nods or shakes of the head. Give a clear answer to each question so we have a clear answer in the booklet, do you understand that?

A. Yes.

Q. Is there any reason why you can't testify accurately today?

A. No.

Q. Have you spent any time preparing for this deposition?

A. Yes.

Q. How much time?

**A. My estimate would be about 12 to 15 hours.**
**Q. When did you do that?**
**A. While at work.**
**Q. Okay. This week, last week?**
**A. The last couple of weeks.**
**Q. What did you do?**
**A. Reviewed the file, went over how to respond.**
MS. PUBLICOVER: Just reviewed the file and met with your lawyer.
THE WITNESS: Okay.
BY MR. ROSATI:
**Q. Don't tell me --**
**A. Not how to -- sorry. I'm new at this. Sorry.**
**Q. Other than the file documents, did you review anything else?**
**A. No.**
**Q. And other than discussing the deposition with your attorney, did you discuss it with anyone else?**
**A. No.**
**Q. Have you ever given a deposition before?**
**A. No.**
**Q. Have you ever signed a declaration under**

**penalty of perjury or an affidavit in a lawsuit?**
**A. No.**
**Q. Ever testified in trial before?**
**A. Yes.**
**Q. Was it relating to your work at Lincoln?**
**A. No.**
**Q. Have you -- can you summarize your education from high school?**
**A. High school, I did two years of postcollege and then community college.**
**Q. What did you study in college?**
**A. General ed.**
**Q. How long have you been employed by Lincoln?**
**A. Eight years.**
**Q. What is your current job title?**
**A. Appeals specialist.**
**Q. What was your first job at Lincoln?**
**A. Short-term disability specialist.**
**Q. How long did you have the short-term disability specialist's job?**
**A. Approximately two and a half years.**
**Q. What was your training that they gave you for that job?**
**A. We did some on-the-job training and some**

**in classroom system training.**

**Q. What did the on-the-job training consist of?**

**A. Job shadowing, watching other people perform the tasks.**

**Q. What did the in-classroom training consist of?**

**A. System training, learning the computer system, learn the systems that we use to process claims.**

**Q. What was your next job?**

**A. Long-term disability specialist.**

**Q. How long did you have that job?**

**A. Two and a half years.**

**Q. Were you given any training for that job?**

**A. No, just job shadowing.**

**Q. And when did you start as an appeal specialist?**

**A. October will be -- September will be three years, so 2010 approximately, I think.**

**Q. Okay. And can you describe your job --**

MS. PUBLICOVER: That's an appeal specialist.

MR. ROSATI: That's what I asked.

MS. PUBLICOVER: I'm sorry.

BY MR. ROSATI:
**Q. What are your job duties as an appeal specialist?**
**A. To evaluate denied disability, long-term disability claims.**
**Q. Do you just handle long-term disability claims, or do you also handle short-term disability claims?**
**A. Long term. I do not do short term.**
**Q. Do you handle life insurance, waiver of premium?**
**A. Waiver of premium.**
**Q. Do you have a job description?**
**A. I do not. There is probably one but I do not have one.**
**Q. Okay. Can you look at Exhibit 8. This was posted on the internet. Have you ever seen Exhibit 8 before?**
**A. This exhibit form, no.**
**Q. Do your job duties include being responsible for the risk management of appeals or complaints?**
MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation.
THE WITNESS: It would be to -- to

the best of my knowledge, my job is to manage the risk of that -- not the risk, but that specific appeal, how it was processed to make sure that it was evaluated or the underlining decision was a correct decision, and then look at the appeal as it goes forward.

BY MR. ROSATI:

**Q. Okay. This description says investigate, evaluate and settle claims. Were you given any training on how to investigate claims?**

**A. On-the-job training.**

**Q. Training on how to evaluate claims?**

**A. Same thing.**

**Q. Do you settle claims?**

**A. I do not.**

**Q. There is a reference to track all decisions, backlog and pending files, are those terms that you recognize?**

**A. I recognize them, yes.**

**Q. Does Lincoln track all of your decisions, or do you track all of your decisions?**

**A. I don't know if Lincoln does. I track my decisions to make sure they are timely.**

**Q. When you say you track your decisions, what does that mean?**

**A. Means I keep a sheet that's got the -- when I get a peer review back or if I was to make sure that the claim's being processed in a timely manner.**

**Q. Is there a title to this sheet?**

**A. No.**

**Q. What do you include on the sheet?**

**A. A claim number, and if it's -- what my next step is going to be with it.**

**Q. Do you keep one sheet for all of your appeals or one sheet per appeal?**

**A. It's just a one piece of paper.**

**Q. And do you keep it just to remind yourself what is next on a given appeal?**

**A. Yes.**

**Q. So once a duty is done for an appeal, then some other task replaces it until the appeal is over?**

MS. PUBLICOVER: Objection: Vague, overbroad.

THE WITNESS: It's more so to track to make sure that the decisions are being done timely, not that each step is being done timely.

BY MR. ROSATI:

**Q. Okay. Does the sheet include all your**

**active appeals?**

**A. No, it does not.**

**Q. What does it normally include then?**

**A. Appeals that have had our pending decisions.**

**Q. And normally how many appeals do you have that are pending decisions?**

**A. It would depend on the day and the week.**

**Q. How many appeals do you have presently pending decision?**

**A. Probably about five.**

**Q. What do you mean by pending decision?**

**A. They are ready for a decision to be made. I need to write a letter.**

**Q. And what has to be done on an appeal before its pending a decision?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation, incomplete hypothetical.

THE WITNESS: It would be that -- it depends. It's going to be from the start to finish to get it to that decision point.

BY MR. ROSATI:

**Q. Okay. So how are appeals assigned to you, do you know?**

A. No, I do not.
Q. Do you have a list of assigned appeals?
A. No.
Q. Do you have currently appeals assigned to you?
A. Yes.
Q. How many?
A. Approximately 54.
Q. And what is your normal caseload? Is that average or high or low?
A. That's average.
Q. Are appeals assigned to you verbally or in writing?
A. They are assigned through our claim system which we call DOCS.
Q. Okay. So when you come to work in the morning, you turn on the computer and there will be a message that you got another appeal assigned to you?
A. I go into my work for that day diary and there will be an appeal there.
Q. When you're first assigned an appeal, what do you do?
A. I review the demographics of the appeal.
Q. What does that mean?

**A. Name, date of birth, date of hire, disability, the diagnosis.**
**Q. And then what do you do?**
**A. Then I move through to review the appeal letter.**
**Q. And then what do you do?**
**A. Review the prior actions on the appeal or the claim.**
**Q. When you say prior actions, what do you mean?**
**A. The prior underlying decision.**
**Q. Do you review earlier decisions if there was an award of short-term disability benefits or an award of long-term disability benefits and thereafter was reserved, you just review the underlying decision that you're reviewing on appeal?**
**A. No, I start at the beginning and work forward.**
**Q. Then next what do you do?**
**A. Call the claimant or the attorney to acknowledge the appeal and prepare a letter.**
**Q. Next?**
**A. It would depend on if there is going to be additional information coming in or if we're ready to go for review at that point.**

**Q. Is there a typical time it takes for you to review and take the steps you have just described?**
**A. It would depend on the appeal.**
**Q. Okay. If the claim is ready to review for appeal, what would you do next?**
**A. I would set up an appeal review or referral to a vendor.**
**Q. And how do you do that?**
**A. Through our DOC system.**
**Q. Do you pick the vendor?**
**A. No, I do not.**
**Q. Do you know how the vendor is picked?**
**A. No, I do not.**
**Q. Do you assign the work to the vendor?**
**A. No.**
**Q. What do you do when you set up an appeal referral to vendor?**
**A. I refer it to one of our medical technicians -- one of the med techs, they refer it out.**
**Q. Do you know what they do when they refer it out?**
**A. I don't.**
**Q. All right. What is your next step on the**

**appeal after they refer it out?**
**A. Wait for it to come back.**
**Q. And the next step?**
**A. Review the claim file again, the peer review, determine what the next action is.**
**Q. And the next step?**
**A. Would be to see if a peer needs to be sent out to an attorney or the claimant, send that out. If not, then I would start to prepare the letter, whatever, if it's an uphold or overturn.**
**Q. Under what circumstances is peer review -- a doctor's review sent out to the claimant or the attorney?**
**A. It would depend on -- if it's a second level appeal, we would send all the peer reviews out. If it's a first level appeal, those would go to California to the California claimant.**
**Q. Why is it different for California claims than other claims?**
MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation.
THE WITNESS: I don't know.
BY MR. ROSATI:
**Q. How do you know that it's different?**
**A. Because that's the way I was trained.**

**Q. Okay. Is there anything in writing that says California claimants get the peer review sent to them first and second level, but other claimants only second level?**

MS. PUBLICOVER: Lacks foundation, calls for speculation.

THE WITNESS: Not that I'm aware of.

BY MR. ROSATI:

**Q. Okay. Next step on appeal?**

**A. If it's one that's been sent out, wait for a return. If we don't get a response, then we would move forward with a letter. If there is a response then we would read the letter and take action with the information provided in that letter.**

**Q. How do you take action?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation, incomplete hypothetical.

THE WITNESS: It would depend on what we get back.

BY MR. ROSATI:

**Q. What are the alternative actions that you could take when you get a response to preview?**

MS. PUBLICOVER: Same objection. It's overbroad, calls for speculation, incomplete

hypothetical.

THE WITNESS: It's going to depend on the claimant. If it's medical records, we can send it for an addendum back to the peer review. If its no new information, we would review that as it applies to the peer review and move forward from there.

BY MR. ROSATI:

**Q. Any other possibilities?**

MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation.

THE WITNESS: It's going to depend. If I'm questioning what's in there, I can go to other areas to get help. I can go to my senior. If there is questions in there that we can handle within the office, it's just really going to depend.

BY MR. ROSATI:

**Q. Next step in the appeal?**

**A. If we're to the point where a decision is ready to be made, we make the decision.**

**Q. Who makes the decision?**

**A. I would make the decision.**

**Q. Do you have -- you consult with your supervisors regarding any decision you make?**

**A. It depends. Some yes, some no.**

MS. PUBLICOVER: Objection: Vague as to supervisor.

BY MR. ROSATI:

**Q. Do you have a supervisor?**

**A. No, I do not.**

**Q. Is there a manager for disability appeals?**

**A. Yes, there is.**

**Q. And who is presently the manager?**

**A. It's Cindy Daley.**

**Q. How long has she been the manager?**

**A. Approximately January.**

**Q. And who preceded Cindy Daley as the manager for disability appeals?**

**A. Barb True filled in.**

**Q. Who was before Barbara True?**

**A. It would have been Greg Russo.**

**Q. Do you get evaluated?**

**A. Yes.**

**Q. How often?**

**A. Performance evaluation yearly.**

**Q. Who does your performance evaluation?**

**A. It would depend. This year it was Barbara True.**

**Q. So is the person who is disability manager, is that your supervisor?**

**A. We don't have a supervisor in appeals.**

**Q. Okay. But the disability manager does your evaluation, can a disability manager overrule your decision on an appeal?**

**A. Yes.**

**Q. And how would that occur?**

MS. PUBLICOVER: Objection: Vague and ambiguous, calls for speculation, lacks foundation.

THE WITNESS: It's going to depend on what -- they're going to review it and they will let me know their thoughts and comments. I can't speak to what they're going to --

BY MR. ROSATI:

**Q. I'm just interested in the procedure. What is in the procedure when you finalize an appeal?**

**A. It would go to our manager and we would have a meeting and go over it. If it's a letter, we go over the letter. If it's an overturn, then we go do the overturn.**

MS. PUBLICOVER: The question was a little confusing. Supervisor is not a term of art in the department.

THE WITNESS: We have a senior, so my

next person up would be a senior. If it's a first level, it would go to my senior.

BY MR. ROSATI:

**Q. Who is your senior now?**

**A. Currently there is three.**

**Q. What are their names?**

**A. Cheryl Geary, Elaine Conley, Sandy Nolan.**

**Q. And what is the job title of your seniors? Is it senior appeals specialist?**

**A. I don't know their specific title. We refer to them as seniors.**

**Q. What do they do vis-a-vis you?**

MS. PUBLICOVER: Objection to the extent it lacks foundation, speculation and it's overbroad.

What is her understanding of what they do in connection with a first level uphold?

BY MR. ROSATI:

**Q. No, no.**

**You interact with them in what context?**

**A. If I have a question, I can go to them. If they're the ones that assign the work, kind of basic daily -- they review first level upholds. They are assigned different projects. I don't know all the specifics that they do.**

**Q. When you say first level, Lincoln has a two appeal process.**
**A. Correct, for ERISA.**
**Q. So, when there is a first appeal, the seniors review your decision on a first appeal?**
**A. Correct, on a nonERISA.**
**Q. On a nonERISA?**
**A. Correct.**
**Q. What about an ERISA case?**
**A. ERISA case does not have to be reviewed.**
**Q. Okay. Can the senior overturn your decision on the first appeal?**
**A. Yes.**
**Q. And how often does that happen?**
MS. PUBLICOVER: Objection: Vague, overbroad.
THE WITNESS: I don't know. It hasn't happened to me.
BY MR. ROSATI:
**Q. But you know it can happen?**
**A. Yes.**
**Q. When you submit a proposed appeal decision, does the senior review it with you?**
MS. PUBLICOVER: Objection: Vague.

BY MR. ROSATI:

**Q. When you're ready to make a decision, can you send out the written decision without consulting with your senior on a first appeal?**

MS. PUBLICOVER: ERISA or nonERISA?

BY MR. ROSATI:

**Q. Okay. ERISA?**

**A. I can send it without.**

**Q. NonERISA?**

**A. There is a review.**

**Q. And for the review, who would be present?**

MS. PUBLICOVER: Objection: Vague, misstates her testimony.

BY MR. ROSATI:

**Q. Just you and the senior?**

MS. PUBLICOVER: No. Vague, misstates her testimony.

BY MR. ROSATI:

**Q. My question is who would be present? Would there be a review in which a person will sit down with you and the senior?**

MS. PUBLICOVER: Lacks foundation. Assumes that there is a meeting. That's not what she testified to.

BY MR. ROSATI:

**Q. Okay. How would the senior review your proposed decision?**

**A. I put the letter in the file on that person's desk.**

**Q. Okay. And how would you know the senior's evaluation of that decision that you have made?**

**A. They would put it back on my desk once they are done.**

**Q. And if they suggested changes, would they tell you what changes to make?**

**A. They would provide guidance as to what their thoughts were.**

**Q. Okay. Would you be required to follow their guidance?**

MS. PUBLICOVER: Objection: Vague, overbroad.

THE WITNESS: It would depend. Generally, yes, I'm going to follow that.

BY MR. ROSATI:

**Q. Okay. On a second appeal for ERISA, can the senior overrule you?**

**A. Yes.**

**Q. And do you always submit the second appeal on ERISA to a senior?**

**A. No.**
**Q. Under what circumstance wouldn't you submit a second appeal on ERISA to a senior?**
**A. A second appeal would go to my manager.**
**Q. So can a manager overturn your decision on a second appeal?**
**A. Yes.**
**Q. How often does that happen?**
**A. It would depend -- I can only speak for mine, but it would be in my time in appeals, less than five times.**
**Q. Okay. And how does that process work when you're submitting a second appeal decision to your manager? Is that a personal meeting, or is that you submit the file and the manager gets back to you?**
**A. It's a personal meeting.**
**Q. Is there an average time that the meeting takes place -- length of the meeting?**
**A. No, it depends on each file.**
**Q. Is the meeting just you and the manager, or are there other people involved?**
**A. There are other people.**
**Q. Is it just your appeal, or is it a group meeting involving multiple appeals?**
**A. Just mine.**

**Q. Who else would typically be present or could potentially be present?**

**A. We could have a nurse case manager.**

**Q. Okay. And then once the decision is made as to finalizing the second appeal decision, you send out the decision?**

**A. Correct.**

**Q. Is that the end of the appeal?**

MS. PUBLICOVER: Objection: Calls for speculation.

THE WITNESS: To my knowledge, yes.

BY MR. ROSATI:

**Q. So that's the normal process of appeals that you handle?**

MS. PUBLICOVER: Overbroad.

BY MR. ROSATI:

**Q. Are there any variations on that basic normal process?**

MS. PUBLICOVER: Overbroad, vague, calls for speculation.

THE WITNESS: It depends on each claim.

BY MR. ROSATI:

**Q. You mentioned that California claims are handled a little differently and that nonERISA**

**claims are handled a little differently. Are there other types of claims that are handled differently other than California and nonERISA claims?**

**A. Not that I'm aware of.**

**Q. Is there anything in writing that explains this process that you just described?**

MS. PUBLICOVER: Lacks foundation, calls for speculation.

THE WITNESS: My knowledge is from job shadowing.

BY MR. ROSATI:

**Q. Okay. Do you have any written manuals or online manuals that you use in processing appeals?**

**A. There is an electronic system available that gives -- it's electronic. It's got some material that we can fall back on if we question how to do something.**

**Q. Is there a title to this?**

**A. We call it APEX.**

**Q. A-P-E-X?**

**A. Yes.**

**Q. Do you know what it stands for?**

**A. No.**

**Q. And do you know how long it is if you were to print it out?**

**A. I have no idea.**

**Q. Can you tell me what topics are covered in it?**

MS. PUBLICOVER: Overbroad.

THE WITNESS: A lot.

BY MR. ROSATI:

**Q. Okay. Can you give me a list of the topics that you can recall?**

**A. There would be -- it would cover privacy, it would cover how to reverse a payment if a check is lost. It's very broad.**

**Q. So there is -- it covers a lot of just procedural matters. Does it cover substantive matters as to what factors you take into account in deciding an appeal?**

**A. No.**

**Q. It's just a procedure manual?**

**A. Yes, more so.**

**Q. Does it list the procedures you're supposed to take in evaluating an appeal?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I don't believe so.

BY MR. ROSATI:

**Q. Does it provide checklists?**

**A. No.**

Q. Does the APEX system have templates or form letters that you can use?
A. No.
Q. Do you have templates or form letters that you can use?
A. Yes.
Q. Where are they located?
A. In our claim system.
Q. Is there a file in the claim system for templates or form letter, or are they part of the claim system?
A. I don't know if it's a file. I know how we get to it. It's part of the claim system.
Q. Okay. Claim system is -- you're all computerized now?
A. Correct.
Q. The appeals program at Lincoln went nonpaper when?
A. 2000 -- it's going to depend. We have two different offices. One office went earlier than the other.
Q. When did the Lincoln office go nonpaper?
A. The Omaha office?
Q. The Omaha office?
A. That went in 2011, July of 2011, I

believe.

Q. When you get paper submissions to an appeal, what happens to them?

A. To the best of my knowledge, they go to our intake department and get scanned into our electronic system.

Q. You never see the paper?

A. No.

Q. So you work exclusively with a computer file?

A. Correct.

Q. And was that the case in the summer of 2012?

A. Partially.

Q. Why partially?

A. If the file started before the electronic system, then we might have a part nonelectronic file.

Q. Okay. By file, you mean the claim started before?

A. Uh-huh.

Q. How would you access the nonelectronic file then?

A. We request it.

Q. Okay. So the claim system consists of

**what? What is on your claim system? When you turn on your computer and you're going to access the file, what is on the system that you're accessing?**
**A. My specific computer?**
**Q. Yes.**
**A. There is our claim system which is called DOCs, and then our files are in the system, that is called AWD.**
**Q. Do you know what AWD stands for?**
**A. I don't know.**
**Q. So by files, you mean the individual claim files?**
**A. Yes.**
**Q. Okay. So you work off AWD and DOCS, and APEX is where in the claim system?**
**A. It's in our computer system. I don't know if it's in our specific claim system.**
**Q. Okay. So you work with APEX, you have individual files and you have the claim system, you work with AWD for files and then the claim system has what else?**
**A. That's where we would do our referrals for med reviews. It's where payments are made. I don't know all the specifics that are in it. I know the pieces that I use out of it.**

**Q. What pieces do you use?**
**A. The action plan which is the LTD claim profile, benefit payment system or screens, follow-ups.**
**Q. What are follow-ups?**
**A. Follow-up would be the next step in the claim. If I sent a letter or the next action is what we would consider a follow-up.**
**Q. Do you have to calendar the follow-ups, or does the system do it for you?**
**A. We do it. I do it.**
**Q. Is there a checklist of things you should follow up on or do based on what you do on the claim?**
MS. PUBLICOVER: Objection: Vague.
THE WITNESS: It would just be -- it's going to depend on each claim, but it's going to be from my past experience.
BY MR. ROSATI:
**Q. Okay. Anything else on this claim system?**
**A. Again, I don't know what is all on there.**
**Q. Okay. Do you have manuals, materials or a library that you use in processing claims, like a paper library that you have at your desk?**
**A. No.**

**Q. Do you have any work-related books or materials that you keep at the office or at home?**

MS. PUBLICOVER: Physical paper materials?

BY MR. ROSATI:

**Q. Physical paper materials?**

**A. Yes.**

**Q. And what are they?**

**A. I have a sheet that's got this human skeleton on it, just stuff like that. I've got a sheet that -- nerves for the back, basically, reference materials, that type of thing.**

**Q. I have a physical paper library, mostly in my office, but sometimes it gets tracked home. You're probably not supposed to work at home. And so what else is in your personal materials and library, medical reference material?**

**A. I would have a blood pressure chart, I don't have a lot. There is the skeleton, the blood pressure chart, it's kind of basic body function things is really what it is.**

**Q. Mostly medical research material or reference material?**

**A. I would call it minor reference.**

**Q. Okay. Is there any claim reference**

material as opposed to medical reference material?
A. No.
Q. Okay. And you get written performance evaluations every year?
A. Yes.
Q. What is evaluated?
A. Lincoln Financial Groups core values and how our work applies to those values.
Q. What are the core values?
A. I don't know all of them off the top of my head. Ethical thinking, I honestly don't know all of them.
Q. What do you remember being evaluated on?
A. Job performance.
Q. What factors of job performance are evaluated?
A. The quality of work that we do, how you work with others, team work.
Q. Playing well with others?
A. Basically.
Q. Anything else?
A. Most everything breaks down into quality of work, team work, that you're meeting department goals.
Q. Anything else?

**A. Off the top of my head, that's all I can think of. Sorry.**

**Q. When quality of work is evaluated, what factors are addressed, to your recollection?**

**A. We have a quality department that reviews our files, and they have a set of criteria. They look at content of letter, accuracy of letter, timeliness.**

**Q. How often does the quality department review files to your knowledge?**

**A. I know that they would -- I believe they review ten files per month, per appeal specialist, I believe.**

**Q. And you get feedback on their review?**

**A. Yes.**

**Q. How frequently is the feedback?**

**A. Generally weekly.**

**Q. And what is the nature of a feedback?**

MS. PUBLICOVER: Objection: Vague, overbroad.

BY MR. ROSATI:

**Q. Is the feedback you get file specific, or is it overall general practice or both?**

**A. File specific.**

**Q. Okay. When was the last time you got**

**feedback?**

**A. Friday.**

**Q. Without telling me the name of the claimant or details, what file specific information was given to you?**

MS. PUBLICOVER: Objection: Relevance.

THE WITNESS: It's going to be those same categories. They review the letter to make sure the dates we use are the correct dates that are pulled from the file, that phone calls were made when they should be made with each claim, so it's going to be claim specific.

BY MR. ROSATI:

**Q. Okay. So -- but they review the work you did and tell you whether they think you did it right or wrong or whether you can improve it? What kind of information is relied on?**

**A. They don't review the claim for decision, they review, again, content. So if a date is wrong, then it's -- they point that out. So accuracy, if you didn't make a phone call timely, that's pointed out so you know to do your phone call timely.**

**Q. Do they have a checklist that they're looking at?**

**A. I know they have guidelines. I don't know if they have a checklist.**
**Q. What are the guidelines?**
**A. I don't know them.**
**Q. Can you identify some of the guidelines that they're looking at?**
**A. Again, quality, as it pertains to the letters, the phone calls. It's nothing related to steps that we take because each step is different per claim. So it just is kind of an overview of the claim.**
**Q. Okay. But when they do a review with you, is it just you and the person from quality review, or is somebody else involved?**
**A. It is not with the person. It's a paper or electronic copy.**
**Q. Is it sent to just you or other people?**
MS. PUBLICOVER: Lacks foundation, calls for speculation.
THE WITNESS: To my knowledge, it's sent to me and my manager, but other than that, I don't know.
BY MR. ROSATI:
**Q. Is it a standardized form that is sent to you every time they do a review, or is it different**

from review to review?

A. The content is different, the form would be the same.

Q. And how long is the form? Is it fill in a blank form or a checklist form? How long is it?

A. It's going to vary from claim to claim, one to three pages.

Q. Is there a title to this form?

A. Not that I'm aware of.

Q. What are the areas addressed in the form?

A. Again, it's going to be letter, timeliness, phone calls, I'm trying to think of all the different things listed, and that's all I can come up with.

Q. Okay. So we were talking about quality of work, how were you evaluated on issues of team work?

A. If you're able to assist anyone, help you get along with people in your department.

Q. Anything else?

A. Nothing that I'm aware of.

Q. You said you were evaluated based on meeting department goals, what department goals are you evaluated on?

A. That's our decisions. Our goal is to do 20 decisions per month.

**Q. And is that per appeals specialist?**
**A. Yes.**
**Q. Do you get a status report every month about whether you met your goal or not?**
**A. No.**
**Q. How do you know whether you met your goal or not?**
**A. Because I know. I just know how many decisions I have made in a month. When you asked if I tracked things earlier, that's what I'm tracking, claim numbers to see where I'm at in the month.**
**Q. Do you have a running tally of appeals you have decided that you keep track of on a computer or spreadsheet?**
MS. PUBLICOVER: Objection: Vague.
THE WITNESS: No, not really.
BY MR. ROSATI:
**Q. How do you keep track of how many appeals you have decided in a possible month or in an evaluation period?**
**A. That I have it on a spreadsheet, but I delete it at the end of the month.**
**Q. Do you keep track on month-by-month how you have done?**
**A. Overall, no.**


Exhibit 8 Page 42 of 192

**Q. If there is a discrepancy, whoever does your evaluation, says last year for the 12 months you didn't meet your 20 per month goal 7 times, how would you controvert that if you didn't keep track?**

MS. PUBLICOVER: Objection: Calls for speculation.

THE WITNESS: I don't, but there is probably a way for them to get it. I don't know.

BY MR. ROSATI:

**Q. Do you normally finish your 20 appeals per month?**

**A. Yes.**

**Q. Do you normally finish more than 20 appeals per month?**

**A. Not usually.**

**Q. Have you ever received an unsatisfactory evaluation as an appeals specialist?**

**A. No.**

**Q. Does Lincoln give performance based raises?**

**A. Yes.**

**Q. What are the criteria utilized in giving raises, if you know?**

**A. I don't know.**

**Q. Does Lincoln give performance-based**

**bonuses?**

**A. Yes.**

**Q. What are the criteria utilized for performance-based bonuses, if you know?**

**A. I don't know.**

**Q. Since you have been employed by Lincoln, have you taken any formal classes relating to your job outside of work?**

**A. I have taken AHIP classes.**

**Q. What is that?**

**A. Insurance industry classes. For example, to get different designations, like a disability insurance, I think it's a DIA, designations of that point.**

**Q. And do you have any of these designations?**

**A. Yes.**

**Q. What designations do you have?**

**A. I don't know them all. I have a DIA.**

**Q. Disability insurance associate?**

**A. Yes, and I couldn't tell you the names of all of them. I have my HIA which is a combination of three different ones.**

**Q. What does the HIA stand for?**

**A. I don't know.**

**Q. What do you need to do to get it?**

**A. It's a book and online training class -- it's a book you read and you test for the class.**
**Q. Okay. Who offers these -- these are certificates or credentials?**
**A. Certificates.**
**Q. Who offers them?**
**A. Through a company called AHIP, A-H-I-P, but I don't know what that stands for.**
**Q. Okay. What other certificates do you have, if you remember?**
**A. Again, it's going to be initials, it's HCAFA.**
**Q. Do you know what it stands for?**
**A. No.**
**Q. Any other certificates?**
**A. It has to do with fraud.**
**Q. Okay. Any other certificates?**
**A. I have a total of seven, but I couldn't tell you all of them.**
**Q. And all of these relate to insurance claims?**
**A. Insurance industry and/or claims.**
**Q. Okay. And that's the -- how many hours of training or review do you have to take to get each of these certificates or does it vary?**

**A. It's going to vary greatly.**

**Q. Can you give me an estimate per certificate?**

**A. The DIA took less time than the HCIFA.**

**Q. Okay. Other than these seven certificates, do you have any licenses or credentials for the insurance industry or insurance claims?**

**A. No.**

**Q. Are you a member of any professional associations relating to insurance?**

**A. No.**

**Q. Have you ever taught in the field of insurance?**

**A. No.**

**Q. How many other disability appeal specialists are there in Omaha?**

MS. PUBLICOVER: Presently?

BY MR. ROSATI:

**Q. Presently?**

**A. I believe there is approximately 12 to 15.**

**Q. And they all do the same thing that you do?**

MS. PUBLICOVER: Objection: Calls for speculation, lacks foundation.

BY MR. ROSATI:

**Q. To your knowledge?**

**A. We're all going to be LTD, short-term waiver complaints.**

**Q. Okay. Is there a disability appeals team or is there an appeals team?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: There is a group of disability appeal specialists, but you could call it a team.

BY MR. ROSATI:

**Q. Do you all meet together under any circumstances?**

**A. All of us, no.**

**Q. Do you ever have group meetings that involve some of you?**

**A. Yes.**

**Q. How often do you have group meetings?**

**A. Approximately once a week.**

**Q. And what groups do you meet with?**

**A. LTD appeal specialists would meet with the seniors.**

**Q. How many LTD appeals specialists are there?**

**A. Nine, I believe.**

**Q. And there are three seniors?**
**A. Correct.**
**Q. And how long are these meetings typically?**
**A. Typically 30 minutes or less.**
**Q. What is done at these meetings typically?**
**A. If there is -- it's going to vary from week to week, but generally to see how we are all doing for the week. If anybody needs help, if anybody's got time to help.**
**Q. Any training at the meetings?**
**A. Generally, no.**
**Q. Other than taking the industry classes, do you have continuing on-the-job training at Lincoln?**
**A. Yes.**
**Q. What is the nature of that training?**
**A. Procedural if we get a new system, computer system. If, for example, there has been recent changes with California law, so we had a brief overview of that.**
**Q. When was that?**
**A. We had that within the last three weeks.**
**Q. What was discussed?**
**A. Changes that were made to -- that were effective January 1 on total -- on the definition of main duties on -- I think there was a time frame**

**piece. I don't remember all of them off the top of my head. They would apply more to claims.**

**Q. Did you get anything in writing about this?**

**A. No.**

**Q. Was an explanation given to you that Lincoln entered into an agreement with the California Department of Insurance that specified the claims be handled a different way?**

**A. I don't remember.**

**Q. Were you told perspectively all policies issued to California would be amended to reflect the changes?**

**A. There is dates involved, but I couldn't tell you dates off the top of my head.**

**Q. The date was January 1st, 2013?**

**A. That's when -- yes, I believe so.**

**Q. And what specifically was being changed, if you recall?**

**A. It was to go over the date change, the definition of main duties, and, I believe, that was the majority of what we discussed or what was discussed.**

**Q. Is this information that is posted to your claim system so that when you're handling the**

**California claim, it comes up and reminds you of this?**

**A. That would be something we could refer to into the APEX system.**

**Q. Are there other similar materials in the APEX system that remind you of legal changes or legal issues?**

**A. I believe so.**

**Q. Is there a file that you can access? Does it come up automatically if the demographics of the claimant require it or suggest it?**

**A. It's not automatic.**

**Q. When you need information on medical issues, how do you go about getting it?**

MS. PUBLICOVER: Objection: Overbroad.

BY MR. ROSATI:

**Q. Do you have medical resources available to you?**

**A. Yes.**

**Q. Who or what other medical resources?**

**A. We have nurse case managers and internal physician and external physician vendors.**

**Q. Who decides whether you use a nurse case manager, an internal physician or an external**

**physician?**

MS. PUBLICOVER: Objection: Compound, overbroad, calls for speculation.

THE WITNESS: It's going to depend on each claim. But you would look at what has been done in the past to determine the step you want to take forward.

BY MR. ROSATI:

**Q. Okay. So can you say, "I need an external review of this?"**

**A. Yes.**

**Q. Can you say, "I need a nurse case manager to give me some advice on this"?**

**A. Yes.**

**Q. Do you have to get medical input on every claim?**

MS. PUBLICOVER: Objection: Vague, overbroad.

THE WITNESS: It's going to depend on the claim.

BY MR. ROSATI:

**Q. What are the variables, if you can tell me?**

**A. If a claim or an appeal does not involve a medical issue eligibility if they're appealing, it's**

**going to depend.**

**Q. If an appeal involves a medical issue, do you have to get a medical review?**

**A. Yes.**

**Q. Okay. When an appeal involves an occupational issue, do you have to get an occupation review?**

MS. PUBLICOVER: Objection: Vague, overbroad.

THE WITNESS: It's going to depend on what was done in the past, yes.

BY MR. ROSATI:

**Q. And do you have access to occupational resources?**

**A. We have vocational experts available to us.**

**Q. Are they in Omaha, or are they somewhere else?**

**A. They're both in Omaha and Atlanta.**

**Q. How do you decide what to use, or do you ask and somebody else decides?**

**A. It would be sent over to our vocational staff, and I don't know how they do it.**

**Q. Other that medical and vocational resources, do you have any other resources available**

**to you to evaluate an appeal?**

MS. PUBLICOVER: Objection: Overbroad, vague.

THE WITNESS: It's going to depend on the claim. We can go to legal. We can go to our seniors, our managers. We do have other things available.

BY MR. ROSATI:

**Q. Okay. Anything else? When you're doing a typical appeal or in the scope of doing an appeal, do you have access to medical assistance, vocational assistance, you can ask the seniors and you can go to legal. Are there any other resources you have available to you?**

MS. PUBLICOVER: Overbroad.

Other than what she's testified to?

BY MR. ROSATI:

**Q. Right.**

**A. Not that I'm aware of.**

**Q. To your knowledge, does Lincoln have standards that you're supposed to apply when evaluating an appeal?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: Each claim is going to stand on its own.


Exhibit 8 Page 53 of 192

BY MR. ROSATI:

**Q. Okay. But are there standards that you're supposed to meet on every appeal?**

MS. PUBLICOVER: Objection: Vague, overbroad, lacks foundation, calls for speculation. She is not here as a corporate witness. She's not here to testify as to the company.

BY MR. ROSATI:

**Q. I know. I'm asking what she does. My paralegals and secretaries have checklists, you are going to do this on this claim?**

**A. There is no checklist.**

**Q. Okay. But are there standards applicable to you in doing your job in terms of doing a thorough investigation of an appeal?**

MS. PUBLICOVER: Objection: Vague, lacks foundation, calls for speculation.

Other that what she's already testified to?

THE WITNESS: Other than what I have gone over, not that I'm aware of.

BY MR. ROSATI:

**Q. You have any standards applicable to you in the handling appeals that require that you be fair in evaluating appeals?**

MS. PUBLICOVER: Objection: Vague, ambiguous as to standards. She's not a corporate witness. I'm not sure where you're ...

BY MR. ROSATI:

**Q. I'm asking you the witness, as a witness, when you evaluate -- how many appeals have you done since you have been an appeal specialist?**

**A. I couldn't give you a number.**

MS. PUBLICOVER: Just ask her if she attempts to be fair. When you talk about standards, you're presumably referring to corporate standards. She is not a corporate designee. She is not an officer of the company. So you can ask her about the way she does her job and her understanding of how she is supposed to do her job, but when you talk about standards, you're implying corporate standards and that's not fair for this witness.

MR. ROSATI: I'm asking first, are there an established set of criteria that apply to all appeal specialists, to your knowledge, as to how to evaluate appeals?

MS. PUBLICOVER: Objection: Vague and ambiguous, lacks foundation, calls for speculation.

Other than what she's testified to?


Exhibit 8 Page 55 of 192

THE WITNESS: The only thing -- to conduct a full and fair review.

BY MR. ROSATI:

**Q. So what does it mean to conduct a full and fair review?**

MS. PUBLICOVER: Objection to the extent it calls for a legal conclusion, overbroad.

BY MR. ROSATI:

**Q. What is your understanding of what it means to conduct a full and fair review?**

**A. It would be to evaluate the claim on the merits of that claim or of that appeal.**

**Q. Okay. And do you have any standards as to how you evaluate each claim?**

MS. PUBLICOVER: Objection: Vague and ambiguous, lacks foundation, calls for speculation.

Other than what she's testified to.

BY MR. ROSATI:

**Q. Yes, other than what you have testified to.**

**A. Not that I'm aware of.**

**Q. Do you have standards for timely handling of appeals?**

MS. PUBLICOVER: Same objection as to

standards.

THE WITNESS: Other than what is set forth in -- under ERISA in California, not that I'm aware of.

BY MR. ROSATI:

**Q. How long -- what is your understanding of how -- of the timeliness of handling appeals? Can you wait two years?**

**A. No. Once you receive an appeal, you have 45 days. If it's an ERISA appeal, 45 days.**

**Q. Okay. Does that apply to nonERISA appeals?**

**A. No, not that I'm aware of.**

**Q. Do you have standards for nonERISA appeals?**

MS. PUBLICOVER: Same objections as to standards, calls for a legal conclusion.

THE WITNESS: It's going to depend on the claim.

BY MR. ROSATI:

**Q. Okay. Do the policies sometimes specify how long you should take to resolve an appeal?**

**A. Not that I'm aware of, but I'm not sure.**

**Q. Okay.**

MS. PUBLICOVER: Let's take a quick


Exhibit 8 Page 57 of 192

restroom break.

MR. ROSATI: Yeah.

(9:01 a.m. - Recess taken.)

(At 9:08 a.m., with parties present as before, the following proceedings were had, to-wit:)

BY MR. ROSATI:

**Q. Okay. You said that the quality review assesses timeliness, do they assess timeliness with reference to responding to a claimant letter?**

**A. They assess turnaround times, so, yes --**

MS. PUBLICOVER: Don't guess. Lack as to foundation. Calls for speculation.

If you know.

THE WITNESS: All I know is it's turnaround time, but it would depend on each area that they are.

BY MR. ROSATI:

**Q. As appeal specialist, do you have an expectation that you respond to claim letters?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation.

THE WITNESS: There is not -- I would be guessing. There is not really a set time frame when you want to respond as timely as possible.

BY MR. ROSATI:

**Q. Okay. Do you have any involvement in choosing peer review doctors or outside doctors?**

**A. No.**

**Q. Do you have any involvement in evaluating the reports?**

MS. PUBLICOVER: Objection: Vague as to evaluating.

BY MR. ROSATI:

**Q. Do you determine that the reports are sufficient and answer all the questions or not, or does someone else determine that?**

**A. I don't know if they're reviewed by anybody else. I know that when I get them back, if the questions that are asked in the review are answered, then that's what I would go with. If I have questions regarding their response, then I can go back and ask further questions.**

**Q. Who frames the questions for the review doctors, you or somebody else?**

**A. It's their template questions.**

**Q. Where are the templates, on the system?**

**A. Yes.**

**Q. Do you have to tailor each question of the facts of your case, or is it always the same sequence of questions?**

**A. Generally it's the same sequence. You might alter the question depending on the claim. Mr. Hall's, the questions were sufficient as they**

**were.**

**Q. Okay. Does the system tell you whether or not a claim is covered by ERISA?**

**A. Yes.**

**Q. Do you handle claims differently whether or not they're covered by ERISA other than the ones you've already explained?**

**A. No.**

**Q. You have any involvement as an appeal specialist in formulating questions for vocational reviewers?**

**A. Depends on the claim. Sometimes, yes.**

**Q. Under what --**

**A. It would depend on what we're asking.**

**Q. Under what circumstances would you have involvement in the form of any questions for a vocational review?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation.

THE WITNESS: It's going to depend on each claim.

BY MR. ROSATI:

**Q. Does Lincoln have standards requiring consideration of a claimant's station in life when evaluating appeals of claimants who live in**

**California?**

**A. Could you say the first part again, please?**

**Q. Does Lincoln have standards requiring consideration of a claimants station in life when evaluating appeals of claimants who live in California?**

MS. PUBLICOVER: Objection: Vague as phrased, lacks foundation as phrased.

THE WITNESS: I'm not sure what you mean by standards. We look at the whole claim and the whole person.

BY MR. ROSATI:

**Q. Okay. In evaluating claimants who live in California, are there special considerations that you're required to follow?**

MS. PUBLICOVER: Objection to the extent it calls for a legal conclusion.

And other than what she's testified to.

MR. ROSATI: Right.

THE WITNESS: I don't know.

MS. PUBLICOVER: Overbroad also.

THE WITNESS: Again, it's -- we look at every claim as a whole.

MS. PUBLICOVER: He's asking if there

are additional standards that you're required to follow in California and I objected on the grounds that it calls for a legal conclusion, vague and overbroad.

THE WITNESS: Not that I'm aware of.

BY MR. ROSATI:

**Q. Okay. When a peer reviewer suggests that a claimant can perform an occupation with accommodations, is it your practice to inquire as to whether any employer would permit those accommodations?**

MS. PUBLICOVER: Objection: Lacks foundation calls for speculation, incomplete hypothetical, vague and ambiguous.

THE WITNESS: It's going to depend on each individual claim and what the review states.

BY MR. ROSATI:

**Q. Okay. But in general, if a -- the conclusion is this person -- this claimant can perform some occupations, but will require an accommodation, is it the practice or standard in evaluating appeals to ask whether any employer would give the accommodation?**

MS. PUBLICOVER: Vague and ambiguous, overbroad, calls for speculation. It also lacks

foundation that she --

MR. ROSATI: Would be the one that does it?

MS. PUBLICOVER: Yeah.

BY MR. ROSATI:

**Q. Would this be something the vocational reviewer would do, if at all?**

MS. PUBLICOVER: If you know.

THE WITNESS: I don't know. It would be a guess.

BY MR. ROSATI:

**Q. Does Lincoln evaluate the course and scope of a claimant's illness in deciding appeals?**

MS. PUBLICOVER: Objection: Vague, overbroad.

THE WITNESS: I'm not sure what you mean.

BY MR. ROSATI:

**Q. Well, some illnesses have a trajectory as it were, orthopedic conditions tend to get either better or stabilize and then get worse. Are the reviewing doctors instructed to consider how the process of this condition normally takes place in evaluating claims?**

MS. PUBLICOVER: Objection: Vague

and ambiguous, lacks foundation, calls for speculation.

THE WITNESS: I don't know.

BY MR. ROSATI:

**Q. Do you have any training as to what weight, if any, to accord a Social Security disability decision in evaluating appeals?**

MS. PUBLICOVER: Objection: Vague, overbroad.

Were you trained?

THE WITNESS: Other than on the job, no.

BY MR. ROSATI:

**Q. What training did you receive on the job?**

**A. Job shadowing.**

**Q. And what did that entail in reference to Social Security decisions?**

**A. It would depend if you get just a Social Security award letter with no decision letter of why their decision was approved, or medical that supports that decision, then you don't have all the information needed to take the total award into consideration. Not into consideration, you don't have all the information.**

**Q. Okay. If you don't get anything besides the decision letter, do you ask for more information?**

**A. Yes, we request.**

**Q. Why do you request it?**

**A. If the claimant wants to supply that information, it's something we would take into consideration.**

**Q. Do you actually request it?**

**A. If I get just a letter?**

**Q. Right.**

**A. Then, yes, I would call and ask. If you have a Social Security award.**

**Q. And what would you do with the information that is provided?**

MS. PUBLICOVER: Objection: Vague and ambiguous, overbroad, calls for speculation.

THE WITNESS: It's going to depend on what all is there. If it's medical records, they could go out with the review.

BY MR. ROSATI:

**Q. Okay. If you just have an award letter, why isn't that enough to evaluate the effect of the Social Security award?**

MS. PUBLICOVER: Objection: Vague

and ambiguous.

THE WITNESS: I don't know what Social Security bases their award off of.

BY MR. ROSATI:

**Q. Why does it matter?**

MS. PUBLICOVER: Objection: Calls for a legal conclusion.

BY MR. ROSATI:

**Q. For you, in evaluating the Social Security decision, why does it matter whether you have all the facts other than the award letter, the knowledge that it was awarded?**

MS. PUBLICOVER: Vague and ambiguous.

THE WITNESS: Because it's not a full and fair review.

BY MR. ROSATI:

**Q. Well, have you been given any training as to what Social Security decides when it awards disability benefits?**

MS. PUBLICOVER: Lacks foundation, calls for speculation.

BY MR. ROSATI:

**Q. Any training?**

MS. PUBLICOVER: Assumes facts not in evidence as to what Social Security decides.


Exhibit 8 Page 67 of 192

BY MR. ROSATI:

**Q. I'm asking her if she received any training as to what Social Security is required to evaluate?**

**A. No.**

**Q. Okay. Do you have templates that you use in addressing Social Security awards when deciding appeals?**

**A. No.**

**Q. Do you get legal advice when evaluating Social Security decisions in deciding appeals?**

MS. PUBLICOVER: Calls for speculation, incomplete hypothetical.

Can she get legal advice?

BY MR. ROSATI:

**Q. Yes.**

**A. Yes.**

**Q. Do you?**

MS. PUBLICOVER: Overbroad, calls for speculation.

THE WITNESS: It's going to depend on the appeal.

BY MR. ROSATI:

**Q. Have you ever requested legal advice to evaluate a Social Security award on an appeal**

**decision?**

**A. No.**

**Q. Why not?**

MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation, overbroad.

BY MR. ROSATI:

**Q. Have you ever received training on the investigation that 50 departments of insurance conducted regarding Unum about eight years ago?**

**A. No.**

**Q. Have you ever received training that at least as to Unum, when they evaluate an LTD claim, if the claimant has Social Security disability, they have to identify specific facts differentiating their decision from the Social Security decision by virtue of their agreement of 50 departments of insurance?**

MS. PUBLICOVER: Objection: Relevance.

MR. ROSATI: I would think that's industry standards.

MS. PUBLICOVER: You can think it all you want.

MR. ROSATI: Most experts on insurance practices would agree with me, I believe.

MS. PUBLICOVER: I'm sure all of the plaintiffs' experts on insurance practices would agree with you.

MR. ROSATI: Any defense expert who didn't agree on that point would not be credible.

MS. PUBLICOVER: In your opinion.

MR. ROSATI: On that point. This is pretty elementary stuff.

MS. PUBLICOVER: You can ask her if she received the training.

BY MR. ROSATI:

**Q. So how do you determine what weight to give, if any, to a Social Security award?**

**A. Depends on what is in their award letter, the information provided by Social Security.**

**Q. If the claim doesn't provide you the award letter, how do you decide what weight to accord to the Social Security decision?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation.

She's testified over and over it depends on the facts of the particular claim.

MR. ROSATI: Well, this is the next thing.

BY MR. ROSATI:
**Q. You don't have facts of the particular Social Security award?**
MS. PUBLICOVER: But she has the facts of the particular claim.
BY MR. ROSATI:
**Q. Okay. Have you ever decided that by virtue of a Social Security award, the claimant is entitled to LTD benefits?**
MS. PUBLICOVER: Objection: Vague.
Solely because of a Social Security award?
BY MR. ROSATI:
**Q. Solely because of a Social Security award?**
**A. I don't know.**
**Q. Okay. In handling appeals, can you request a field visit with the claimant?**
**A. Personally?**
**Q. Yes.**
**A. I don't know.**
**Q. Can you say I want to send a representative out to interview the claimant on a one-to-one basis so I have more information?**
**A. Anything else is possible.**
**Q. Have you ever done it?**
**A. No.**

**Q. Do you have any standards as to when or if to ask for a field visit with a claimant?**

MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation as to company standards in that regard.

THE WITNESS: Not that I'm aware of.

BY MR. ROSATI:

**Q. In handling an appeal, can you request an IME of the claimant?**

**A. Yes.**

**Q. Have you ever done it?**

**A. Yes.**

**Q. How often do you do it?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I don't know.

BY MR. ROSATI:

**Q. Can you give me an estimate of if you handle 20 appeals a month, in an average month, how many times do you request an IME of an appeals claimant?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: It wouldn't be an estimate. It would be a guess.

BY MR. ROSATI:

**Q. But you would know, you're the one who is**


Exhibit 8 Page 72 of 192

**doing it?**
**A. I don't track it though.**
**Q. Okay. Have you requested an IME of appeals claimant in April of 2013?**
**A. No.**
**Q. In March of 2013?**
**A. Not that I recall.**
**Q. In February of 2013?**
**A. I don't know.**
**Q. January of 2013?**
**A. I don't know. We're going back too far.**
**Q. Okay. Does Lincoln have standards as to when it's appropriate to request an IME of an appeals claimant?**
MS. PUBLICOVER: Same objection. Lacks foundation, calls for speculation.
THE WITNESS: I don't know. Not that I'm aware of.
BY MR. ROSATI:
**Q. Have you ever requested an FCE of an appeals claimant?**
**A. Yes.**
**Q. How often?**
MS. PUBLICOVER: Objection: Vague.
THE WITNESS: I don't recall. Not

very often.

BY MR. ROSATI:

**Q. Does Lincoln have standards as to when you should request an FCE for an appeal?**

MS. PUBLICOVER: Same objections as to standards, lacks foundation, calls for speculation.

THE WITNESS: Not that I'm aware of.

BY MR. ROSATI:

**Q. Does Lincoln have standards that in evaluating an appeal, you should always ask for complete Social Security records that the claimant has a Social Security award?**

MS. PUBLICOVER: Same objections as to standards.

If you want to ask her how she's been trained or what her procedures and practices are, I'm fine with that. She's not a corporate designee. She is not a corporate officer.

BY MR. ROSATI:

**Q. All right. What have you been trained in terms of getting complete Social Security records?**

**A. We can request from the claimant the record if they want to provide it, then we take that into consideration.**

**Q. But in evaluating a claim, if the claim has Social Security, why wouldn't you request it?**

MS. PUBLICOVER: Objection: Vague and ambiguous.

THE WITNESS: Again, we would ask the claimant if they wanted to supply it.

BY MR. ROSATI:

**Q. Okay. If you didn't have complete medical records, would you request them in processing?**

**A. I would ask the claimant if their appeal was complete, or if they had additional information they wanted to submit.**

**Q. Would you ask them to provide additional medical records specifically?**

MS. PUBLICOVER: Objection: Calls for speculation, vague and ambiguous.

THE WITNESS: Depends on the claim.

BY MR. ROSATI:

**Q. Under what circumstances would you ask the claimant to provide additional medical records?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation, vague and ambiguous.

THE WITNESS: It's going to depend, but generally I always give -- the option is always

given to the claimant to supply records.

BY MR. ROSATI:

**Q. Okay. But have you ever been trained that it's your obligation to request any records you think are necessary to make your decision?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: Again, we would request from the claimant if they wanted to submit anything.

BY MR. ROSATI:

**Q. But have you ever been trained that it's your obligation to request records that you think are necessary to decide the appeal?**

MS. PUBLICOVER: Objection: Vague and ambiguous, incomplete hypothetical, calls for speculation.

THE WITNESS: It's going to depend on the claim.

BY MR. ROSATI:

**Q. How does it depend on the claim?**

**A. If there is no medicals received, then I'm going to ask the claimant if they want to submit medical records.**

**Q. All right. If there are medical records submitted but you conclude they are not complete, would you ask for more?**

MS. PUBLICOVER: Objection, calls for speculation, incomplete hypothetical.

THE WITNESS: Generally I would ask them if they wanted to submit anything additional.

BY MR. ROSATI:

**Q. But do you say I would like more on this point or older records or -- rather than additional, would you ask for more specific records?**

MS. PUBLICOVER: Objections: Incomplete hypothetical, calls for speculation, vague and ambiguous.

THE WITNESS: It's going to depend on the claim.

BY MR. ROSATI:

**Q. What is your practice in reference to requesting a peer review or an IME from an outside doctor?**

MS. PUBLICOVER: Objection: Vague, calls for speculation, incomplete hypothetical.

THE WITNESS: It would depend on the appeal, the information.

BY MR. ROSATI:

**Q. What factors would you take into account in deciding whether to request a peer review or IME?**

MS. PUBLICOVER: Same objection.

THE WITNESS: It's going to depend, but generally it would be what reviews have been done in the past and what type of medical records there are.

BY MR. ROSATI:

**Q. What is your practice in evaluating the disabling effects of pain?**

MS. PUBLICOVER: Objection to the extent it calls for an expert conclusion, vague and ambiguous, lacks foundation, calls for speculation, overbroad.

THE WITNESS: I'm going to rely on the medical professionals review.

BY MR. ROSATI:

**Q. What are your practices for evaluating the disabling effects of fatigue?**

MS. PUBLICOVER: Same objections.

THE WITNESS: Again, generally I'm going to rely on the medical expertise.

BY MR. ROSATI:

**Q. What are your practices for evaluating disabling affects of medication side affects?**

MS. PUBLICOVER: Same objections.

THE WITNESS: Again, and I would rely on the medical expertise of the reviewer.

BY MR. ROSATI:

**Q. If the reviewer doesn't address the disabling affects of pain, how do you deal with that issue?**

MS. PUBLICOVER: Objection: Overbroad, incomplete hypothetical, calls for speculation, vague and ambiguous.

THE WITNESS: It would depend on the medical records. What is in them.

BY MR. ROSATI:

**Q. If you're depending upon the reviewer and the reviewer doesn't address it, can you address it on your own?**

**A. It depends if the claimants brought pain into their reviews and into their exams, discussion of it.**

**Q. Does the same apply to fatigue and side effects of medication?**

**A. Yes.**

**Q. When you formulate questions for medical reviewers, do the templates ask please address the disabling effects of pain?**

**A. Specifically, no.**

**Q. Does the template ask, please address the disabling effects of fatigue?**

**A. Specifically, no.**
**Q. Does the template ask, please address the disabling affects of medications?**
**A. Specifically, no.**
**Q. Does and template ask, please consider the compounding effects of pain, fatigue and medications on the claimant's ability to work?**
**A. Those specific words are not used.**
**Q. How is the reviewing doctor to know that he or she is supposed to address these issues if you don't ask?**
MS. PUBLICOVER: Objection to the extent it lacks foundation, calls for speculation.
THE WITNESS: Generally we ask them to review the medical records in totality.
BY MR. ROSATI:
**Q. You keep time records?**
**A. Not sure what you mean.**
**Q. Do you keep a log of how much time you spend on individual cases?**
**A. No, I do not.**
**Q. Do you keep a daily log of what you do on a given day?**
**A. No, I do not.**
**Q. Other than completing 20 appeals a month,**

**do you have any other quantitative goals that you're required to meet?**

**A. Not that I'm aware of.**

**Q. Do you know whether Lincoln maintains statistics on the outcome of the appeals that you handle?**

**A. I don't know.**

**Q. Do you keep statistics on the outcome of the appeals that you handle?**

**A. No.**

**Q. Does Lincoln maintain -- do you maintain records of everything you do on a file?**

MS. PUBLICOVER: Objection: Vague. Does she maintain records?

MR. ROSATI: Yes.

MS. PUBLICOVER: Vague.

BY MR. ROSATI:

**Q. When you open an appeal, when you're assigned an appeal and do your review, do you document that somewhere?**

**A. Yes.**

**Q. And when you write letters, do you document that somewhere?**

**A. Generally, yes.**

**Q. When you review an appeal, do you document**

**that somewhere?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: Generally, yes, but it's going to depend on the information that we have.

BY MR. ROSATI:

**Q. Do you keep notes of -- do you make notes of appeal reviews while you're reviewing materials?**

MS. PUBLICOVER: Overbroad.

THE WITNESS: Other than jotting down thoughts, no.

BY MR. ROSATI:

**Q. Do you jot down the thoughts on a piece of paper or on the computer?**

**A. A piece of scrap paper.**

**Q. And what happens to the scrap paper when the appeal is done?**

MS. PUBLICOVER: Overbroad, calls for speculation, vague.

THE WITNESS: I don't keep them. I put them in a shredder box.

BY MR. ROSATI:

**Q. Okay. So do you normally keep notes when you're reviewing an appeal?**

**A. No.**


Exhibit 8 Page 82 of 192

**Q. If appeals are lengthy, how do you keep track of what the content is?**

**A. Through the action plan documentation.**

**Q. How do you remember when you're handling 54 appeals right now, correct?**

**A. Roughly, correct.**

**Q. How do you differentiate appeal from appeal without keeping notes?**

MS. PUBLICOVER: Objection: Argumentive.

BY MR. ROSATI:

**Q. When I look at a new file I wrote notes typically on the back of an old -- it's a calendar. I make them print out a calendar and I use the old calendars to make notes. You can find my notes in the file by looking for the blue handwritten notes. And when I go back to that file, I look for the notes.**

MS. PUBLICOVER: Other than what she's already testified to in terms of the action -- she already testified that she can refer to the action plan.

BY MR. ROSATI:

**Q. Okay. But is the action plan a summary of what is in the appeal?**

MS. PUBLICOVER: Objection: Vague, overbroad.

THE WITNESS: Generally.

BY MR. ROSATI:

**Q. Okay. Can we look at Exhibit 8 again?**

**A. Sure.**

**Q. There is a reference to Exhibit 8 to an appeals counsel. Have you ever heard that term before?**

**A. No, I have not.**

**Q. Can you look at Exhibit 9. There is an Exhibit 9 that is 14 pages entitled LTD claim file?**

MS. PUBLICOVER: Let's identify Exhibit 9 for the record that this is portions of the claim file that was produced by Lincoln in connection with this case, that it's not the entire file.

MR. ROSATI: Right. 9 through 56 are portions of the claim file.

MS. PUBLICOVER: Okay.

BY MR. ROSATI:

**Q. But 9 is entitled LTD claim profile.**

**What is the purpose of this document LTD claim profile. Is that done for every claim?**

**A. Yes.**

**Q. What is its function?**

MS. PUBLICOVER: Objection to the extent that it lacks foundation. Calls for speculation.

THE WITNESS: Generally I should be able to look at that and tell what has been done in a file.

BY MR. ROSATI:

**Q. So there is an LTD claim profile for every LTD claim?**

**A. Correct.**

**Q. Can you take a look at Exhibit 10. It's entitled chronological activity list. Is there a chronological activity list for every LTD claim?**

**A. I don't know. I have not seen this before.**

**Q. There are entries that refer to things that you did, but you don't enter these things. Do you know who creates the chronological activity list, Exhibit 10?**

**A. It might be something that's pulled from the system. I'm not sure.**

**Q. Okay. Can you take a look at Exhibit 11, which all of this seems to be referrals. Do you recognize Exhibit 11? Only the last couple of pages**

**were done by you?**
**A. Yes.**
**Q. LZK is you?**
**A. That's correct.**
**Q. What is the purpose of these documents that are collected as referrals, if you know?**
**A. I'm not sure which document you're referring to.**
**Q. Well, the first page of Exhibit 11 has med review returned. It has a claim summary. Did you do the claim summary and then it has questions. Is that something that you did to submit to the peer reviewer.**
**A. The one on 7-3-12, correct, I would have entered that.**
**Q. Look at the one on 6-13-2012?**
**A. Yes.**
**Q. Is that something that you prepared?**
**A. Yes.**
**Q. And what is the purpose of preparing that?**
**A. To send the file out for referral out to a peer.**
**Q. So you summarized the claim and you described what sedentary occupations are, and you asked some specific questions. Are the questions**

**that you asked all from the template questions?**

**A. Correct.**

**Q. Can you take a look at Exhibit 12. This is a claim DOC screens. It doesn't have anything that you handle. Is that something you have access to when you're processing a claim?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: This information is pulled from the appeal, but I have not seen it set up like this before.

BY MR. ROSATI:

**Q. Okay. Can you look at Exhibit 13. These are entitled telephone notes LTD. Is that something you would have access to in processing an appeal?**

**A. Yes, it is.**

**Q. At the end of Exhibit 13 there is some entries that reflect things entered by you because it says LZK?**

**A. Correct.**

**Q. Other than the telephone notes like Exhibit 13, do you have claim DOC screens that you have access to like Exhibit 12?**

MS. PUBLICOVER: Objection: Vague, overbroad.

BY MR. ROSATI:

**Q. When you're looking at the file, what do you have?**

MS. PUBLICOVER: Overbroad, calls for speculation, incomplete hypothetical.

BY MR. ROSATI:

**Q. Is there anything else other than what we have showed in 9, 10, 11, 12 and 13 plus the medical records and the correspondence, what constitutes the totality of your claim file?**

MS. PUBLICOVER: Objection: Vague, ambiguous, overbroad, calls for speculation.

The claim file is the claim file.

BY MR. ROSATI:

**Q. Are there any other summaries that your claim file has? Does somebody make a summary of medical records other than what we have seen? Is there an action plan other than what we have seen?**

**A. Not that I'm aware of.**

**Q. Okay.**

MS. PUBLICOVER: And objection to the extent it lacks foundation and calls for speculation.

BY MR. ROSATI:

**Q. When were you first assigned to work on**

**the Hall claim?**
**A. Can I refer to a document?**
**Q. Yes. It would be Exhibit 9, third page.**
**A. It was assigned to me on May 30th, 2012.**
**Q. Who is C1G?**
**A. That would be my senior, Cheryl Geary.**
**Q. The next entry is 5-31-12, pending recent medical records, LZK. You entered that?**
**A. Yes.**
**Q. What does that mean?**
**A. When we go into the claim screen and you acknowledge that you receive it, you enter an acknowledgment reason and it generates this into the system.**
**Q. Okay. The next entry also on Exhibit 9, Page 3. 5-31-12, pending rationale, and then this includes your action plan?**
MS. PUBLICOVER: Objection: Vague.
BY MR. ROSATI:
**Q. It's your summary of your appeal in the action plan?**
**A. Correct.**
**Q. So at this point you read the appeal letter?**
**A. Yes.**

Q. And there is an entry 6-1-12, OBC to attorney, what?

A. Up on call, I left a voice message with Jill that the appeal was received.

Q. Okay. And then there is a summary of the 589 pages of a variety of things, medical records and other things, correct?

A. Correct.

Q. And then there is an entry for 6-6-12, mail, received priority mail package from attorney. Was that the receipt of the hard copy of the appeal?

A. Yes, that references all that information right below it, Page 1 through 59, that's all together.

Q. So at this point you received the whole appeal, what did you do when you received the appeal?

A. Began review to try to determine if there is any additional information to be submitted.

Q. In beginning your review, did you review the policy?

A. Yes.

Q. And can you take a look at Exhibit 14? Have you ever seen a hard copy of the policy before?

A. Yes.

**Q. Is it in your file?**
**A. It would depend on the claim.**
**Q. Okay. What portion of the hard -- of the policy would you review in evaluating an appeal?**
MS. PUBLICOVER: Objection: Overbroad, calls for speculation.
BY MR. ROSATI:
**Q. If any?**
**A. Generally you take into consideration the whole policy.**
**Q. If you look at the first page of Exhibit 14, it says, "This policy is delivered in the state of California and subject to the laws of that jurisdiction." Does that have any relevance to you, that sentence?**
MS. PUBLICOVER: Objection: Vague, overbroad.
THE WITNESS: It tells me that it's a California appeal and it's such to the laws of California.
BY MR. ROSATI:
**Q. Does that mean you do anything differently with the appeal?**
**A. Other than already stated, time frames, no, and the peer review.**

**Q. Can you look at Page 12 of the policy?**
**A. Claims procedures is the title.**
**Q. Yes. It says notice of claim decisions. And Item No.1 references any internal guidelines, are you aware of any internal guidelines that Lincoln applies to evaluating policies?**
MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation, vague and ambiguous. Other than what she's already testified to?
MR. ROSATI: Right.
THE WITNESS: Not that I'm aware of.
BY MR. ROSATI:
**Q. Can you look at Page 13 of Exhibit 14 under review procedure.**
**A. Okay.**
**Q. It says, "The insured employee may review certain nonprivileged information relating to the request for review." In your practice, what is considered privileged and nonprivileged that the insured claimant is entitled to review?**
MS. PUBLICOVER: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I don't know.

BY MR. ROSATI:

**Q. Okay. The Page 13 of Exhibit 14 says, "The notice on the review will be sent within 45 days after the company receives the request or within 90 days if the special case requires more." Is that the normal practice that you follow?**

**A. Generally.**

**Q. What is the special case?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation.

THE WITNESS: Depends on the file.

BY MR. ROSATI:

**Q. What would make a case a special case?**

MS. PUBLICOVER: Same objection, overbroad, calls for speculation, incomplete hypothetical.

THE WITNESS: Could be a variety of things.

BY MR. ROSATI:

**Q. Can you give me some examples?**

**A. If we're waiting on medical records would be one example.**

**Q. Any other examples?**

MS. PUBLICOVER: Same objections.

THE WITNESS: It's going to depend on

each file.

BY MR. ROSATI:

**Q. Okay. There is a heading "claim subject to ERISA," and it says that if the claim is subject to ERISA, the insured employee must seek two administrative reviews. So if claim's not subject to ERISA, they only have to seek one, correct?**

**A. They don't have in seek any that I'm aware of.**

**Q. For a nonERISA claim?**

**A. Correct.**

**Q. But for an ERISA claim they have to seek two?**

**A. Correct.**

**Q. Can you take a look at Page 20 of Exhibit 14?**

**A. Okay.**

**Q. There is a definition of total disability or totally disabled. Do you have any understanding that the definition of total disability is modified by the laws of the state of California?**

**A. Yes.**

**Q. What is your understanding?**

MS. PUBLICOVER: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I know that in California there are different -- slightly different guidelines regarding continuity or reasonable continuity, which I take into consideration on all claims.

BY MR. ROSATI:

**Q. What are those different guidelines?**

MS. PUBLICOVER: Same objection to the extent it calls for a legal conclusion.

THE WITNESS: I'm not sure what you mean.

BY MR. ROSATI:

**Q. You said in California there are different guidelines, what are those guidelines?**

MS. PUBLICOVER: Same objection.

THE WITNESS: Guidelines might have been too broad a term. I know it's continuity of care.

BY MR. ROSATI:

**Q. Do you have any understanding that the definition of totally disabled is altered by California law?**

MS. PUBLICOVER: Same objections, calls for a legal conclusion.

THE WITNESS: I know that it's

slightly different. I'm not -- the specifics I don't know.

BY MR. ROSATI:

**Q. How was it that you know that it's different?**

**A. Because I know that California has different laws.**

**Q. Is there something in writing that tells you that when you are evaluating a California claimant's claim, you're to apply standards other than what is in the policy?**

**A. No.**

**Q. Have you been trained that where you're evaluating the California claimant's claim, that you're to provide standards for disability other than those in the policy?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: Generally we apply a full and fair review.

BY MR. ROSATI:

**Q. Okay. But you start with the definition of disabled under the policy, correct?**

**A. Correct.**

**Q. Does every policy have the same definition?**

**A. I'm unsure.**
**Q. So you start with whatever the policy says, correct?**
**A. Correct.**
**Q. Have you been told that not withstanding whatever the policy says, in California you have to apply to a different standard of what is disabled?**
MS. PUBLICOVER: Objection: Vague.
THE WITNESS: I'm really not sure.
BY MR. ROSATI:
**Q. Have you been ever taught or told that when evaluating a California claimant's claim for disability, not only do you have to apply a standard that's different in the policy, you have to tell the claimant that?**
MS. PUBLICOVER: Objection: Vague and ambiguous.
THE WITNESS: Not that I'm aware of, but I'm not sure.
MS. PUBLICOVER: And compound.
BY MR. ROSATI:
**Q. In evaluating the appeal, did you look at Exhibit 15?**
**A. Yes.**
**Q. Exhibit 15 indicates that Hall's claim is**

**an ERISA claim, there are other documents that indicate it's not. Do you know why there is a document in the file indicating that Hall's claim was an ERISA claim?**

**A. I do not know.**

**Q. Did it affect your handling of the claim whether or not it was an ERISA claim?**

**A. No.**

**Q. In reviewing Mr. Hall's appeal, did you look at Exhibit 16?**

**A. Yes.**

**Q. And would this have been a paper copy of 16 because it happened before the change?**

**A. Yes, it should have been.**

**Q. Is it relevant to you in evaluating the effect that you should accord a Social Security decision that Lincoln sent Mr. Hall to lawyers to get him Social Security benefits?**

MS. PUBLICOVER: Objection: Vague and ambiguous.

MR. ROSATI: It referred him to a lawyer.

MS. PUBLICOVER: I understand that. I don't understand what you're asking her.

MR. ROSATI: I'm asking her if it's


Exhibit 8 Page 98 of 192

relevant to her in making her decision.

MS. PUBLICOVER: That Lincoln sent Mr. Hall to a lawyer, that's your question?

MR. ROSATI: Yes.

MS. PUBLICOVER: Vague.

THE WITNESS: Not that I'm aware of.

BY MR. ROSATI:

**Q. Okay. In evaluating the appeal, did you look at Exhibit 17?**

**A. Yes.**

**Q. When deciding the appeal, did you use any portion of Exhibit 17?**

MS. PUBLICOVER: Objection: Vague as to use.

BY MR. ROSATI:

**Q. Well, Exhibit 17 says, "Your policy provides," in part on the second page, "Your policy provides 24 months of benefits as long as you are unable to perform the main duties of your occupation as defined by your policy." But it doesn't say that the policy definition of occupation is modified by California law. Did you use the information provided in Exhibit 17, or did you do your own assessment of what any occupation was for reference to Mr. Hall?**

MS. PUBLICOVER: Objection: Vague, compound.

I don't understand your question.

BY MR. ROSATI:

**Q. Okay. I will withdraw the question.**

**Can you take a look at Exhibit 18?**

**A. Okay.**

**Q. In evaluating Mr. Hall's appeal, did you take into account he was awarded Social Security benefits?**

**A. Yes, I took that into account.**

**Q. The only material in that file about that award is this front page of a letter?**

**A. Uh-huh.**

**Q. Did you ask for any other information?**

MS. PUBLICOVER: Objection to the extent that it misstates the record.

MR. ROSATI: It's two pages.

MS. PUBLICOVER: You go on and rant on about it in your letter too. That's in the file. This is not the only thing in the file relating to the Social Security award.

BY MR. ROSATI:

**Q. This is the only thing from the Social Security administration?**

**A. That I'm aware of.**

**Q. Okay. Did you think you needed more information from the Social Security administration when you were evaluating Mr. Hall's appeal?**

MS. PUBLICOVER: Objection: Vague and ambiguous.

THE WITNESS: I don't recall.

BY MR. ROSATI:

**Q. Can you look at Exhibit 19. In evaluating Mr. Hall's appeal, did you review Exhibit 19?**

**A. Yes.**

**Q. This is a letter from the lawyer that Lincoln's referring Mr. Hall to get Social Security benefits saying he's been awarded benefits, and authorized me to transfer funds for the recovery of the overpayment. So you were aware that once Mr. Hal was awarded Social Security he repaid some money to Lincoln?**

**A. Yes.**

**Q. Did you take into account the fact that by virtue of the Social Security award, Lincoln got to pay less money to Mr. Hall?**

MS. PUBLICOVER: Objection: Vague and ambiguous.

THE WITNESS: I'm aware.

BY MR. ROSATI:

**Q. Okay. Was that a factor that you considered in evaluating his appeal?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: Not that I'm aware of.

BY MR. ROSATI:

**Q. Can you take a look at Exhibit 20?**

**A. Okay.**

**Q. Did you review Exhibit 20 in deciding Mr. Hall's appeal?**

**A. In deciding the appeal, no. I looked at it.**

**Q. Were you aware that by virtue of his award of Social Security at $1,541 a month, the payments that he received from Lincoln were decreased by $1,541 a month?**

MS. PUBLICOVER: Objection: Vague, relevance.

THE WITNESS: I would have noted that.

BY MR. ROSATI:

**Q. Okay. Did you take that into account in evaluating his appeal?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I am not sure by what

you mean take it into account.

MS. PUBLICOVER: Are you asking if it affected her appeal determination?

MR. ROSATI: Yes.

THE WITNESS: No.

BY MR. ROSATI:

**Q. Can you take a look at Exhibit 21. This is a request during the claim's period or notice to Mr. Hall that he had to provide additional information. I'm mostly interested in the second page and the middle paragraph which says, "The records must document based upon a physical examination by a physician finding significant abnormalities or abnormal testing results. What specific restrictions and limitations are present as a result of the abnormal findings." Did you ever see that particular phrase?**

**A. Other than right here, not that I'm aware of.**

**Q. Is that a standard that Lincoln applies to claimant's obligations to provide proof of claim?**

MS. PUBLICOVER: Objection to the extent it lacks foundation, calls for speculation.

THE WITNESS: I'm not sure.

BY MR. ROSATI:

**Q. Did you file that standard when you handled Mr. Hall's appeal?**

**A. No.**

**Q. Why not?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I would have looked at everything.

BY MR. ROSATI:

**Q. Okay. But was Mr. Hall required to provide records which documented based upon a physical examination by a physician finding significant abnormalities or abnormal testing results what specific restrictions and limitations are present as a result of the abnormal findings?**

MS. PUBLICOVER: Objection: Vague as to time.

Are you asking if she asked Mr. Hall to provide that?

BY MR. ROSATI:

**Q. I'm asking if Mr. Hall was required to provide that in her mind?**

MS. PUBLICOVER: At the time that she was handling the appeal?

BY MR. ROSATI:

**Q. Yes, at the time that she was handling the appeal.**

**A. He would have been asked to submit records. I can't speak as to the rest of it.**

**Q. Do you know where this terminology came from?**

MS. PUBLICOVER: Asked and answered.

THE WITNESS: No.

BY MR. ROSATI:

**Q. Is there anything in Mr. Hall's policy that specifies he has to provide such evidence?**

MS. PUBLICOVER: Objection: Policy speaks for itself. She's already testified she doesn't know.

BY MR. ROSATI:

**Q. Okay. And can you look at Exhibit 22. Twenty-two has the same language, did you review 22 in evaluating Mr. Hall's appeal?**

**A. I would have taken a look at it.**

**Q. Okay. Then Exhibits 23, 24 deal with Mr. Hall failing to provide certain information, did you review that in evaluating Mr. Hall's appeal?**

MS. PUBLICOVER: Objection to the characterization of the document. The documents

speak for themselves.

Did you review these documents in the course of you appeal review?

THE WITNESS: Yes.

BY MR. ROSATI:

**Q. Was it relevant to your peer review that there was period of time that Mr. Hall's doctors were not filling out forms?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: Was it relevant, no.

BY MR. ROSATI:

**Q. Okay. Can you look at Exhibit 25. This was the initial decision to terminate his benefits based on the October 19, 2011, letter based on his doctors not returning forms. Did you review that in deciding Mr. Hall's appeal?**

**A. I would have taken it into consideration, but I wouldn't have used it to decide the appeal.**

MS. PUBLICOVER: He was asking if you had read the letter.

THE WITNESS: Yes.

BY MR. ROSATI:

**Q. Was it relevant to your decision on the appeal?**

**A. No.**


Exhibit 8 Page 106 of 192

**Q. Can you look at Exhibit 26. This is a peer review final report by Dr. David Trotter dated November 22nd, 2011. Did you review that in deciding Mr. Hall's appeal?**

**A. I read it.**

**Q. Did you accord it any weight in deciding his appeal?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I read the peer report.

BY MR. ROSATI:

**Q. Dr. Trotter concludes that Mr. Hall has functional impairment supported due to shoulder restricted motion and lumbar paraspinal tenderness postlaminectomy. And that as a result, he had limitations: Standing and walking each for up to 30 minutes at a time and no more than 2 hours a day would be applicable. That sitting would not be restricted as long as shifting positions were allowed as needed. Only occasional reaching at any level would be applicable, otherwise no restrictions of handling or feeling. And Dr. Trotter concluded that Mr. Hall could perform activities with restrictions.**

**Was that a factor that you took into account in evaluating Mr. Hall's appeal in**

**Dr. Trotter's report?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I would have reviewed the letter or the peer report as part of the file as to weight. Are you asking if I'm weighing it in the letter?

BY MR. ROSATI:

**Q. Yes. Using it in any context?**

**A. No.**

**Q. Can you take a look at Exhibit 27. This is the vocational assessment done by Diana Rhode dated November 28, 2011, plus or supporting documentation. Did you review Exhibit 27 in deciding Mr. Hall's appeal?**

**A. Yes, I took it into consideration.**

**Q. Had you received any training in evaluating vocational reviews?**

**A. I rely on our vocational experts.**

**Q. Can you look at Exhibit 28. This is the termination of benefits letter?**

**A. Correct.**

**Q. Dated December 20th, 2011. Do you review that in deciding appeals?**

MS. PUBLICOVER: In deciding appeals or in reviewing appeals?

MR. ROSATI: Yes, in deciding appeals.

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I review the letter and take it into consideration. I don't use it to decide the appeal.

BY MR. ROSATI:

**Q. When you reviewed the letter, did you note anything about it that you thought was inappropriate?**

**A. I don't recall.**

**Q. Well, the letter starts by quoting the policy, did you note that the policy definition is not consistent with California law?**

MS. PUBLICOVER: Objection: Calls for a legal conclusion, assumes facts not in evidence.

Did you make any notations about the policy language when you were reviewing the file?

THE WITNESS: No.

BY MR. ROSATI:

**Q. The December 20th, 2011, letter identifies a number of jobs that states Mr. Hall can do, these are all from Diane Rowes vocational assessment; is that correct?**


Exhibit 8 Page 109 of 192

**A. To the best of my knowledge, yes.**
**Q. Did you note that most of those jobs required additional training according to the materials that Ms. Rowe collected?**
MS. PUBLICOVER: Objection: Assumes facts not in evidence.
THE WITNESS: I would have relied on our vocational expert to take that into consideration.
BY MR. ROSATI:
**Q. Is it your understanding that alternative occupation can be an occupation the claimant hasn't been trained to do?**
MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation, vague and ambiguous.
THE WITNESS: It's my understanding that the vocational experts take that into consideration.
BY MR. ROSATI:
**Q. Okay. But who evaluates whether the policy takes that into consideration? You or the vocational expert?**
MS. PUBLICOVER: Objection: Vague and ambiguous, lacks foundation, calls for

speculation.

I don't understand your question.

BY MR. ROSATI:

**Q. Okay. The policy is quoted in Exhibit 28. After the OWN occupation period, it means that due to an injury or sickness, the insured employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow. Does that mean that an appropriate job is one that requires additional training, or only training that the employee has obtained to that date?**

MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation. She's already testified that she has no training as to how the vocational experts do their job.

BY MR. ROSATI:

**Q. Do you have any training on how to apply the policy?**

MS. PUBLICOVER: Objection: Overbroad as -- other than what she's already testified?

MR. ROSATI: Yes.

MS. PUBLICOVER: Vague and ambiguous.

THE WITNESS: I'm not sure what you

mean.

BY MR. ROSATI:

**Q. Have you received any training on Lincoln's standard policy on how to apply them?**

MS. PUBLICOVER: Objection: Vague and ambiguous, overbroad.

Other than what she's already testified to.

BY MR. ROSATI:

**Q. Yes.**

**A. Not that I'm aware of.**

**Q. Have you received any training as to the NE occupation definition of disabled that is referenced in Exhibit 28 with specific reference to whether or not the employee has to have the training now or whether an appropriate alternative occupation is one he or she can be trained to do?**

MS. PUBLICOVER: Same objections, vague and ambiguous, overbroad. She's already testified that she doesn't have any experience or expertise in terms of the vocational evals.

BY MR. ROSATI:

**Q. I'm asking in terms of the policy?**

MS. PUBLICOVER: Have you had specific training in that regard other than what you

have testified to?

THE WITNESS: No.

BY MR. ROSATI:

**Q. For example, if an employee is disabled and the vocational reviewer says, you're disabled, but you can be trained to be an attorney. It's three years of law school. Would that be an appropriate occupation for somebody who can only do a sedentary job?**

MS. PUBLICOVER: Same objections, vague and ambiguous, calls for speculation. She's already testified she does not have knowledge of the vocational analysis. You're asking about a job that has been identified by a vocational person, and she's already testified very clearly that she has no knowledge and no training in that regard. She relies on the vocational experts.

BY MR. ROSATI:

**Q. Okay. Do you know whether the vocational expert looks at the policy?**

MS. PUBLICOVER: Lacks foundation, calls for speculation.

THE WITNESS: I don't know.

BY MR. ROSATI:

**Q. So if the vocational -- if the medical**

**expert says the claimant is capable of doing a sedentary job, and the vocational expert says lawyers are sedentary jobs and this person has a college degree so he can go to law school for three years and become a lawyer, therefore, he can become a lawyer and that's a job he can do. Would you say okay?**

MS. PUBLICOVER: Objection: Vague and ambiguous, calls for a wild speculation and assumes facts not in evidence.

BY MR. ROSATI:

**Q. Some of the jobs that are identified for Mr. Hall required a year of training that he didn't have, did you note that?**

MS. PUBLICOVER: Same objection, assumes facts not in evidence.

MR. ROSATI: It's in evidence, actually.

BY MR. ROSATI:

**Q. Some of the jobs on the list in Exhibit 28 actually require six to twelve months of training?**

MS. PUBLICOVER: She's already testified she relied on the conclusion of the vocational expert.

BY MR. ROSATI:

**Q. So if the vocational expert concludes that it's appropriate for a person to do another alternative occupation that he's not trained for, you're obligated to follow that.**

MS. PUBLICOVER: No, she said in this case she relied on the vocational expert. Everything else is speculation and conjecture.

BY MR. ROSATI:

**Q. Have you ever concluded that the vocational expert's conclusion is wrong?**

MS. PUBLICOVER: Objection: Overbroad, lacks foundation. Have you ever reached that conclusion in the course of your appeals handling?

THE WITNESS: Not that I can recall.

BY MR. ROSATI:

**Q. Are you aware of any instance in which a Lincoln appeal specialist concluded that the vocational expert's conclusion was wrong?**

**A. I have no knowledge of that.**

**Q. Have you ever concluded that the medical reviewer's conclusion was wrong?**

**A. Not that I'm aware of.**

THE WITNESS: Can I get another

water?

MR. ROSATI: Sure.

(10:12 a.m. - Recess taken.)

(At 10:21 a.m., with parties present as before, the following proceedings were had, to-wit:)

BY MR. ROSATI:

**Q. In reviewing the appeal, did you look at Exhibit 29 which is my letter to Ms. Lions asking for a copy of the file?**

**A. Yes.**

**Q. And did you review Exhibit 30 which is Mr. Lions letter to me transmitting the copy of the file?**

**A. No, that's not Exhibit 30.**

**Q. What is Exhibit 30? What is Exhibit 29?**

MS. PUBLICOVER: You sent two letters, one to the church and one to the company both on December 30th asking for documents.

MR. ROSATI: Okay. The other one shouldn't have been in.

BY MR. ROSATI:

**Q. Okay. Can you look at 31 -- can you look at 32. What have you got as 32?**

**A. Your appeal letter.**

**Q. Did you receive the appeal?**

**A. Yes, I did.**

**Q. Did you review the appeal letter?**

**A. Yes, I did.**

**Q. The appeal letter asserts that the California definition of NE occupation applies rather than the policy terms, did you see that on Page 4 and 5?**

**A. Yes.**

**Q. Did you investigate this argument that the California definition of NE occupation applies rather than the policy definition?**

MS. PUBLICOVER: Objection: Vague.

BY MR. ROSATI:

**Q. On Pages 4 and 5 and into Page 6 of Exhibit 32, the May 29, 2012, letter, the appeal letter says, "Lincoln failed to apply the proper definition of totally disabled as required by law. Notwithstanding the specific language of the policy, California law is clear." And then goes on to describe the NE occupation standard that I contend it should be applied. Did you investigate this argument on Pages 4, 5 and 6 of Exhibit 32?**

MS. PUBLICOVER: Objection: Vague as to investigate.

THE WITNESS: I took it into consideration.

BY MR. ROSATI:

**Q. How did you take that into consideration?**

**A. I reviewed the letter.**

**Q. And what did you do -- are you trained in law?**

**A. No.**

**Q. How did you evaluate the legal argument presented regarding this Erica versus Western States Life Insurance Company case?**

**A. I relied on legal.**

**Q. Is that document somewhere in the file? She said she relied on legal.**

MS. PUBLICOVER: Let's go off the record.

(Discussion had off the record.)

BY MR. ROSATI:

**Q. Okay. Obviously you have a right to assert the attorney/client privileges context, that's your prerogative.**

**Did you conclude that the argument on Pages 4, 5 and 6 regarding the California definition of NE occupation was correct or incorrect?**

MS. PUBLICOVER: Objection: Vague to the extent if calls for a legal conclusion.

You can ask her how she applied the policy.

BY MR. ROSATI:

**Q. Did you apply the argument -- the California definition of NE occupation or the policy definition of NE occupation?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: Are you asking if I read it here or if I applied --

BY MR. ROSATI:

**Q. I'm asking what you applied in your decision?**

**A. In my decision I applied the California, the totality of it. It's taken into consideration.**

**Q. Your decision is Exhibit 53. Can you look at 53?**

**A. Yes.**

**Q. Is that your decision on appeal?**

**A. Yes.**

**Q. Your decision on appeal quotes the policy definition of total disability?**

**A. Correct.**

**Q. Does it state anywhere that you were not following that policy definition?**

MS. PUBLICOVER: Objection: Letter speaks for itself.

MR. ROSATI: She's the one that wrote the letter.

MS. PUBLICOVER: I understand that.

THE WITNESS: The definition of total disability is taken out of the policy.

BY MR. ROSATI:

**Q. Where in your decision, Exhibit 53, do you address the California definition of NE occupation?**

MS. PUBLICOVER: Objection: Vague, letter speaks for itself. She testified that the letter quotes the policy definition.

BY MR. ROSATI:

**Q. Okay. Where did you address the California definition?**

MS. PUBLICOVER: Objection: Vague.

In the letter?

MR. ROSATI: In the letter.

MS. PUBLICOVER: She testified the letter quotes the policy definition.

BY MR. ROSATI:

**Q. Did you consider the California definition from the appeal anywhere in your decision?**

MS. PUBLICOVER: In her decision or letter?

MR. ROSATI: In her decision?
MS. PUBLICOVER: Yes, she's already testified.
MR. ROSATI: Where is that stated in the her letter?
MS. PUBLICOVER: It's not in the letter. She testified to that as well.
BY MR. ROSATI:
**Q. Why isn't it in the letter if you considered it?**
MS. PUBLICOVER: Objection: Vague. Calls for speculation.
THE WITNESS: The letter contains the policy definition.
BY MR. ROSATI:
**Q. Why didn't you include in the letter if you were following the California definition from the appeal letter? Why didn't you say that in your letter?**
MS. PUBLICOVER: Objection: Calls for speculation, vague and ambiguous.
THE WITNESS: I would have gone with what my past training is that we use the policy language.

BY MR. ROSATI:

**Q. Okay. You have never been trained that when California law supercedes the policy language, you're to use the California standard?**

MS. PUBLICOVER: Objection: Misstates her testimony. She's talking about drafting the letter she quoted the policy language, but she considered the California definition in adjudicating the appeal. You're misstating her testimony.

BY MR. ROSATI:

**Q. Where in Exhibit 53?**

MS. PUBLICOVER: It's not. She's already testified that it's not in there.

BY MR. ROSATI:

**Q. Do you address the criteria of the California definition?**

**A. I don't believe it's in there.**

**Q. Okay. In evaluating Mr. Hall's appeal, did you consider whether the argument on Page 6 of 32 that this was not an ERISA plan?**

**A. Would you mind asking your question again.**

**Q. In evaluating Mr. Hall's appeal, did you consider the argument on Page 6 of Exhibit 32 that this was not an ERISA claim?**

MS. PUBLICOVER: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I read in your letter that you stated it's not ERISA and that I was aware of that.

BY MR. ROSATI:

**Q. Okay. In evaluating Mr. Hall's appeal, did you consider the medical records summarized on Pages 7 through 12 of the appeal letter, Exhibit 32?**

MS. PUBLICOVER: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I would have read them.

BY MR. ROSATI:

**Q. Do you personally read all the medical records submitted?**

**A. Yes, I do.**

**Q. Is there a reason why none of the medical records referenced in Mr. Hall's appeal are referenced in Exhibit 53?**

MS. PUBLICOVER: Objection: Vague, calls for speculation.

THE WITNESS: I rely on the medical experts.

MS. PUBLICOVER: And assumes facts not in evidence.

THE WITNESS: I rely on the medical experts.

BY MR. ROSATI:

**Q. Okay. And that would have been Dr. Akhavan?**

**A. Correct.**

**Q. In evaluating Dr. Hall's appeal, did you take into account the summary of Mr. Hall's medication and side effects they had on him that's referenced on Page 12 of the appeal, Exhibit 32?**

**A. Yes, I saw this.**

**Q. And did you -- what effect did that have on your decision?**

**A. You take into consideration the medical records and rely on our peer review, the medical experts.**

**Q. Did the peer review, either of your medical experts, address Mr. Hall's medications or their side effects?**

MS. PUBLICOVER: Objection to the extent the documents speak for themselves.

THE WITNESS: I would have to refer back.

BY MR. ROSATI:

**Q. Isn't it true that neither Dr. Trotter nor**

**Dr. Akhavan addressed Mr. Hall's medications or their side affects?**

MS. PUBLICOVER: And also assumes facts not in evidence.

MR. ROSATI: What facts?

MS. PUBLICOVER: The facts that his records said that he wasn't having any side affects from medications.

BY MR. ROSATI:

**Q. Exhibit 33 is a declaration submitted by Mr. Hall saying he was having side affects, and his records show that he kept changing the medications because he was having side affects?**

MS. PUBLICOVER: He was having one side affect.

BY MR. ROSATI:

**Q. He was falling asleep. Did you look at Exhibit 33 in evaluating Mr. Hall's appeal.**

**A. I reviewed Exhibit 33.**

**Q. That is his declaration?**

**A. Correct.**

**Q. In that declaration he explained in Paragraph 7B that the medications he takes had side affects: Headache, fatigue, somnolence, sedation drowsiness and various other conditions.**

**And on Paragraph 10, "I have tried and failed multiple injection interventions. I have tried multiple medication variations to control my pain and leave me somewhat functional. None of the combinations have been successful. My goal is to return to work and I am exploring every avenue to that end. But as of today, the pain is too great and the medications and every combination leave me unable to function mentally, at a level required in the job market. What weight did you accord this in evaluating Mr. Hall's appeal?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I would have relied on the medical expert to review the medical records.

BY MR. ROSATI:

**Q. Did the medical records address Mr. Hall's declaration?**

**A. The medical records would have provided that information had it been there or if it's there.**

**Q. Was Mr. Hall's declaration submitted to Dr. Akhavan?**

**A. Yes, it was.**

**Q. Does he address it in his review?**

**A. Not that I'm aware.**

**Q. Does he address side affects of**

**medications in his review?**

MS. PUBLICOVER: Objection. The report speaks for itself.

THE WITNESS: I would have to refer back to it.

BY MR. ROSATI:

**Q. We will get to it. Back to Exhibit 32.**

MS. PUBLICOVER: Let me take a quick break for a second.

MR. ROSATI: Sure.

(10:33 a.m. - Recess taken.)

(At 10:35 a.m., with parties present as before, the following proceedings were had, to-wit:)

BY MR. ROSATI:

**Q. Back to Exhibit 32. On Page 13 of Exhibit 32, there is an assertion that AMR provides flawed, deceptive and untrustworthy reviews. Did you evaluate that in citing Mr. Hall's appeal?**

MS. PUBLICOVER: Objection: Vague as to evaluate.

THE WITNESS: I read this statement.

BY MR. ROSATI:

**Q. Did you ask anybody whether this statement was true?**

MS. PUBLICOVER: Other than legal?

BY MR. ROSATI:

**Q. Anybody?**

**A. Other than our legal department, no.**

**Q. Do you know whether AMR instructs doctors to limit their review to objective findings?**

MS. PUBLICOVER: Lacks foundation. Have you ever heard that?

THE WITNESS: I don't have that knowledge.

BY MR. ROSATI:

**Q. Reviewing Mr. Hall's appeal, did you take**

**into account the assertions on Pages 13 through 15 that the policy doesn't limit consideration to only clinical evidence?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I did read it and review it when I did my review. I didn't ask for just clinical.

BY MR. ROSATI:

**Q. In evaluating Mr. Hall's appeal, did you take into account the argument that the decision to terminate benefits failed to reasonably consider pain as a disabling condition as discussed on Pages 15 through 21 of the appeal?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I took it into consideration, your statement, that it didn't take in pain.

BY MR. ROSATI:

**Q. How does Lincoln evaluate pain?**

**A. I would have relied on Dr. Akhavan's review. He is a pain management specialist.**

**Q. Okay. Did you do any independent evaluation of the arguments on the appeal as to pain?**

**A. I'm not sure what you mean.**

**Q. Pages 15 through 21 have a discussion of the disabling effects of pain. Did you do any independent evaluation of that discussion, or did you just rely upon Dr. Akhavan's assessment of Mr. Hall's condition?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I would have looked at the medical records and his assessment. Other than that, I'm not sure what you's asking.

BY MR. ROSATI:

**Q. Well, the argument on Pages 15 through 21 is partially a medical argument and partially a legal argument. Pain is a disabling condition. And some people characterize chronic pain as a disease on its own, how did you assess that issue other than rely upon Dr. Akhavan?**

MS. PUBLICOVER: And legal.

MR. ROSATI: And legal.

MS. PUBLICOVER: Other than what she's already testified to?

MR. ROSATI: You're asserting attorney/client privilege to legal, correct?

MS. PUBLICOVER: Absolutely.

MR. ROSATI: Which it's your right, but then you can't come forward at the time of trial

and say we want to tell you what legal told us. So basically you're just relying upon Dr. Akhavan as far as what you're telling me, correct?

MS. PUBLICOVER: No. That misstates her testimony. She relied on the doctor and she referred the matter to legal.

BY MR. ROSATI:

**Q. Okay. What did legal tell you?**

MS. PUBLICOVER: And your question is vague and ambiguous. And I'm going to instruct the witness not to answer questions as to what legal told her.

MR. ROSATI: As long as you're instructing the witness not to answer questions as to what legal told her, which is perfectly legitimate, my position is that it didn't happen if you don't disclose it. You can't rely upon it in time of trial unless you disclose it now?

MS. PUBLICOVER: She's disclosing the fact of it. She doesn't have to disclose the specific communications, but she is disclosing the fact that she referred the matter to legal.

MR. ROSATI: So what advice did you get?

MS. PUBLICOVER: No. The fact of the

referral is admissible, Counselor. The substance of the communications are privileged and we're asserting the privilege.

MR. ROSATI: My position is, that unless you can't disclose the substance, you can't disclose the fact.

MS. PUBLICOVER: That's -- you're welcome to have that position.

MR. ROSATI: Okay.

BY MR. ROSATI:

**Q. Did you take into account the argument on Page 21 of the appeal that the decision to terminate Mr. Hall's benefits failed to reasonably consider fatigue as a disabling condition?**

MS. PUBLICOVER: Same objections.

THE WITNESS: I would have taken into consideration the contents of your letter.

BY MR. ROSATI:

**Q. Okay. Is there a reason why you don't address fatigue in the course of Exhibit 53?**

MS. PUBLICOVER: Objection: Assumes facts not in evidence.

BY MR. ROSATI:

**Q. You have Exhibit 53, and it doesn't address the arguments about fatigue?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I relied on Mr. Hall's medical records as well as the review provided by Dr. Akhavan.

MS. PUBLICOVER: He's asking you about your uphold letter, and whether or not you specifically addressed fatigue.

THE WITNESS: I do not believe so.

BY MR. ROSATI:

**Q. Okay.**

MS. PUBLICOVER: The letter speaks for itself.

BY MR. ROSATI:

**Q. In evaluating Mr. Hall's appeal, did you address the side affects of medications as a disabling condition as discussed on Pages 21 and 22 of the appeal?**

MS. PUBLICOVER: Objection: Vague. Did she consider the side affects of medications?

MR. ROSATI: Yes.

THE WITNESS: Yes, I took it into consideration.

BY MR. ROSATI:

**Q. Why isn't it addressed on 53?**

MS. PUBLICOVER: Objection: Assumes

facts not in evidence, vague and ambiguous. The letter speaks for itself. It quotes portions of the file, it quotes portions of Dr. Akhavan's report.

BY MR. ROSATI:

**Q. But it doesn't address side affects of medication as a disabling condition?**

MS. PUBLICOVER: Not in the way you want it to, but ...

MR. ROSATI: I just want to know why she doesn't address it.

MS. PUBLICOVER: The letter speaks for itself.

MR. ROSATI: That's a meaningless phrase.

MS. PUBLICOVER: It's not a meaningless phrase.

MR. ROSATI: When lawyers assert that as an answer in a complaint, it's an improper denial which is stricken so that the answer is admitted. So when you say the letter speaks for itself, you're saying nothing.

MS. PUBLICOVER: You're misconstruing the content of the letter. If you want to ask her is the word fatigue stated in the letter, she can go through and she can read it and address it. But to


Exhibit 8 Page 135 of 192

say that it was not addressed in the uphold is not accurate. And I am entitled to assert my objections of misstating the record and assuming facts not in evidence.

BY MR. ROSATI:

**Q. Why don't you specifically address the arguments raised in the appeal in your denial letter?**

MS. PUBLICOVER: Assumes facts not in evidence, vague and ambiguous.

THE WITNESS: I would have relied on Dr. Akhavan's review of the medical records because he is a pain management physical medical rehabilitation physical examination. I relied on his expertise.

BY MR. ROSATI:

**Q. On Page 23 of the appeal it addresses -- presents an argument that Mr. Hall's benefits were terminated in part due to Lincoln's financial problems. Did you address that or evaluate that in your appeal decision?**

MS. PUBLICOVER: Objection: Vague and compound.

THE WITNESS: I would have referred that to legal.

BY MR. ROSATI:

**Q. We have already talked about Social Security.**

**Pages 25 through 27 of the appeal critiqued Dr. Trotter's opinions. Did you evaluate that in deciding Mr. Hall's appeal?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I reviewed your pages, but they were not a determining factor in my overall decision.

BY MR. ROSATI:

**Q. How did you evaluate the critique of Dr. Trotter's review?**

MS. PUBLICOVER: Objection: Vague, overbroad.

BY MR. ROSATI:

**Q. Did you get a medical assessment of that critique?**

**A. No.**

**Q. Why not?**

**A. That wouldn't be the practice in -- that wouldn't be something that we would do in general. It's his review. It's his opinion.**

**Q. But doesn't the appeal assert that his review and his opinion are factually and medically**

**unfounded?**

MS. PUBLICOVER: Objection. Again, it --

BY MR. ROSATI:

**Q. How do you assess that issue, when an appellant says, "Okay, you have a doctor that says one thing. I think your doctor is dishonest and unethical and incompetent." How do you address that?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation, incomplete hypothetical.

THE WITNESS: It's going to be dependent on each case. The review is sent out again to a PM specialist to cover all the medical records.

BY MR. ROSATI:

**Q. Okay. We will get to his opinion too.**

**The next portion of the appeal addresses numerous pages talking about the Diane Rowes transferable skills analysis. Did you evaluate that in deciding Mr. Hall's appeal?**

MS. PUBLICOVER: Objection: Vague.

Did she consider it?

MR. ROSATI: Yes.

THE WITNESS: The items brought up in your letter, yes.

BY MR. ROSATI:

**Q. It goes on from Page 27 through 36. Did you ask for a second vocational review?**

**A. I did not.**

**Q. Why not?**

MS. PUBLICOVER: Objection: Calls for speculation.

THE WITNESS: I felt the review completed by Dr. Akhavan led to the same or similar conclusions and that the vocational expert used those conclusions and they were appropriate.

BY MR. ROSATI:

**Q. Okay. The next section of the appeal talks about the legal admissibility of the other opinions. Did you address that in your review of Mr. Hall's appeal, Pages 37 through 44?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I read them and referred my questions to our legal department.

BY MR. ROSATI:

**Q. Did you get a response?**

MS. PUBLICOVER: Objection.

MR. ROSATI: That's a yes or no.

MS. PUBLICOVER: Doesn't matter. Objection: Attorney/client privilege.

MR. ROSATI: Only if there was a response.

MS. PUBLICOVER: There was a response.

MR. ROSATI: Okay. Then the response is privileged, but whether or not there was a response isn't privileged because there is no content.

BY MR. ROSATI:

**Q. Pages 44 through 46 of the appeal talk about the independence of your doctors. Do you know whether the doctors are independent, in fact?**

MS. PUBLICOVER: Objection: Vague, lacks foundation, calls for speculation.

THE WITNESS: I know we rely on vendors. Other than that, I don't know.

BY MR. ROSATI:

**Q. Did you investigate whether the doctors are independent, in fact?**

**A. No.**

**Q. Why not?**

**A. I rely on our company to --**

**Q. Does the company investigate whether the**

**doctors are independent?**

MS. PUBLICOVER: Lacks foundation, calls for speculation.

THE WITNESS: I don't know.

BY MR. ROSATI:

**Q. So if you -- if Lincoln hires a vendor that hires Dr. Trotter or Dr. Akhavan 100 times, and 100 times Dr. Trotter or Dr. Akhavan give reports that support Lincoln's economic position, would that influence whether you rely upon their opinions?**

MS. PUBLICOVER: Assumes facts not in evidence, lacks foundation, calls for speculation, incomplete hypothetical, vague and ambiguous.

THE WITNESS: I wouldn't know.

BY MR. ROSATI:

**Q. Well, the issue presented was doctors that Lincoln hires are not independent. Is it relevant to you in evaluating an appeal whether the doctors that Lincoln refers medical reviews to are independent?**

MS. PUBLICOVER: Objection: Vague and ambiguous. She's already testified that she assumes that they are independent.

BY MR. ROSATI:

**Q. Do you assume that the treating doctors**

**are independent?**

MS. PUBLICOVER: Objection: Vague and ambiguous.

THE WITNESS: The claimant's treating doctors?

BY MR. ROSATI:

**Q. Yes.**

**A. Independent to who?**

**Q. Independent professionals giving independent opinions?**

MS. PUBLICOVER: Objection: Vague and ambiguous. They're not hired to give opinions. They're treaters.

BY MR. ROSATI:

**Q. Right. But they give opinions, don't they?**

MS. PUBLICOVER: Objection: Calls for speculation, incomplete hypothetical, lacks foundation.

BY MR. ROSATI:

**Q. Why do you give more credence to reviewing doctors hired by Lincoln than to the treating doctor as to whether a claimant in this case is disabled?**

MS. PUBLICOVER: Objection: Misstates her testimony. Objection: Also it's

argumentive. She already testified she's not giving credence. She's not evaluating. She gives the medical records and complete file to the vendor to retain the physician to render an opinion. She didn't say anything about giving credence.

BY MR. ROSATI:

**Q. In your decision letter you quote Dr. Akhavan's opinions, not the opinions of Mr. Hall's treating physicians, correct?**

MS. PUBLICOVER: Misstates the record.

BY MR. ROSATI:

**Q. Exhibit 53 relies fairly extensively on Dr. Akhavan's opinions?**

MS. PUBLICOVER: It also references the conditions that were outlined in the medical records by Mr. Hall's own physicians. You said she didn't even mention his doctors' opinions and that's just wrong. I'm taking offense the way you are formulating your questions. You are assuming facts. And I know assumes facts not in evidence is also not really an appropriate objection because there are no facts in evidence, but you are misstating the records.

MR. ROSATI: No, I'm not, but I will

restate the question.

MS. PUBLICOVER: Thank you.

BY MR. ROSATI:

**Q. In reaching your conclusion, you relied upon Dr. Akhavan's opinion that Mr. Hall was capable of working, correct?**

MS. PUBLICOVER: Objection: Misstates her testimony.

BY MR. ROSATI:

**Q. Exhibit 53 quotes at length Dr. Akhavan's report, correct?**

MS. PUBLICOVER: Objection: Document speaks for itself.

THE WITNESS: Yes.

BY MR. ROSATI:

**Q. Have you ever been trained on how social security reaches a decision as to whether to award Social Security benefits?**

MS. PUBLICOVER: Asked and answered. She testified no.

BY MR. ROSATI:

**Q. So you have no idea what process is involved in a Social Security disability award?**

MS. PUBLICOVER: Asked and answered.

THE WITNESS: That's correct. I do

not.

BY MR. ROSATI:

**Q. Do you know whether or not doctors are asked to evaluate a claimant who applies for Social Security disability?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I would speculate. I don't know.

BY MR. ROSATI:

**Q. Are you aware that in order to be awarded disability with the Social Security administration, there have to be a doctor's review by a doctor hired by the Social Security administration, or by a state agency acting on behalf of the Social Security administration?**

MS. PUBLICOVER: Objection: Vague, lacks foundation, calls for speculation.

THE WITNESS: I'm not aware.

BY MR. ROSATI:

**Q. And those are independent doctors independent of the claimant. Why don't you give more credence to the Social Security administration's doctors than you do to Dr. Akhavan?**

MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation, assumes facts not

in evidence and misstates her testimony. She testified that she considers all information. She didn't testify that she gives any more weight.

BY MR. ROSATI:

**Q. Can you take a look at Exhibit 50. It's your September 4, 2012, letter?**

**A. Okay.**

**Q. Did you receive Exhibit 50 before you made your decision on Mr. Hall's appeal?**

**A. Based on the dates of the letters, yes.**

**Q. And Exhibit 50 I wrote to you that Dr. Akhavan's report is patently fraudulent and in bad faith. Did you take that into account in deciding Mr. Hall's appeal?**

**A. I reviewed your statement.**

**Q. Did you evaluate the assertion that Dr. Akhavan's report is patently fraudulent and in bad faith?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: I don't know what you mean by evaluate.

BY MR. ROSATI:

**Q. Did you decide whether or not that assertion was correct or not correct?**

**A. I rely on the vendors to -- that we use.**

**Q. Did you send the September 4, 2012, letter to Dr. Akhavan for his comments?**

**A. I did not.**

**Q. Why not?**

**A. I asked you if you wanted me to and you stated no.**

**Q. Why didn't you do it on your own?**

**A. It would require additional time that you were not willing to provide.**

**Q. You didn't issue an opinion or decision for Dr. Akhavan or Mr. Hall's appeal for another five weeks. What were you doing in the five weeks from September 4 until October 19, 2012?**

**A. Reviewing the letter, the nearly 600 pages of appeal information and the medical documents.**

**Q. But if you wanted another opinion from Dr. Akhavan, didn't you have five weeks to do it?**

MS. PUBLICOVER: Objection: Argumentive. She already testified. You told her not to do it.

MR. ROSATI: Because I wanted an opinion in September, not October.

MS. PUBLICOVER: She already testified why she didn't. She didn't do it because you told her not to do it.

BY MR. ROSATI:

**Q. So did you accept the conclusion that Dr. Akhavan's opinion was fraudulent?**

MS. PUBLICOVER: Objection: Misstates the testimony. She said she relies on the vendors to vet the qualifications of the physician.

BY MR. ROSATI:

**Q. Do you rely upon the vendor to vet the opinion of the physician?**

MS. PUBLICOVER: Objection: Vague.

BY MR. ROSATI:

**Q. The assertion in this letter was Dr. Akhavan's report was fraudulent, how did you assess that?**

MS. PUBLICOVER: Objection: Asked and answered.

BY MR. ROSATI:

**Q. Did you do anything to evaluate that assertion?**

MS. PUBLICOVER: Other than what she's already testified to?

BY MR. ROSATI:

**Q. Dr. Akhavan did not examine Mr. Hall; did you ask for an examination of Mr. Hall?**

**A. No, I did not.**

**Q. Dr. Akhavan did not review all the medical records. At least according to his report he makes no reference to them. Did you ask him whether he reviewed all of the medical records?**

MS. PUBLICOVER: Objection: Vague and ambiguous, assumes facts not in evidence.

THE WITNESS: I would have sent him the file for review.

BY MR. ROSATI:

**Q. But he didn't reference most of the medical records, does that suggest he didn't review them?**

MS. PUBLICOVER: Objection: Relevance, assume facts not in evidence.

BY MR. ROSATI:

**Q. The September 4th letter asserts that Dr. Akhavan did not properly read or understand the records provided because he disregards critical facts. Did you assess that?**

MS. PUBLICOVER: Objection: Vague and ambiguous as to assess.

BY MR. ROSATI:

**Q. How much weight do you accord Dr. Akhavan's report if you conclude that Dr. Akhavan's report is unsubstantiated and**

**fraudulent?**

MS. PUBLICOVER: Objection: Misstates her testimony.

BY MR. ROSATI:

**Q. Did you conclude if there was any error in Dr. Akhavan's report?**

**A. I did not have an issue with the peer report.**

**Q. So did you give any weight to the September 4th, 2012, letter?**

MS. PUBLICOVER: Objection: Asked and answered. She testified that she considered it.

BY MR. ROSATI:

**Q. How did you consider the September 4th, 2012, letter?**

MS. PUBLICOVER: Objection: Vague and ambiguous. She already testified she got it, she read it, she considered it, she talked to you about it, you told her not to send it to him. Asked and answered.

MR. ROSATI: That's not what happened but we will talk about that.

MS. PUBLICOVER: That's what the records reflect.

MR. ROSATI: That's not what

happened.

MS. PUBLICOVER: That's what the records reflect and that's her testimony.

MR. ROSATI: I understand that.

MS. PUBLICOVER: Okay.

BY MR. ROSATI:

**Q. Did you assess the inconsistencies between Dr. Akhavan's summaries of Mr. Hall's condition as to pain and his conclusions as to Mr. Hall's capacity to work, Item No. 5 in the September 4th, 2012 letter?**

MS. PUBLICOVER: Objection: Vague and ambiguous, asked and answered.

MR. ROSATI: I haven't asked that one at all.

THE WITNESS: I would have given consideration to the statements that you made. Dr. Akhavan is board certified, a pain management specialist. It's within reason that he would be able to comment on these.

BY MR. ROSATI:

**Q. Did he?**

**A. In his peer report I would have to refer back to it. I do not believe so.**

**Q. Can you look at Exhibit 33?**

**A. Okay.**

**Q. Is there a reason why you don't address Mr. Hall's declaration in your appeal decision which is Exhibit 53?**

MS. PUBLICOVER: Objection: Assumes facts not in evidence, vague and ambiguous.

THE WITNESS: All the information was given consideration.

BY MR. ROSATI:

**Q. Is there a reason why you didn't address his declaration in your written decision?**

MS. PUBLICOVER: Objection: Vague and ambiguous, assumes facts not in evidence, argumentive, calls for speculation.

THE WITNESS: I believe that the letter stands for itself.

BY MR. ROSATI:

**Q. My question is is there a reason why you did not specifically address Mr. Hall's declaration, which is Exhibit 33 in your appeal decision which is Exhibit 53?**

MS. PUBLICOVER: Objection: Assumes facts not in evidence, vague and ambiguous, calls for speculation.

As you sit here today, can you answer it?

THE WITNESS: No.

BY MR. ROSATI:

**Q. Okay. Can you look at Exhibit 34. Did you review the additional medical evidence submitted as part of Mr. Hall's appeal?**

MS. PUBLICOVER: Asked and answered.

THE WITNESS: Yes, I took it into consideration.

BY MR. ROSATI:

**Q. And what weight did it have in your evaluation, if any?**

MS. PUBLICOVER: Objection: Vague and ambiguous.

THE WITNESS: I took it into consideration.

BY MR. ROSATI:

**Q. The appeal denial letter has a couple of entries for the new medical records. Other than some isolated entries, why didn't you say I have looked at all these medical records and they show this and it doesn't change my opinion?**

MS. PUBLICOVER: Objection: Argumentive. The letter says Mr. Hall's entire file was reviewed upon appeal, quote, end quote. You are misstating the letter.

MR. ROSATI: I'm asking why she didn't specifically address the --

MS. PUBLICOVER: Do you know why she -- you just said she does address the medical records. Maybe she doesn't address every single page of the medical records, but you're misstating the record.

BY MR. ROSATI:

**Q. How much time did you spend on Mr. Hall's appeal?**

**A. I don't know.**

**Q. Why not?**

**A. Because I don't track it.**

**Q. Why not?**

**A. It's not a requirement and I have never been asked to.**

**Q. Did you decide 20 appeals during the month of October 2012?**

**A. Without looking, I would guess that I did, but I'm not sure.**

**Q. Okay. Did you decide 20 appeals every month in 2012?**

**A. The goal is 20, and that's what we would have done or I would have done.**

**Q. Can you look at Exhibit 35. Thirty-five**

**is literature on the side affects of the medications Mr. Hall was taking. Is there a reason why you don't address that literature in Exhibit 53?**

**A. The literature was provided to the peer expert who was, again, a PM&R specialty. I would have relied on him to review the side affects of the medication.**

**Q. Does Dr. Akhavan address the side affects of medication in his peer review?**

**A. Not that I'm aware of.**

**Q. Did that concern you?**

MS. PUBLICOVER: Objection: Vague.

BY MR. ROSATI:

**Q. Did you ask for follow-up review by Dr. Akhavan?**

MS. PUBLICOVER: Misstates her testimony.

BY MR. ROSATI:

**Q. You can ask the doctor to clarify opinions, correct?**

**A. Correct.**

**Q. One of the issues in the appeal was the side affects of medications, correct?**

**A. Correct.**

**Q. It was raised in the appeal letter,**

**Exhibit 32, and raised in Mr. Hall's declaration, Exhibit 33, there was material submitted, Exhibit 35, but Dr. Akhavan didn't address it. Did you ask Dr. Akhavan to reconsider and address that issue?**

MS. PUBLICOVER: Objection: Misstates the record. That's not what she testified. She testified that she assumed that he did consider it in reaching his conclusions.

BY MR. ROSATI:

**Q. It doesn't say so?**

MS. PUBLICOVER: Objection: Misstates the record, vague and ambiguous, argumentive.

BY MR. ROSATI:

**Q. Can you take a look at Exhibit 36. Literature from the American Pain Society on pain and his assessment management and treatment. Did you read that?**

**A. I reviewed it, yes.**

**Q. Did you read it page to page?**

**A. I don't recall.**

**Q. Did Dr. Akhavan read it?**

MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation, argumentive.

THE WITNESS: It was provided to him.
BY MR. ROSATI:
**Q. Okay. Did Dr. Akhavan comment on it in his opinion?**
MS. PUBLICOVER: Objection: Vague and ambiguous.
THE WITNESS: I don't recall.
BY MR. ROSATI:
**Q. Okay. Can you look at Exhibit 37. This is an excerpt from an Institute of Medicine of the National Academy's report on relieving pain in America. Did you review it in the course of deciding Mr. Hall's appeal?**
**A. Yes.**
**Q. Did you submit it to Dr. Akhavan?**
**A. Yes.**
**Q. Can you take a look at Exhibit 38. This is an excerpt from the "AMA Guides to the Evaluation of Permanent Impairment Sixth Edition." Did you review it in deciding Mr. Hall's appeal?**
**A. I would have reviewed it.**
**Q. Did you submit it to Dr. Akhavan for his review?**
**A. Yes, the entire file was submitted.**
**Q. And 39 is -- the first page, Lincoln**

**Financial, $710 Million Swing from Black to Red. Did you review Exhibit 39 in deciding Mr. Hall's appeal?**

**A. I reviewed this.**

**Q. And you asked for legal advice on it?**

**A. Correct.**

**Q. Exhibit 40 is the Dr. Botterbusch's evaluation of vocational reviews, did you review that in deciding Mr. Hall's appeal?**

**A. Yes.**

**Q. Did you submit that to your vocational people for their comments?**

**A. The vocational reviewers have access to the entire file.**

**Q. But this came in after the vocational review was done, so did you then send it back to vocational and say here is some additional thoughts. Can you give me your opinion on it?**

**A. No, I did not.**

**Q. Why not?**

MS. PUBLICOVER: Objection: Calls for speculation.

THE WITNESS: I don't recall.

BY MR. ROSATI:

**Q. Can you look at Exhibit 41. This is an**


Exhibit 8 Page 158 of 192

**evaluation of TSAs by Steven Simon. Did you review that as part of your appeal review?**

**A. Yes.**

**Q. Did you submit that to your vocational people for their thoughts?**

**A. No.**

**Q. Why not?**

MS. PUBLICOVER: Objection: Calls for speculation.

THE WITNESS: I don't know.

BY MR. ROSATI:

**Q. Can you take a look at Exhibit 42.**

**A. Okay.**

**Q. This is your initial acknowledgment of the appeal?**

**A. Yes.**

**Q. This is a template letter?**

**A. Yes.**

**Q. Can you take a look at Exhibit 43. This is a follow-up letter from me to you stating that the appeal letter was faxed, the rest of the documents you should have by now?**

**A. Yes.**

**Q. And you received Exhibit 43?**

**A. Yes.**

**Q. Can you take a look at Exhibit 11, Page 24, entry for June 11th, 2012.**
**A. Which page, I'm sorry?**
**Q. Bate Page 24?**
**A. Thank you.**
**Q. This is a medical review referral entered by you on 6-11-2012?**
**A. Correct.**
**Q. It doesn't specify a specialty. Is there a reason for that?**
**A. Yes, at this time it was presented to a senior and our nurse case manager to determine the best special type specialty.**
**Q. Okay. And it says, "California, yes." Why is there a reference of the California?**
MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation.
THE WITNESS: It's part of the form.
BY MR. ROSATI:
**Q. Do you know why that's part of the form?**
MS. PUBLICOVER: Lacks foundation, calls for speculation.
THE WITNESS: No.
BY MR. ROSATI:
**Q. It says file type, all AWD. What does**


Exhibit 8 Page 160 of 192

that mean?

A. It would have meant that the long-term disability file was all in our electronic system.

Q. Okay. And the next entry on the same page and document is medical review referral entered by CIG or C1G, 6-12-2012. File presented for appeal direction. What does that mean?

A. Means that we go over the entry below to determine the type of specialty to send it out to.

Q. Who participated in that appeal direction?

A. Bryan Gall, our nurse case manager, Cheryl Geary, my senior and myself.

Q. And the conclusion was that?

A. To send it for PM&R with pain management.

Q. Is that what happens on Pages 23 and 24, your entry for June 13th?

A. Correct.

Q. When you prepare the medical review referral, who does it go to?

A. Medical technician.

Q. Who is that?

A. In this case, DSF, Demarcus Franks.

Q. Is that a nurse or technician?

A. A technician.

Q. Do you know what Demarcus Franks does with

**the referral?**

**A. No.**

**Q. Can you look at Exhibit 44.**

**A. Okay.**

**Q. This is Dr. Akhavan's report, correct, dated -- it has a date at the end, June 8th, 2012?**

**A. Correct.**

**Q. And addressed to Demarcus Franks?**

**A. Yes.**

**Q. So at this point you don't have -- are you looking -- can you look at Exhibit 45.**

**A. Yes.**

**Q. What is 45?**

**A. It's an email that the review has been submitted to -- back to me.**

**Q. Who is Denise Weight, W-E-I-G-H-T?**

**A. She is another med tech.**

**Q. So the review went to Denise Weight, but this is July 3rd. Why is Dr. Akhavan's report dated June 28th, and the review doesn't come to Lincoln, if you know, until July 3rd?**

MS. PUBLICOVER: Lacks foundation, calls for speculation.

THE WITNESS: I don't know.

BY MR. ROSATI:

**Q. And then Denise Weight is emailing it to you, correct?**

**A. Correct.**

**Q. And copying Elaine Conley, who is Elaine Conley?**

**A. Senior in the department.**

**Q. And copying Cheryl Geary, what is Cheryl Geary?**

**A. Another senior in our department.**

**Q. And copying Carla Tierno-Hogue, who is Carla Tierno-Hogue?**

**A. She is one of the nurse case managers.**

**Q. Do you know why those people were copied on this report?**

**A. No, I do not.**

**Q. Did you discuss this report with any of those people?**

**A. I don't recall.**

**Q. Exhibit 45 says a copy of the report can be found in Q://Common/CLAIMS/VendorRequests/FinalVendorReports. Do you know what that means?**

**A. Q is a drive in our computer. And this is where they would have loaded the report to.**

**Q. Does the come -- it says final vendor reports. Do you get interim vendor reports?**

MS. PUBLICOVER: Objection: Vague.

BY MR. ROSATI:

**Q. Are there other kinds of vendor reports?**

**A. Not that I'm aware of.**

**Q. Do you get drafts of vendor reports?**

**A. No, not that I'm aware of.**

**Q. What does the reference common mean, if you know?**

**A. Other than that's how it's labeled, I don't know.**

**Q. What does the reference claims means?**

**A. Claims would be our department.**

**Q. What does the reference vendor request mean, if you know?**

**A. Vendor request is what we sent out.**

**Q. Okay. Can you take a look at Exhibit 9. This is the LTD claim profile, and look on Page 2 of the entry at July 3rd, 2012.**

**A. Yes.**

**Q. It says, "Med view return. Need to draft response letter to attorney list of questions prior to determination, LZK." What does ma mean?**

**A. It means I received the med review and**

**needed to write a letter to you in response to the peer review and your appeal letter.**

**Q. And did you?**

**A. Yes.**

**Q. When?**

**A. October 19th was the final letter.**

**Q. So why did it take so long from the time you had Dr. Akhavan's opinion to write the appeal denial letter?**

MS. PUBLICOVER: Objection: Vague, calls for speculation.

THE WITNESS: I don't know.

BY MR. ROSATI:

**Q. Does it typically take you that long?**

**A. No.**

**Q. What was different in this case as opposed to typical cases?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: It took time to review the report, the 600 pages of appeal information.

BY MR. ROSATI:

**Q. From that entry on July 3rd, 2012, there is no more entries on the LTD claim profile until August 24th, 2012. Were you working during those two months, July and August of 2012?**

**A. Yes.**

**Q. Were you working on other files?**

**A. Yes.**

**Q. Is there a reason why this appeal wasn't decided?**

**A. Again, it was being reviewed.**

**Q. Was it being reviewed by somebody else?**

**A. At that time, no.**

**Q. At any time during the appeal, did this file get reviewed by somebody else?**

MS. PUBLICOVER: Objection: Vague and ambiguous. And she already testified that her senior would have reviewed it, and she already testified that had she communicated with others about it.

BY MR. ROSATI:

**Q. At this point everything on the appeal is on computer, correct?**

**A. Correct.**

**Q. Anybody could review it by accessing the computer claim, correct?**

**A. Correct.**

**Q. Would they have noted in the file somewhere that they reviewed it?**

MS. PUBLICOVER: Objection: Lacks

foundation, calls for speculation.
THE WITNESS: Not that I'm aware of.
BY MR. ROSATI:
**Q. So somebody could have reviewed it without entering a notation in the file and you wouldn't know?**
MS. PUBLICOVER: Objection: Lacks foundation, calls for speculation.
THE WITNESS: That could happen.
BY MR. ROSATI:
**Q. Did you refer it to anybody for a further review?**
MS. PUBLICOVER: Objection: Vague and ambiguous. Other than what she's already testified to?
BY MR. ROSATI:
**Q. Other than what you've told your seniors?**
MS. PUBLICOVER: And legal.
THE WITNESS: For review, no.
BY MR. ROSATI:
**Q. Can you take a look at Exhibit 46. Do you recall receiving Exhibit 46?**
**A. Yes.**
**Q. Exhibit 46 indicates that the appeal was submitted earlier, and by letter June 2012, you**

**advised us that you received it by a letter dated June 5, 2012, I noted you received the entire appeal by USPS. And we hadn't heard from you in 60 days. Can you explain to me why you didn't decide the appeal in those 60 days?**

MS. PUBLICOVER: Objection: Vague and asked and answered.

Other than what he she's already testified to?

MR. ROSATI: Uh-huh.

THE WITNESS: I was reviewing the file and medical documentation.

BY MR. ROSATI:

**Q. What else were you doing?**

MS. PUBLICOVER: Objection: Asked and answered, vague and ambiguous, overbroad.

You have asked and answered that question.

BY MR. ROSATI:

**Q. As of August 1st, 2012, you had Dr. Akhavan's report for four weeks, correct?**

**A. Since the beginning of July, correct.**

**Q. What other medical review were you conducting as of this point?**

**A. I was reviewing the information that you submitted.**

**Q. Did you submit that information to Dr. Akhavan?**
**A. Yes.**
**Q. Did he review it to your knowledge, or to your understanding?**
**A. To my understanding, yes.**
**Q. Did you respond to Exhibit 46?**
**A. I don't recall. I would have to look.**
**Q. If you responded, would it be noted in Exhibit 9, the LTD claim profile?**
**A. Generally, yes.**
**Q. Is there any indication in Exhibit 9 that you responded?**
**A. No.**
**Q. Can you take a look at Exhibit 47. This is a letter dated August 22nd, 2012, from me to you. It states it's a follow-up of the August 1st letter. It states, "To date I have had no response from you. You are placing a serious financial burden on Mr. Hall by not paying him his benefits as he has no money and no other income. You failure to decide his claim in a reasonable time is bad faith. Unless you reinstate Mr. Hall's benefits and pay past due benefits with interest by September 4th, 2012, I will initiate litigation for bad faith against**

**Lincoln on his behalf." Can you tell me what you were doing with Mr. Hall's file between August 1st 2012, when Exhibit 46 was sent to you, and August 22nd, 2012, when Exhibit 47 was sent to you?**

MS. PUBLICOVER: Objection: Asked and answered.

MR. ROSATI: Not that question.

MS. PUBLICOVER: Overbroad.

THE WITNESS: A copy of the peer report was sent out to you during that time.

BY MR. ROSATI:

**Q. It was sent out afterwards. The letter is dated August 30th.**

MR. ROSATI: Excuse me. Let's take a break.

(11:24 a.m. - Recess taken.)

(At 11:32 a.m., with parties present as before, the following proceedings were had, to-wit:)

BY MR. ROSATI:

**Q. We were at Exhibit 47.**

**A. Okay.**

**Q. So you did responded to Exhibit 47, correct?**

**A. Correct.**

**Q. And that is Exhibit 48?**

**A. Yes.**

**Q. In Exhibit 48 you write, we have recently received -- you write, "It was necessary to have a peer review completed on Mr. Hall's file. We have recently received a review and will move forward with our determination at this time." Isn't it true that you received a review on July 3rd?**

**A. Correct.**

**Q. Why are you just referencing that you recently received it when you actually had it at the point of the August 24th letter for 52 days?**

MS. PUBLICOVER: Objection: Argumentive, calls for speculation.

THE WITNESS: I don't know. This is a template letter. I use the language out of the letter.

BY MR. ROSATI:

**Q. Okay. You write, "We will make every effort to finalize our review by September 4, 2012," correct?**

**A. Yes.**

**Q. Why did you put that in?**

**A. That was my hope. It was not realistic.**

**Q. If you go back to Exhibit 9. On Page 2 there is an entry for 8-24-12, file to TKH. Who is TKH?**

**A. She is another appeal specialist in our department.**

**Q. Why was the file submitted to her?**

**A. She was going to help me write the letter.**

**Q. Write what letter?**

**A. The uphold letter. Finish the review on the file.**

**Q. What needed to be done as of August 24th in terms of finishing the review on the file?**

**A. More of a broad statement and just bringing all the pieces together.**

**Q. Okay. Did you have a checklist of things you needed to do?**

**A. No.**

**Q. As far as I can tell, the next step on the**

**file is an entry in Exhibit 9 dated August 28th, 2012. "TKH for LZK, determine peer review will be sent to attorney for review, follow up set." What does that mean?**

**A. It means that at that time Theresa realized it was a California peer review and it needed to be sent to you for review.**

**Q. Why hadn't it been sent for review earlier?**

**A. I didn't realize at that point that it was California. I knew it was, but I don't think it stated it on the peer report and I missed it.**

**Q. Okay. Can you look at Exhibit 49.**

**A. Yes.**

**Q. This is a letter dated August 30th, 2012. Transmitting Dr. Akhavan's peer review for me for comment?**

**A. Correct.**

**Q. Is there a reason why this wasn't faxed?**

MS. PUBLICOVER: Objection: Calls for speculation.

THE WITNESS: No. Generally I don't fax.

BY MR. ROSATI:

**Q. But you only gave me ten days to respond?**

**A. California we give ten days.**
**Q. It was over a holiday?**
MS. PUBLICOVER: Is there a question, or is it an argumentive statement?
BY MR. ROSATI:
**Q. You asked for a response on a Sunday, which meant that the response had to be due on a Friday to meet the deadline. You realize that you gave me effectively seven days which included a three-day weekend to respond?**
MS. PUBLICOVER: Vague and argumentive.
Does she realize that now?
BY MR. ROSATI:
**Q. Did you realize it at the time?**
**A. No.**
**Q. And that you mailed it to me, so it would take three or four days before I got it?**
MS. PUBLICOVER: Objection: Argumentive, asked and answered.
BY MR. ROSATI:
**Q. Rather than fax it so I would have it?**
MS. PUBLICOVER: Objection: Argumentive, asked and answered.

BY MR. ROSATI:
**Q. Okay. So then the response to that was Exhibit 50 which was sent on September 4th?**
**A. Correct.**
**Q. And we have already talked about Exhibit 50?**
**A. Yes.**
**Q. Then there is an entry on September 11th, 2012, on Exhibit 9, Page 2. "Received letter from claimant's attorney stating the peer review was fraudulent and demands benefits be reinstated. Moving forward with determination." What does it mean to be moving forward with determination?**
**A. Taking the next steps in finishing the review. Reading your letter, moving forward to that point where we can make a determination.**
**Q. The next entry there is an entry for --**
MS. PUBLICOVER: I think there might be an entry redacted in between.
MR. ROSATI: Oh, it spaced.
BY MR. ROSATI:
**Q. Does that mean entry redacted?**
**A. Not necessarily, but I don't know.**
**Q. There is an entry for September 20th, 2012, on Exhibit 9, Page 2. "IBC from attorney**

requesting a call back."  What does that mean?

A.   IBC is inbound call.

Q.   Okay.  There is an entry on 9-21-12, "Returned call to attorney and advised that based on the most recent letter we have options.  We can provide him time to respond to the peer report." You already had a response to the peer report.  "We can forward his questions to the reviewer, or we can move forward with the determination based on the review in the file.  He does not wish to submit any additional information and would like LFG to move forward with the determination.  Advised would have this for him within the next week."  So you and I had a conversation?

A.   Yes.

Q.   And you told me you could ask Akhavan to respond to the questions at this late date?

A.   Yes.

Q.   You had the questions at that point for -- since I faxed Exhibit 50, you had those questions since September 10th -- actually they were faxed on September 4th.  This is the hard copy you received on September 10th.  You had them at that point for two weeks.  Why didn't you send them to Akhavan when you received them?

MS. PUBLICOVER: Objection: Calls for speculation.

THE WITNESS: I don't recall.

BY MR. ROSATI:

**Q. Did you realize that Mr. Hall is starving?**

MS. PUBLICOVER: Objection: Argumentative, assumes facts not in evidence.

BY MR. ROSATI:

**Q. Well, he commented about his need to other people, not to you, but it's in the file. He needed a decision, do you understand that?**

**A. Yes.**

**Q. So on 9-21, you and I had a conversation. I advised you that Mr. Hall needs his decision, and you advised me that, "would have this for him within the next week," correct?**

**A. Correct, that was my goal.**

**Q. Why wasn't there a decision within the next week?**

MS. PUBLICOVER: Objection to the extent it calls for speculation.

THE WITNESS: I don't recall other than we were working on it.

BY MR. ROSATI:

**Q. Who was working on it?**

**A. I was, I'm sorry.**
**Q. Anybody else working on it?**
**A. No.**
MS. PUBLICOVER: Other than what she's already testified to?
THE WITNESS: My senior would have reviewed it.
BY MR. ROSATI:
**Q. Did you get any notes from your senior?**
**A. Not that I recall.**
**Q. Which senior reviewed it?**
**A. I believe it was Cheryl.**
**Q. Did she make any recommendations?**
**A. Not that I recall.**
**Q. At any point, did you recommend granting the appeal?**
**A. Based on the information in the file, no.**
**Q. To your recollection, did you ever recommend granting the appeal?**
MS. PUBLICOVER: You mean overturning the appeal?
BY MR. ROSATI:
**Q. Overturning the decision to determinate benefits and granting the appeal?**
**A. At any point did I?**

**Q. Yes.**

MS. PUBLICOVER: Objection: Overbroad.

THE WITNESS: Everything is a possibility until we get all the information in.

BY MR. ROSATI:

**Q. That's not what I asked. At any point did you decide or recommend that the appeal be granted and the benefits be reinstated?**

**A. Not that I recall.**

**Q. At any point did any of your seniors recommend that the appeal be granted and benefits be reinstated?**

**A. Not that I recall.**

**Q. Obviously Theresa Henderson worked on this file. What did she do with reference to the file?**

MS. PUBLICOVER: Objection to the extent it calls for speculation. To the extent you know.

THE WITNESS: To what I know, when she was going to assist in writing the letter, but once we saw that it was California, we sent the letter out with the peer report to you. That was her extent.

BY MR. ROSATI:

**Q. Okay. Back to Exhibit 9. The next entry that I see is October 4th, 2012. "Inbound call from Attorney Rosati. Left voicemail requesting status." And that you called and got a voicemail and left a message. "Currently working on the file and will have shortly." Is that correct?**

**A. That's correct.**

**Q. Can you look at Exhibit 51.**

**A. Yes.**

**Q. This is a letter from me to you asking for a status on the appeal?**

**A. Correct.**

**Q. Is there a reason why it took so long to get this appeal decided?**

MS. PUBLICOVER: Objection: Asked and answered.

BY MR. ROSATI:

**Q. We're now in October?**

**A. I was reviewing the file. Getting the letter ready.**

**Q. The next thing that I see is Exhibit 53 -- no, 52. Can you take a look at Exhibit 52?**

**A. Yes.**

**Q. This is another follow-up?**

**A. Correct.**

**Q. From me to you asking for the status of the appeal?**

**A. Correct.**

**Q. And there is an entry on Exhibit 9, Page 2, 10-17-12, received fax cover page and nothing more. Received letter requesting status. "Currently working on letter and will forward once completed." Once again, why did it take so long to finish it?**

MS. PUBLICOVER: Asked and answered. Other than what she's already testified to?

BY MR. ROSATI:

**Q. Uh-huh, yes.**

**A. Reviewing the file. Getting the letter ready and it went to my senior to review.**

**Q. Is there any documentation in the file that the letter went to your senior for review, or is that normally not documented?**

**A. It's on the 10-19 entry.**

**Q. Okay.**

**A. Other than there, no, it's generally not documented.**

**Q. Reviewed by CIG prior to sending it out.**

**Okay. And then you sent a denial letter which we pretty much talked about. The denial letter asserts on Page 2, this is Exhibit 53. "We referred your client's entire file to an independent physician consultant for review. Dr. Mehras Akhavan who is California board certified in physical medicine and rehabilitation and pain management completed the review." And that's our Exhibit 44.**

**Is there a reason why the denial letter doesn't address my critique that Dr. Akhavan's review was fraudulent and in bad faith?**

MS. PUBLICOVER: Objection: Calls for speculation, vague.

THE WITNESS: Not that -- no.

BY MR. ROSATI:

**Q. I have noted that there was no discussion of the side affects of medications or pain or fatigue as disabling conditions. Dr. Akhavan's report, Exhibit 44, does discuss quote, "The restrictions and limitations placed upon the claimant's work capacities or capabilities are mainly based on the claimant's self-reported complaints." Does Lincoln disregard self-reported complaints of pain and fatigue?**

**A. No, we take them into consideration.**

**Q. How does a doctor in your understanding evaluate a patient's pain and fatigue without considering the patient's self-reports?**

MS. PUBLICOVER: Objection: Assumes facts not in evidence, vague and ambiguous, lacks foundation, calls for speculation.

She's already testified that she does not have any knowledge as to how the -- she doesn't have the technical expertise.

BY MR. ROSATI:

**Q. If you have no knowledge of the technical expertise, what was the point of you reviewing the medical records?**

**A. To have an understanding of what's in the file.**

**Q. What was the point of referring the medical records to Dr. Akhavan?**

MS. PUBLICOVER: Asked and answered.

She already testified to evaluate the medical records.

BY MR. ROSATI:

**Q. Okay. After the appeal was denied, did you have any other involvement in the case?**

**A. I don't believe so.**

**Q. There is a reference that there was a**


Exhibit 8 Page 183 of 192

**second appeal that was assigned to Theresa Henderson?**

**A. Correct.**

**Q. Did you have any involvement in that?**

**A. No.**

**Q. There is a reference on Exhibit 9 that, "On October 30th, 2012, file not in appeals, CO, emailed LZK for assistance." Do you know what that means?**

**A. It means our file clerk asked me if I had a copy of the file.**

**Q. I thought Lincoln had computer files at this point? Was there a paper file?**

**A. There was a short-term disability file.**

**Q. Was that the only part of the file that was missing? Is that what this is referring to?**

**A. I believe so.**

**Q. And then there are actually two more references regarding status of claim file, so those references to the missing claim file refer to the portion of the file that wasn't on a computerized file?**

**A. Correct.**

**Q. Okay. You had the authority to make the final decision as to Mr. Hall's appeal?**

**A. Yes.**

**Q. And you made that decision?**

**A. Yes.**

**Q. And the only person that reviewed that decision before you sent it out was your senior, CIG, I don't remember her name, Geary?**

MS. PUBLICOVER: Objection: Misstates the testimony.

She said the person that reviewed the letter.

BY MR. ROSATI:

**Q. The letter.**

**Did anybody else participate in rendering the decision other than the person who approved your letter?**

**A. Not that I'm aware of, no.**

**Q. Did anyone ever suggest to you that your decision should be changed?**

MS. PUBLICOVER: Asked and answered.

THE WITNESS: No.

BY MR. ROSATI:

**Q. Are all the reasons for your decisions set forth in your appeal letter, Exhibit 53?**

MS. PUBLICOVER: Objection: Overbroad, argumentive, vague and ambiguous.

BY MR. ROSATI:
**Q. Do you understand the question?**
**A. I believe -- could you re-ask just so I'm clear.**
**Q. Are all the reasons set forth in your decisions set forth in Exhibit 53?**
MS. PUBLICOVER: Same objections.
THE WITNESS: I believe so.
BY MR. ROSATI:
**Q. Have you told me about all the facts you relied upon? There is nothing else that's not in the claim file or in the correspondence that you relied upon in making your decision?**
MS. PUBLICOVER: Objection: Vague, overbroad.
Her own personal background, experience, training.
BY MR. ROSATI:
**Q. Anything else that's not referenced in the file?**
MS. PUBLICOVER: Objection: Overbroad.
THE WITNESS: Not that I'm aware of.
BY MR. ROSATI:
**Q. Are you aware of any facts not consistent**

**with your opinion?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: Not that I'm aware of.

BY MR. ROSATI:

**Q. Have you ever been criticized for your work on Mr. Hall's claim?**

**A. No, not that I'm aware of.**

**Q. Have you ever been disciplined for your work on Mr. Hall's claim?**

**A. No.**

**Q. Did you do anything different since you completed your work on Mr. Hall's appeal?**

MS. PUBLICOVER: Objection: Vague, overbroad.

THE WITNESS: Not that I can recall.

BY MR. ROSATI:

**Q. Did you do anything on Mr. Hall's appeal that you would change now if you had the chance?**

MS. PUBLICOVER: Objection: Overbroad, calls for speculation. You can answer.

THE WITNESS: I'm not really sure.

BY MR. ROSATI:

**Q. Well, do you ever -- does Lincoln ever do what the doctors call a postmortem on a claim?**

MS. PUBLICOVER: Objection: Vague.

THE WITNESS: With me, not that I'm aware of, no.

BY MR. ROSATI:

**Q. Was there ever a quality review of Mr. Hall's appeal decision?**

**A. I don't recall.**

**Q. If you had the chance to do it over, would you do something different with reference to Mr. Hall's appeal?**

MS. PUBLICOVER: Calls for speculation.

THE WITNESS: There may be. I don't know.

BY MR. ROSATI:

**Q. If you had the chance to do it over, would you change the ultimate decision on Mr. Hall's appeal?**

**A. No.**

MR. ROSATI: And I'm done.

MS. PUBLICOVER: No questions.

Read and sign.

I think for my own personal I would like a condensed.

MR. ROSATI: I would like a regular and condensed.

MS. PUBLICOVER: Disk of exhibits.

MR. ROSATI: Disk is fine.

(11:55 a.m. - Adjournment.)

C E R T I F I C A T E

STATE OF NEBRASKA )
) ss.
COUNTY OF DOUGLAS )

I, Dena J. Schweitzer, General Notary Public within and for the State of Nebraska, do hereby certify that the foregoing testimony of Lisa Kurtz was taken by me in shorthand and thereafter reduced to typewriting by use of Computer-Aided Transcription, and the foregoing one hundred and eighty-nine (189) pages contain a full, true and correct transcription of all the testimony of said witness, to the best of my ability;

That I am not a kin or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

IN WITNESS WHEREOF, I hereunto affix my signature and seal this 25th day of April, 2013.

________________________________

DENA J. SCHWEITZER
GENERAL NOTARY PUBLIC

My Commission Expires:

April ____, 2013
Lisa Kurtz
o/o Ms. Adrienne C. Publicover
525 Market Street, 17th Floor
San Francisco, CA 94105

Dear Ms. Kurtz:

You have elected to read and sign your deposition taken on April 12, 2013.

Enclosed please find a transcribed, condensed copy of your deposition and separate correction page. THIS IS A VALUABLE DOCUMENT, so please take a few minutes at this time to do the following:

1. Read your deposition thoroughly. Photocopying or other reproduction of this document without the express consent of Thomas & Thomas Court Reporters is strictly prohibited.

2. Make corrections only on the enclosed, separate correction page entitled "AMENDMENT TO DEPOSITION." Do not make corrections on the condensed transcript.

3. Sign in the spot indicated as "WITNESS" on the page entitled "AMENDMENT TO DEPOSITION" and have that page notarized by a duly licensed Nebraska Notary Public.

4. Please return the separate correction page with or without corrections within 30 days to the Office of Thomas & Thomas Court Reporters, 1321 Jones Street, Omaha, Nebraska 68102. Failure to read, sign, and return your requested changes within 30 days to the above address may result in the acceptance of the original deposition without signature, pursuant to NEB. CT. R. DISC º 6-330(e).

Sincerely,

______________________________

DENA SCHWEITZER
GENERAL NOTARY PUBLIC

Copies to:
Mr. Rosati
Ms. Publicover

AMENDMENT TO DEPOSITION

I, Lisa Kurtz, wish to make the following changes in the testimony as originally given:

PAGE LINE SHOULD READ REASON

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

____ ____ ______________________ ___________________

________________________________

WITNESS SIGNATURE

IN WITNESS WHEREOF, I hereunto affix my signature and seal the ____ day of __________, 2013.

________________________________

GENERAL NOTARY PUBLIC

My Commission Expires: